PICCARRETA DAVIS KEENAN FIDEL PC
2 East Congress Street, Suite 1000
Tucson, AZ 85701
(520) 622-6900
Michael L. Piccarreta
State Bar No. 003962
Email: mlp@pd-law.com
Attorney for Defendant Andrew Padilla

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-00422-06-PHX-SPL |
| Plaintiff, | DEFENDANTS' JOINT STATUS REPORT |
| vs. | |
| 6. Andrew Padilla,<br>   (Counts 1-51) | |
| Defendant. | |

Defendants, by and through their attorneys undersigned, hereby submit their Status

Report for the hearing scheduled for January 25, 2019.

RESPECTFULLY SUBMITTED this 18th day of January, 2019.

**PICCARRETA DAVIS KEENAN FIDEL PC**
/s/ Michael Piccarreta
Attorney for Andrew Padilla

**FEDER LAW OFFICE, PA**
/s/ Bruce Feder
Attorney for Scott Spear

**LIPSITZ GREEN SCIME CAMBRIA, LLP**
/s/ Paul Cambria
Attorney for Michael Lacey

**BIENERT MILLER & KATZMAN, PLC**
/s/ Thomas Bienert, Jr.
Attorney for James Larkin

**BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW PC**
/s/ Gary Lincenberg
Attorney for Jed Brunst

**KIMERER & DERRICK, PC**
/s/ Michael Kimerer
Attorney for Jed Brunst

**KARP & WEISS, PC**
/s/ Stephen Weiss
Attorney for Joye Vaught

EXHIBIT A

# DEFENDANTS' JOINT STATUS REPORT

## I.    INTRODUCTION

The Defendants have requested a status conference because the Government's actions since the beginning of the case have created constant interference with the Defendants' ability to defend this case. Virtually all of the Defendants' assets have been seized, virtually all of the money in their attorneys' trust accounts designated to fund the defense has been been seized or is effectively frozen, and the Defendants are currently litigating those issues in the Central District of California and the Ninth Circuit Court of Appeals so they can continue to fund their defense. The Defendants therefore respectfully request that the Court continue Defendants' upcoming deadlines for a period of **four** (4) **months** to allow time for the Ninth Circuit and Central District of California to address Defendants' pending challenges to the Government's seizures and determine whether Defendants will be able to continue to exercise their right to counsel of choice. Defendants further request that the Court set another status hearing approximately four months from now.

Virtually all of the Defendants are without funds to pay for their defense. The Government seized nearly all their funds in overbroad and constitutionally deficient civil seizures executed at the outset of this case and in the ensuing months. Defendants have challenged those seizures as improper in the Central District of California, but, due to the Government's tactics, Defendants' objections to the seizures have not yet been heard. These issues currently are on appeal before the Ninth Circuit Court of Appeals.

EXHIBIT A

The Government began seizing Defendants' assets and the assets of Backpage and other companies in April of 2018. The Government assured counsel for two defendants at that time that the Government was not seeking attorney trust funds. The Government first mentioned its "concerns" about funds for Mr. Padilla's representation in May of 2018, and Mr. Padilla's counsel provided a detailed response, setting forth reasons they and Mr. Padilla believed the funds were not tainted and could not be subject to seizure or forfeiture (*see* Doc. 360). The Government did not raise the matter again with Mr. Padilla's counsel until, after months of vigorous litigation, the Court issued numerous rulings in mid-October 2018, including denying the Government's attempt to disqualify the Davis Wright Tremaine firm. The Government obtained seizure warrants for the retainers shortly thereafter on October 31, 2018.

Defendants also challenged the propriety of the seizure warrants for the attorney trust funds, first in this Court and then in the District Court for the Central District of California. Although the warrants expired, the Government obtained the bulk of the funds in these trust accounts under the threat of execution of the warrants. Despite Defendants' challenges to the seizures, the Government has refused to return the funds. The Government has informed counsel for Defendants Padilla and Vaught that the trust funds they hold cannot be used to pay any fees earned after November 2018. (*See* Exhibit 1, attached hereto). The Government also has represented that it likely will seek to seize any funds remaining in the trust accounts, and that Defense Counsel may expose themselves to criminal liability if they use those funds to pay fees earned after November 2018. Thus, the Government has engaged in a pattern of

EXHIBIT A

escalation resulting in the inability to use funds in attorney trust accounts. Challenges to these seizure warrants are currently in front of Magistrate Judge Rozella A. Oliver in California.

Additionally, the Government has produced over two terabytes of data to Defendants -- which likely translates to 10,000,000 to 22,000,000 documents.[1] For some perspective, two terabytes of data is the equivalent of 2,000 pickup truck loads of paper documents.[2] Due to the Government's seizures, Defendants cannot pay the costs of reviewing these documents -- which would include paying a third-party vendor to process and host these documents and

---

[1] To date, the Government has produced over 2.2 terabytes (2,200 gigabytes) of data to Defendants. Although it is not possible to directly translate terabytes or gigabytes to a number of documents, the range typically is 5,000 documents per gigabyte to 25,000 documents per gigabyte -- with 10,000 documents per gigabyte being the accepted norm. David Degnan, Accounting for the Costs of Electronic Discovery, *Minnesota Journal of Law, Science & Technology*, 2011, Vol. 12:1, p. 163. Using the 10,000 documents per gigabyte norm, and 2,200 gigabytes of data, the Government's production can be presumed to include roughly 22,000,000 documents. Even using the lowest figure in the range, 5,000 documents per gigabyte, the production likely includes at least 11,000,000 documents.

[2] *Degnan*, p. 160 and fn. 67 ("1 gigabyte of data is equivalent to about 75,000 pages of documents, which would fill a pickup truck.").

EXHIBIT A

then paying lawyers to review them.[3]

As a result of the Government's actions, Defendants have been deprived of resources necessary to defend the case and have had to expend time and resources litigating the Government's actions, while continuing their best efforts to prepare for trial and comply with their upcoming obligations in this case. Therefore, Defendants respectfully request that the

---

[3] For Defendants to review these documents, there are two main costs: 1) the costs for a litigation support vendor to load, process, and host the documents on an electronic review platform like Relativity; and 2) the costs for personnel to review the documents. The costs for a litigation support vendor to load and cull data, with related costs, is typically in the range of $750 to $1,800 per gigabyte, with an industry average of about $1,000 per gigabyte. Degnan, p. 165. For 2,200 gigabytes, that would translate to $2,200,000. (This data processing cost would be incurred *in addition to* the cost for attorneys to review the data.)

For the review of documents, the standard assumption is that a reviewer can review 400 documents per day (allowing just over one minute to review each document, with eight hours of review each day). *Degnan*, p. 165. Even if Defendants could cull ½ the documents before review, by eliminating duplicates and obvious irrelevant documents with electronic tools, they would need to review 5,250,000 to 11,000,000 documents. To review that volume of documents across one year would require Defendants to engage 55 outsourced review lawyers on a full-time basis (400 documents per day x 55 lawyers x 5 days/week x 48 weeks/year = ~5,250,000 documents)) or 115 review lawyers (for 11,000,000 documents). Assuming an hourly rate for review lawyers at $40 per hour (the low end of the range for domestic reviewers, Degnan, p. 164), the cost for that initial review would be in the range of $4,576,000 to $9,568,000. Due to the Government's seizure of assets, even a reduced review cannot be undertaken. These figures do not include the cost of the defense team reviewing the documents identified by the review team as being pertinent to the Government's case or to the Defense. (And, if the number of documents per gigabyte turns out to be at the high end of the range, or if culling the documents removes less than ½ the documents, these rough estimates might understate the cost by a factor of two to ten.)

Moreover, Defendants believe the 2.2 terabyte figure, and hence the review costs, will grow significantly over time, as the Government has produced little or none of what it has seized from Backpage.com, LLC last year -- likely many tens of millions of electronic records. The 2.2 terabyte figure also does not include a similarly enormous number of documents that the Government's "partners" in California seized and are in the process of producing to Defendants.

EXHIBIT A

Court continue Defendants' upcoming deadlines for a period of four months, to allow time for the Ninth Circuit and the Central District of California to address Defendants' pending challenges and determine whether Defendants will be able to keep their counsel of choice.

## II.   PROCEDURAL HISTORY

### 1.   The Government's Initial Seizures of Defendants' Assets

Commencing in April 2018, the Government seized, or otherwise caused to be frozen, millions of dollars of Defendants' money and other assets. (*See* Doc. 360.) In early August, Defendants challenged the constitutionality of those seizures in the District Court for the Central District of California, which is the district that authorized the civil seizure warrants used to seize those assets, under the First, Fourth, Fifth, and Sixth Amendments, as well as on *Franks* grounds. (See Mot. to Vacate (Doc. 6), 18-CV-06742.)

With respect to their First Amendment challenge, Defendants argued that the government's pursuit of the seizure of assets that constitute the proceeds of publishing activity before trial and a conviction through *ex parte* seizure warrants violated the First Amendment, pointing to *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989), and *Adult Video Ass'n v. Barr*, 960 F.2d 781(9th Cir. 1992) (readopted in *Adult Video Ass'n v. Reno*, 41 F.3d 503 (9th Cir. 1994)). Based on well-settled Supreme Court and Ninth Circuit authority, the Defendants believe that their efforts in the matter that is now pending before the Ninth Circuit will be successful.

In *Fort Wayne Books*, the Supreme Court reaffirmed that "rigorous procedural safeguards must be employed before expressive materials can be seized." 489 U.S. at 62.

EXHIBIT A

1   The Court outlined the "special rules" that must be followed to render a pretrial seizure of

2   expressive materials acceptable. First, the establishment of "mere probable cause to believe

3   a legal violation has transpired is not adequate" to permit the pretrial seizure of expressive

4   materials. *Id*. at 66. Second, the government cannot achieve the pretrial restraint of

5   expressive materials through *ex parte* seizure warrants. Instead, the government must

6   establish the "claimed justification for seizing" expressive materials "in an adversary

7   hearing." *Id*. at 67. As a result, even though the materials that were seized prior to trial and

8   without an adversary hearing might, ultimately, be forfeitable upon conviction, the Court

9   explained that "the seizure at issue . . . [was] unconstitutional." *Id*. at 65.

10

11       Years later the Ninth Circuit recognized these same principles in *Barr*. In discussing

12   the pretrial seizure of expressive materials that had occurred in *Fort Wayne Books* and the

13   case pending before it, the Ninth explained that "[t]he First Amendment will not tolerate such

14   seizures until the government's reasons for seizure weather the crucible of an adversary

15   hearing." *Barr*, 960 F.2d at 788.

16

17       Further, even though *Fort Wayne Books* and *Barr* dealt directly with expressive

18   materials, it is well-settled that the profits or proceeds of participation in protected expression

19   are subject to the same "special rules" concerning pretrial forfeiture as are expressive

20   materials. In S*imon & Schuster, Inc. v. Members of the New York State Crime Victims Bd*.,

21   502 U.S. 105 (1991), the Court invalidated a law that "impose[d] a financial burden on

22   speakers because of the content of their speech" as "presumptively inconsistent with the First

23   Amendment." *Id*. at 115. The profits or proceeds that flow from participation in protected

24

25

26

27

28

8

1  expression are part and parcel of protected expression. *See United States v. Nat'l Treasury*

2  *Emps. Union*, 513 U.S. 454, 468-69 (1995) (recognizing that a statute that banned federal

3  employees from accepting compensation for making speeches or writing articles "chills

4  potential speech before it happens" because the "prohibition on compensation

5  unquestionably imposes a significant burden on expressive activity"); *American Library*

6  *Ass'n v. Thornburgh*, 713 F. Supp. 469, 484 n. 19 (D.D.C. 1989) (recognizing that the "pre-

7  trial seizure of non-expressive material [including printing presses, bank accounts, etc.] *ex*

8  *parte* from a business engaged in expressive material also is unconstitutional"), *rev'd on*

9  *standing grounds sub nom. American Library Ass'n v. Barr*, 956 F.2d 1178, 1194-96 (D.C.

10  Cir. 1992); *see also Citizens United v. F.E.C.*, 558 U.S. 310, 336-37 (2010) (explaining that

11  law suppressing speech "may operate at different points in the speech process," including by

12  "imposing a burden by impounding proceeds on receipts or royalties"); *United States v.*

13  *Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) (recognizing that reducing the

14  profitability of a business can infringe the First Amendment because "[t]he distinction

15  between laws burdening and laws banning speech is but a matter of degree").

16         Indeed, the Department of Justice, too, knows that the proceeds of participation in

17  protected expression are entitled to full First Amendment protection. In the wake of *Simon*

18  *& Schuster*, the Department of Justice amended its Criminal Resource Manual explaining

19  that special forfeiture statutes that had allowed the government to seek forfeiture of "proceeds

20  received or to be received by criminals convicted of violent crimes from sales of the literary

21  rights to their stories about their crimes" should not be enforced "because there is little doubt,

9

if any, that they are inconsistent with the First Amendment." U.S. D.O.J. Criminal Resource Manual § 1104 (quotations omitted).

Critically, numerous courts have recognized that the publication of classified advertisements, even advertisements for adult services, are protected expression. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (recognizing that Backpage's publication of classified advertisements constituted protected expression); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1280-82 (W.D. Wash. 2012) (invalidating state law targeting Backpage and holding that the advertisements posted on the website are constitutionally protected speech); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *8 (D.N.J. Aug. 20, 2013) (same regarding a different state law).

In response to Defendants' challenges to the seizures, the Government employed a variety of procedural tactics to avoid having any court hear Defendants' challenges. First, by way of an *ex parte* submission, the Government asserted that these issues should be addressed before this Court, not in the Central District of California. Then, while motions related to the seized assets were pending both in this Court and in the Central District of California, the Government filed dozens of civil forfeiture complaints in the Central District of California and moved *ex parte* for a stay of all civil forfeiture proceedings (including the motion pending in California), pending resolution of the criminal case. The Honorable R. Gary Klausner (U.S.D.J., C.D.C.A.) granted that motion. The stay order and the constitutionally infirm civil seizures are currently on appeal before the Ninth Circuit. Defendants do not anticipate that the Ninth Circuit will issue a decision on the appeal any

EXHIBIT A

earlier than April 2019. As set forth in greater detail below, Defendants' inability to obtain a prompt adversary hearing on the Government's seizures has impacted this case.

**2.      The Government's Seizures of Funds Contained in Attorney Trust Accounts**

The Government's recent seizure of funds contained in attorney trust accounts has seriously and adversely impacted Defense Counsel's ability to prepare for trial and comply with the upcoming deadlines in this case. Defendants initially raised the validity of these seizures with this Court. Although the Government previously took the position in front of Judge Klausner that any issues pertaining to its seizures should be heard by this Court, the Government asserted the contrary position before this Court -- that the attorney trust account seizures should be dealt with by the District Court for the Central District of California, the court that issued the warrants. This Court agreed with the Government and denied the Motion. (Doc. 393).

Defendants, and counsel for other interested parties whose fees were also the subject of seizure warrants, then filed an Application and Motion to (1) Stay Execution of Seizure Warrants; and (2) Provide Notice to the Court of First Amendment and *Franks* Violations on November 21, 2018, in the Central District of California. The Government's primary response was that these seizure warrants had expired, and therefore Defendants' arguments were moot. This was despite the fact that the Government had obtained the bulk of the funds in the trust accounts under the threat of the impending seizures. The Government also indicated the likelihood the seizure warrants for any remaining retainers would be reissued. Moreover, the Government has refused to agree that Defense Counsel may draw upon any

11

EXHIBIT A

funds remaining in their attorney trust accounts to cover their clients' fees for any services rendered after November 2018, despite Defendants' pending motion to stay those seizures. On December 12, 2018, a hearing was held before Judge Oliver.[4] Following this hearing, Judge Oliver ordered the parties to submit further briefing. Defendants' motion now is fully briefed and the parties are awaiting a ruling from Judge Oliver.

## III. PROPOSED SUBJECTS OF DISCUSSION AT THE STATUS CONFERENCE

Without a current ability to access adequate funds to pay for their defenses, Defendants cannot meaningfully comply with their upcoming discovery obligations, including reciprocal Rule 16 discovery and expert disclosures, which are due on March 4 and March 14, 2019, respectively. The Government's actions have effectively precluded Defendants from continuing to pay for their counsel of choice, who have represented them since (and sometimes before) the indictment was issued.

Under these circumstances, it is exceedingly difficult for the Defendants to continue to prepare for trial and comply with their upcoming discovery obligations. Defense Counsel

---

[4] During the December 12 hearing, in response to a question from Judge Oliver regarding the Government's "de facto" seizures of the remaining funds contained in the attorney trust accounts, counsel for the Government stated that the use of these funds to pay for the costs of the defense might be viewed by the Government "as being criminal activity prospectively." This implied threat has precluded most of Defendants from funding their defense by using retainer money that the Government may seek to seize (again) at some point in the future. Notably, the Government's efforts to deprive Defendants of access to trust funds deposited to fund their defenses stands in stark contrast to the position the Government has taken on the trust funds held by the defense counsel for cooperators Ferrer and Hyer, as it has permitted the cooperators' counsel to freely expend similarly-sourced funds in their trust accounts.

EXHIBIT A

cannot retain experts, who will require retainers and some assurance that their fees will be paid. It is highly unlikely that any expert would agree to provide services under the circumstances. Defense Counsel also have been unable to make any meaningful review of the documents produced by the Government.

Defendants therefore request that the Court continue their upcoming obligations under the current Scheduling Order for **four (4) months**, to allow time for the Ninth Circuit Court of Appeals and the District Court for the Central District of California to address Defendants' pending challenges to the Government's seizures. Defendants further request that the Court set another status hearing approximately four months from now.[5] Depending on the timing and substance of the decisions of the Ninth Circuit Court of Appeals and the District Court for the Central District of California, Defendants may need to seek other relief from this Court.

---

[5] By seeking to extend certain upcoming deadlines, Defendants are not asking the Court to defer ruling on any pending motions, including, but not limited to, Defendant Lacey's pending Motion for Release of Funds (Doc. 385). Lacey's motion concerns funds that are unrelated to Backpage -- funds originating with Voice Media Group, Inc. and paid in connection with its purchase of *The Village Voice* and other print newspapers in 2013. Release of these approximately $1.1 million in funds would enable Lacey's counsel to continue to pursue his client's interests in this matter.

EXHIBIT A

DATED this 18th day of January, 2019.

**PICCARRETA DAVIS KEENAN FIDEL PC**
/s/ Michael Piccarreta
Attorney for Andrew Padilla

**FEDER LAW OFFICE, PA**
/s/ Bruce Feder
Attorney for Scott Spear

**LIPSITZ GREEN SCIME CAMBRIA, LLP**
/s/ Paul Cambria
Attorney for Michael Lacey

**BIENERT MILLER & KATZMAN, PLC**
/s/ Thomas Bienert, Jr.
Attorney for James Larkin

**BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW PC**
/s/ Gary Lincenberg
Attorney for Jed Brunst

**KIMERER & DERRICK, PC**
/s/ Michael Kimerer
Attorney for Jed Brunst

**KARP & WEISS, PC**
/s/ Stephen Weiss
Attorney for Joye Vaught

14

EXHIBIT A

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I hereby certify that on the 18th day of January, 2019, I electronically
transmitted the foregoing to the Clerk of the Court via the CM/ECF system for
4    filing and transmittal of a Notice of Electronic Filing to the following CM/ECF
registrants:
5

6

**Kevin Rapp:**  Kevin.Rapp@usdoj.gov
7    **Andrew Stone:**  Andrew.Stone@usdoj.gov
**Margaret Perlmeter:**  Margaret.Perlmeter@usdoj.gov
8    **John Kucera:**  John.Kucera@usdoj.gov
**Reginald Jones:**  Reginald.Jones@usdoj.gov
9    **Peter S. Kozinets:**  Peter.Kozinets@usdoj.gov
**Amanda Wick:** Amanda.Wick@usdoj.gov
10   *Attorneys for the United States*
11

12   **Paul Cambria:**  pcambira@lglaw.com
**James Grant:**  jimgrant@dwt.com
13   **Erin McCampbell:**  emccampbell@lglaw.com
**Robert Corn-Revere:** bobcornrevere@dwt.com
14   **Ronald London:**  ronnielondon@dwt.com
**Janey Henze Cook:**  janey@henzecookemurphy.com
15   **John Littrell:**  jlittrell@bmkattorneys.com
**Kenneth Miller:**  kmiller@bmkattorneys.com
16   **Whitney Bernstein:** wbernstein@bmkattorneys.com
**Michael Piccarreta:** mlp@pd-law.com
17   **Stephen M. Weiss:**  sweiss@karpweiss.com
**Michael Kimerer:**  mdk@kimerer.com
18   **Tom Bienert:**  tbienert@bmkattorneys.com
**Gary Lincenberg:**  gsl@birdmarella.com
19   **Ariel Neuman:**  aneuman@birdmarella.com
**KC Maxwell:**  kcm@kcmaxlaw.com
20   **David Wakukawa:** dsw@kcmaxlaw.com
**Tom Henze:** Tom@henzecookemurphy.com
21   *Attorneys for the Defense*
22

23

24

25   *By: /s/* Melissa Hahn                 
26

27

28

# EXHIBIT 1

## Barbara Polowetz

| | |
|---|---|
| **From:** | Michael Piccarreta |
| **Sent:** | Saturday, January 5, 2019 9:45 AM |
| **To:** | Barbara Polowetz |
| **Cc:** | Jefferson Keenan |
| **Subject:** | Fwd: Padilla: November redacted billings |

**From:** "Wick, Amanda (CRM)" <Amanda.Wick@usdoj.gov>
**Date:** January 4, 2019 at 11:18:51 PM MST
**To:** Michael Piccarreta <mlp@pd-law.com>
**Cc:** "sweiss@karpweiss.com" <sweiss@karpweiss.com>
**Subject: RE: Padilla: November redacted billings**

Mike, apologies for not responding to your email sooner. I was traveling for the last few weeks and had eye surgery, and am just catching up on correspondence that came in while I was out.

I do not remember you conditioning production of your invoices on who reviewed them, because had you raised it prior to producing the invoices, I would have told you the government would not agree to this. MLARS is assisting the prosecution team with the IOLTA funds issue, and some other related forfeiture issues. We are all criminal prosecutors and all part of the "criminal prosecution" team, in that sense. However, as recent additions to the team, our knowledge of the case and its history is limited, and there was no way we could do any kind of substantive due diligence review of the bills without consulting other attorneys on the team. However, the promise I *did* make to you – that the invoices you provided would be used solely for our due diligence review, no matter who reviewed them – does still stand.

Also, there is no need to send invoices beyond November 2018 at this point in time. During the execution of the seizure warrants, the government stated it would not be seizing earned fees up through the date of seizure, and asked for bills through the end of November. Subsequently, litigation ensued and that matter is still pending resolution. Please do not move any funds from any Backpage entities that were for fees earned after November 2018. Those funds should remain in your IOLTA account until the litigation is resolved.

If you have any additional questions or requests, please let me know.

Thanks,

**Amanda Schlager Wick**
Trial Attorney, Asset Forfeiture & Money Laundering Unit
Money Laundering & Asset Recovery Section (MLARS)
1400 New York Ave. NW, 10th Floor
U.S. Dept. of Justice, Washington, D.C. 20004
(202) 514-2842
(202) 597-0435 (cell)
(202) 514-5522 (fax)

EXHIBIT A

**CONFIDENTIALITY NOTICE**: This communication with its contents and attachments, if any, may contain confidential, law enforcement sensitive, privileged attorney/client communications or work products, and is not subject to disclosure. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited. If you believe that you have received this communication in error, please notify the sender immediately and permanently delete the email, any attachments, and all copies from your computer.

**From:** Barbara Polowetz [mailto:bpolowetz@pd-law.com]
**Sent:** Monday, December 10, 2018 11:47 AM
**To:** Wick, Amanda (CRM) <Amanda.Wick@CRM.USDOJ.GOV>
**Cc:** Michael Piccarreta <mlp@pd-law.com>; sweiss@karpweiss.com
**Subject:** RE: Padilla: November redacted billings

Amanda,

In my initial packet of invoices, I requested that the invoices not be shared with attorneys working on the criminal prosecution and I would request the same for the packet I sent to you on December 7. I understand that the government needs to review these for the purpose of doing due diligence but by providing the past invoices and this recent invoice, we would request that they not be disseminated other than to personnel needed to complete this due diligence task. Best wishes.

Mike Piccarreta

**From:** Barbara Polowetz
**Sent:** Friday, December 7, 2018 10:38 AM
**To:** 'Amanda.Wick@usdoj.gov' <Amanda.Wick@usdoj.gov>
**Cc:** Michael Piccarreta <mlp@pd-law.com>
**Subject:** Padilla: November redacted billings

Amanda,

I previously sent you billings in the format that we use when we send billings to third party payors. The billings are in those formats as when the corporation or some other third party is paying the bill, we err on the side of caution by not disclosing the details of any work performed on behalf of the client. We were advised today that the government needs slightly more detail but without releasing any privileged information in order to do its due diligence in order to approve the November withdrawal from the IOLTA trust account. Accordingly, I have attached a copy of the redacted client billing which is the same billing, minus redactions of course, that is sent to the client. Based on our conversation, I am assuming this redacted version is similar to some of the billings that you have received from other law firms.

EXHIBIT A

I would request that the government review this redacted billing as soon as possible and authorize us to receive payment from the IOLTA trust account for earned fees in the month of November.

Feel free to give me a call if you have any questions. Best wishes.

Mike Piccarreta

Barbara Polowetz, Legal Assistant
PICCARRETA DAVIS KEENAN FIDEL PC
2 East Congress Street, Ste 1000, Tucson, AZ 85701
t 520.622.6900, ext. 137 | f 520-622-0521 | www.pd-law.com

EXHIBIT A

1  ELIZABETH A. STRANGE
   First Assistant United States Attorney
2  District of Arizona

3  KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
   MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
4  PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
   ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
5  JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
   Assistant U.S. Attorneys
6  40 N. Central Avenue, Suite 1800
   Phoenix, Arizona 85004-4408
7  Telephone (602) 514-7500

8  BRIAN BENCZKOWSKI
   Assistant Attorney General
9  Criminal Division, U.S. Department of Justice

10 REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
   Senior Trial Attorney, U.S. Department of Justice
11 Child Exploitation and Obscenity Section
   950 Pennsylvania Ave N.W., Room 2116
12 Washington, D.C. 20530
   Telephone (202) 616-2807
13 Attorneys for Plaintiff

14                 IN THE UNITED STATES DISTRICT COURT

15                    FOR THE DISTRICT OF ARIZONA

16

17 United States of America,              CR-18-422-PHX-SPL (BSB)

18            Plaintiff,              **UNITED STATES' STATUS
                                         MEMORANDUM**
19       v.
                                      **[Status Conference set for
20                                      Jan. 25, 2019, 9:30 a.m.]**
   Michael Lacey, et al.,
21
             Defendants.
22

23

24 **I.      Introduction**

25        On April 26, 2018, the government and Defendants submitted a Joint Proposed Case

26 Management Order to the Court setting forth a number of discovery and disclosure

27 deadlines.  CR 121.  On May 2, 2018, the court adopted the proposed order with the

28 exception of granting Defendants' request to move the trial date from October 14, 2019 to

EXHIBIT B

January 15, 2020.[1] CR 131.  The United States has complied with the Scheduling Order as set forth below.

## II.    Superseding Indictment

On July 25, 2018, a District of Arizona grand jury returned a 100-count Superseding Indictment charging Defendants Michael Lacey, James Larkin, Scott Spear, Jed Brunst, Daniel Hyer, Andrew Padilla, and Joye Vaught with conspiracy, facilitating prostitution, and money laundering offenses for their roles in operating the website Backpage.com.  *See* CR 230.[2]  The superseding indictment was timely returned in accordance with the Scheduling Order.  CR 131.

## III.    Discovery

The government has produced to Defendants approximately 7.8 million documents, comprising approximately 10.6 million pages in an agreed-upon electronic, load-ready, industry-standard format—easily searchable by text or metadata fields (e.g. email date, sender, etc.).  To assist Defendants in navigating these documents, the government has also: (1) created indexes consisting of more than 25 categories denoting the source from which the materials were obtained; (2) produced subsets of "hot documents"—documents specifically related to the allegations in the Superseding Indictment—that the government thinks is helpful to its case; and (3) made arrangements for a DOJ discovery specialist in Washington, D.C. to assist defense counsel with certain technical questions.

For example, on May 24, 2018—nearly 20 months in advance of trial—the government provided Defendants with approximately 10.4 million pages of documents.  *See* Exhibit A.  Of those 10.4 million pages of documents, more than 2.1 million pages

---

[1] As the Court may recall the government initially requested an October 14, 2019, trial date and Defendants requested a date in January 2020.  CR 121.  The Court granted Defendants' request, but none of the other deadlines were moved to correspond to the extended trial date.

[2] On August 17, 2018, Backpage's former Sales and Marketing Director Daniel Hyer pleaded guilty to conspiracy to facilitate prostitution.  *See* CR 270.

EXHIBIT B

were documents Backpage had previously provided the U.S. Senate Permanent Subcommittee on Investigations ("PSI") in the fall of 2016,[3] as well as documents Backpage had previously produced to the government on September 15, 2017, as a result of the district court's April 7, 2018 order and the Ninth Circuit's mandate compelling them to comply with Grand Jury Subpoena No. 16-04-108.  *See* Exhibit B.

Additionally, more than 5.9 million pages of documents disclosed to Defendants originated from a source entitled "Co-Star materials."  Because of the large production of Co-Star materials, the government agreed to disclose to Defendants materials contained in this production that it believes are relevant to the case and might be utilized at trial.  The government provided these approximately 100 pages of materials to Defendants on August 14, 2018.  *See* Exhibit C.

Hence, more than 7 million of the 10.6 million documents produced to Defendants in discovery to date either are documents Defendants have previously produced to the government, or a category of materials whereby the government has provided Defendants with pertinent documents the government might utilize at trial.

A. Hot Documents

In addition to providing Defendants with discovery well in advance of trial, the government has also produced to Defendants a subset of those documents that it believes is important to its case (i.e. "hot documents").  For example, on July 19, 2018, the government provided Defendants with more than 1,070 pages of "hot documents," and on September 24, 2018, the government supplemented this production by providing Defendants with an additional 400 pages of "hot documents."  *See* Exhibits D and E.  These nearly 1,500 pages of documents contained emails and other documentary evidence supporting the allegations contained in the Superseding Indictment.  This includes materials about the Defendants' efforts to: 1) aggregate adult content from other

---

[3] Declaration of Breena Ross, *Senate Permanent Subcommittee on Investigations v. Carl Ferrer*, Misc. No. 1:16-mc-00625-RMC (D.D.C. Nov. 30, 2016).

EXHIBIT B

prostitution websites in order to increase content on Backpage;  2) create business relationships with other prostitution websites in order to increase traffic on Backpage;  3) remove words and/or images overtly indicative of prostitution (including the prostitution of children) from Backpage ads, and then posting these "moderated" ads knowing that they advertised prostitution services; and 4) engage in money laundering activities.

Apart from providing Defendants with "hot documents," the government has also provided counsel for a number of Defendants (upon request) with subsets of the 1,500 pages of "hot documents" specifically related to the allegations in the Superseding Indictment against their respective clients, and has even participated in meetings with counsel to discuss these materials.  For example, in December 2017—nearly four months before the grand jury returned an indictment in this case—the government met with counsel for Defendant Andrew Padilla to discuss the government's theory of the case.  The government subsequently provided counsel with more than 100 pages of documents relevant to Defendant Padilla's knowing facilitation of illegal services via Backpage.  *See* Exhibit F.  Additionally, on August 26, 2018, the government provided counsel for Defendant Scott Spear with approximately 50 "hot documents" comprising hundreds of pages of materials specifically related to the allegations in the Superseding Indictment against Spear.  Furthermore, on September 6, 2018, the government held an hour-long conference call with counsel to discuss these documents and its theory of the case.  *See* Exhibit G.

Moreover, on October 2-3, 2018, the government provided counsel for Defendant Jed Brunst with approximately 35 "hot documents" consisting of more than 100 pages of materials specifically related to the allegations in the Superseding Indictment against Brunst.  The government has also offered to meet with counsel to discuss these documents and the government's theory of the case in detail.  *See* Exhibit H.  Most recently, on January 9, 2019, the government provided counsel for Defendant Joye Vaught with approximately 25 "hot documents" consisting of more than 100 pages of materials specifically related to the allegations contained in the superseding indictment against Vaught.  As was the case

- 4 -

1  with Defendant Brunst, the government offered to meet with Vaught's counsel to discuss
2  these documents and the government's theory of the case in detail.   *See* Exhibit I.

3       As detailed above, the government has been unusually forthcoming with the
4  Defendants when it comes to discovery.  Not only did it provide Defendants with over ten
5  million pages of discovery more than 20 months in advance of trial, the government also
6  created detailed indexes to assist Defendants in navigating these documents, produced a
7  subset of "hot documents" to all Defendants, and even produced additional subsets of "hot
8  documents" for individual Defendants upon request.

9       B.    Backpage Server Data

10      The government has identified a number of servers that are associated with
11 Backpage.  These include the following: [4]

12      -   32 servers and three hard drives located in Tucson, Arizona, from Desert Net,
13          which is an Internet service provider;
14      -   5 servers from Dallas, Texas—one from Backpage's headquarters and four other
15          servers from a data center; and
16      -   40 servers from a datacenter in Amsterdam.

17 *See* Exhibit J.

18      Currently, the government is in possession of all 32 servers from Desert Net, all five
19 servers from Dallas, and nine of the 40 servers in Amsterdam.[5]  The government is
20 currently in the process of imaging the servers in its possession.  This is a time consuming
21 task, but the government has already completed the imaging of at least eight servers.  The
22 information  contained  on  these  servers  includes:  images  uploaded  to  Backpage;

---

[4] This information was provided to Defendants in a letter dated December 10, 2018, which is attached as Exhibit J.

[5] Desert Net administrators have informed the government that the 31 servers remaining in Amsterdam do not contain pertinent data, but were utilized for frontend websites associated with Backpage.  That said, the government is working to obtain the remaining 31 servers through a request to the Netherlands pursuant to the Mutual Legal Assistance Treaty and will inform Defendants if and when this occurs.

EXHIBIT B

marketplace databases with advertisements that were posted to Backpage; and payment processing. The advertising data contains a myriad of ad postings that are typical of the ads referenced in the U.S. Senate PSI report, the Superseding Indictment, and discovery. In addition, much of the information is duplicative. The government understands that many of these servers were used primarily for backing-up the company's information, including all 32 servers that were maintained by Desert Net. Despite the likely lack of utility for Defendants, the government is working to provide the Defendants with verified imaged copies of the information contained on the servers currently in the government's possession.[6] Ex. J.

## IV.   Initial Expert Disclosures

On December 14, 2018, the government filed its notice of expert witnesses. The notice provided Defendants with an initial overview of the individuals and subjects the government may seek to present evidence of by way of expert testimony. *See* CR 422.

## V.   Pending Motions

The parties await the Court's ruling on the following motions: (1) the United States' Motion to Compel Destruction of Inadvertently Disclosed documents (CR 352); (2) the United States' Motion for Clarification re: Order to Resolve Attorney-Client Privilege (CR 355); (3) Defendant Lacey's Motion for Release of Funds Unrelated to Backpage and Request for Expedited Relief (CR 385); and (4) Defendant Lacey's Motion to Strike (CR 415).

## VI.   Upcoming Deadlines

On February 25, 2019 (nearly eleven months before trial), the government intends

---

[6] There are a few other categories of documents that may be subject to disclosure in this case. These include, among others, documents the government has received from Defendants' personal electronic devices and a third party IT company, along with Defendants' personal and corporate taxes. For several of these categories of documents, it is likely that the government will need its filter team to conduct an initial review to determine whether the attorney-client privilege applies. The government has not yet started this process because of Defendants' objections to the filter team, which the parties have discussed in detail in their briefing on the government's motion for clarification (CR 355).

EXHIBIT B

to provide Defendants with statements (*Jencks* Act material) of witnesses whom the government intends to call at trial.  CR 131.  The government will provide an index for all *Jencks* Act statements for Defendants' ease of use.  In addition, on April 1, 2019, the government will provide a preliminary witness and exhibit list to Defendants.  (*Id.*)

Respectfully submitted this 18th day of January, 2019.

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

*s/ Reginald E. Jones*
REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
JOHN J. KUCERA
Assistant U.S. Attorneys

EXHIBIT B

# CERTIFICATE OF SERVICE

I hereby certify that on this date, January 18, 2019, I transmitted the foregoing under-seal document for filing to the Clerk of the United States District Court and sent a copy via electronic mail to: Paul J. Cambria Jr. Esq. and Erin e. McCambell, Esq., Lipsitz Green Scime Cambria, LLC, 42 Deleware Ave, Suite 120, Buffalo, NY 14202, **pcambria@lglaw.com** and **emccampbell@lglaw.com**, Thomas H. Bienert, Jr., Esq., Anthony R. Bisconti, Esq., Kenneth M. Miller, Esq., and Whitney Bernstein, Esq., Bienart, Miller & Katzman, PLC, 903 Calle Amanecer, Suite 350, San Clemente, CA 92673, **tbienert@bmkattorneys.com,                                tbisconti@bmkattorneys.com, kmiller@bmkattorneys.com, wbernstein@bmkattorneys.com**; Mike Piccarreta, Esq., Piccarreta Davis Keenan Fidel, PC, 2 East Congress Street, Suite 1000, Tucson, AZ 85701, **mlp@pd-law.com**; Jim Grant Esq., Davis Wright Termaine, LLP, 1201 Third Avenue, Suite 2200, Seattle, WA 98101, **jimgrant@dwt.com**; Michael D. Kimerer, Esq. and Rhonda Elaine Neff, Esq., 1313 E. Osborn Road, Suite 100, Phoenix, AZ 85014, **MDK@kimerer.com** and **rneff@kimerer.com**; Steve Weiss Esq., Karp & Weiss, PC, 3060 North Swan Rd., Tucson, AZ 85712, **sweiss@karpweiss.com;** Robert Corn-Revere Esq., Davis Wright Termaine, LLP, 1919 Pennsylvania Avenue N.W., Suite 800, Washington, D.C., 20006, **bobcornrevere@dwt.com**; Bruce Feder, Esq., 2930 East Camelback Road, Suite 160, Phoenix, AZ 85016, **bf@federlawpa.com**; Gary Linenberg, Esq., Ariel Neuman, Esq., Gopi K. Panchapakesan, Esq., Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C., 1875 Century Park East, 23rd Floor, Los Angeles, CA 90067, **glincenberg@birdmarella.com, aan@birdmarella.com, gkp@birdmarella.com.**

*s/ Angela Schuetta*
Angela Schuetta
U.S. Attorney's Office

EXHIBIT B

# EXHIBIT A



**U.S. Department of Justice**

United States Attorney
District of Arizona

Two Renaissance Square          Main:   (602) 514-7500
40 N. Central Ave., Suite 1800   Main Fax: (602) 514-7693
Phoenix, AZ 85004-4408

May 24, 2018

Paul J. Cambria Jr.
Attorney at Law
Lipsitz Green Scime Cambria,
LLC
42 Delaware Ave, Suite 120
Buffalo, NY 14202
(attorney for Michael Lacey)

Jim Grant
Davis Wright Tremaine, LLP
1201 Third Avenue,
Suite 2200
Seattle, WA 98101
(attorney for Lacey and Larkin)

Robert Corn-Revere
Davis Wright Tremaine, LLP
1919 Pennsylvania Avenue N.W.,
Suite 800
Washington, DC 20006
(attorney for Lacey and Larkin)

Thomas H. Bienart, Jr., Esq.
Bienart, Miller & Katzman,
PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
(attorney for James Larkin)

Michael D. Kimerer, Esq.
1313 E. Osborn Road,
Suite 100
Phoenix, AZ 85014
(attorney for Jed Brunst)

Bruce Feder, Esq.
2930 East Camelback Road,
Suite 205
Phoenix, AZ 85016
(attorney for Scott Spear)

KC Maxwell, Esq.
Law Office of K.C. Maxwell
235 Montgomery Street,
Suite 1070
San Francisco, CA 94104
(attorney for Dan Hyer)

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel, PC
2 East Congress Street,
Suite 1000
Tucson, AZ 85701
(attorney for Andrew Padilla)

Steve Weiss
Attorney at Law
Karp & Weiss, PC
3060 North Swan Rd.
Tucson, AZ 85712
(attorney for Joye Vaught)

Re:   <u>U.S. v. Michael Lacey, et.al.</u>
      CR-18-00422-PHX-SPL (BSB)

Dear Counsel:

Pursuant to your request for discovery and the government's obligations under Fed. R. Crim. P. 16 and the stipulated scheduling order in this case, please find enclosed two hard drives containing the government's initial disclosure.[1] The drive labeled *Hard Drive #1* contains the following Bates Stamped records:

---

[1] Hard Drives containing disclosure for defendants Michael Lacey and James Larkin are being provided to Paul J. Cambria Jr. and Thomas H. Bienart Jr., respectively.

EXHIBIT B

Lacey, et. al. Discovery Letter 1
May 24, 2018
Page 2

- USAO 108 Subpoena – DOJ-BP-0000000001-DOJ-BP-0001037594
- Permanent Subcommittee Investigation (PSI) – DOJ-BP-0001037595-DOJ-BP-0002102561
- USAO 359 Subpoena – DOJ-BP-0002102562-DOJ-BP-0002137199
- California Department of Justice – DOJ-BP-0002137200-DOJ-BP-0003851025
- Carl Ferrer Gmail – DOJ-BP-0003851026-DOJ-BP-0004425148
- Additional Co-Star[2] – DOJ-BP-0004425149-DOJ-BP-0004425622
- SW Applications/Affidavits and Sealed GJ Pleadings/Orders – DOJ-BP-0004425623-DOJ-BP-0004426152
- USAO 108 Subpoena (supplemental) – DOJ-BP-0004426153-DOJ-BP-0004426710

The drive labeled *Hard Drive #2* contains Co-Star Bates Stamped records 17-0040_000000001-17-0040_005901038 and 17-0040_MOBILE_000000001-17-0040_MOBILE_000047872.

Any discovery provided which is not mandated by court order, the Federal Rules of Criminal Procedure, federal statute, or federal case law is provided voluntarily solely to expedite litigation of this case. Additional Rule 16 discovery within the government's possession will be provided to you by the court-imposed compliance deadline of December 3, 2018. The remainder of this letter sets forth government requests, and concludes with general discovery expectations.

A.      Defense requests

Pursuant to Rule 16.1 of the Arizona Local Rules of Criminal Procedure and Rules 12(b)(4) and 16(a)(1)(A) & (B) of the Federal Rules of Criminal Procedure, the government gives notice of its intent to use at trial the following information: (1) the substance of any relevant oral statements made by the defendant before or after arrest in response to interrogation by any person then known to the defendant to be a government agent if such statements will be used at trial; (2) any relevant written or recorded statements made by the defendant before or after arrest in response to interrogation by any person then known to the defendant to be a government agent; (3) any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent; and (4) any recorded testimony by the defendant before a grand jury relating to the charged offense. In the event that additional evidence of this nature becomes available, it will be provided to you as part of the discovery process.

In the event that any interview notes subsequently prove to be discoverable, and pursuant to *U.S. v. Harris*, 543 F.2d 1247 (9th Cir. 1976), federal government agents have preserved and will continue to preserve any notes of interviews with the defendants in this case.

The United States does not share the view, nor is it aware of authority to support the position, that the Sentencing Guidelines create additional defense discovery privileges. Please be advised that the United States will continue to comply with its discovery obligations pursuant to

---

[2] Co-Star records produced to the government without assigned bates numbers.

Lacey, et. al. Discovery Letter 1
May 24, 2018
Page 3

applicable constitutional requirements, federal discovery rules, and applicable case law, including but not limited to *Brady v. Maryland*, 373 U.S. 83 (1963).

Pursuant to Rule 16(a)(1)(F) & (G), the government intends to use expert testimony at trial. The government will supplement this response by the deadline specified in the scheduling order (i.e., December 14, 2018) after the experts have been retained and their reports have been prepared and their intended testimony is known.

Pursuant to Rule 404(b) of the Federal Rules of Evidence, the discovery now being provided to you (as well as the discovery materials that will be produced in the future) may relate to other acts by the defendant which may be relevant to the actions of the defendant that resulted in the criminal charges in this case. This letter serves as notice of the government's intent to use this evidence at trial.

You have also requested notice of all evidence which may be used at trial by the government. Pursuant to Rule 12(b)(4)(B) and Rule 16(a)(1)(E), the government may use all evidence disclosed at trial. The government reserves the right to supplement the evidence disclosed prior to trial.

B.    Government requests

Please also consider this letter the government's request for reciprocal discovery pursuant to Rule 16(b)(1)(A) and (B) of the Federal Rules of Criminal Procedure by the court-imposed March 4, 2019 deadline. I am requesting permission to inspect and copy or photograph any books, papers, documents, photographs, tangible objects, or copies of portions thereof, which are in your possession, custody or control, and which you intend to introduce as evidence in your case-in-chief at trial. We also request permission to inspect and copy or photograph any results or reports of physical or mental examinations, scientific tests or experiments made in connection with the case, or copies thereof, within your possession, custody, or control, which you intend to introduce as evidence in your case-in-chief at trial, or which were prepared by a witness whom you intend to call at trial.

Pursuant to Rule 16(b)(1)(C), I am requesting a written summary of any expert testimony the defendant intends to use as evidence at trial by the court-imposed March 14, 2019.

I also wish to respectfully call your attention to Rules 12.1, 12.2, and 12.3 of the Federal Rules of Criminal Procedure with respect to the defenses of alibi, mental capacity and public authority. Failure to comply with the time limits of those rules may result in a refusal by the court to permit testimony in support of those defenses.

Pursuant to Rule 12.1(a) of the Federal Rules of Criminal Procedure, the government specifically requests that the defendant serve upon the undersigned a written notice of intention to offer an alibi defense within ten days of the receipt of this letter. Please include in your response each specific place your client claims to have been as well as the names, addresses, and telephone numbers of any witnesses upon whom you intend to rely to establish the alibi. The government hereby states that the offenses were committed on the dates set forth in the charging document and

Lacey, et. al. Discovery Letter 1
May 24, 2018
Page 4

that the offenses were committed at the locations indicated in the charging document and/or discovery materials.

C.      General expectations

To avoid delay during the trial, it is my intention that information, statements, and reports discoverable under the Jencks Act and Fed. R. Crim. P. 26.2 which are not provided sooner will be produced by the court-imposed February 25, 2019 deadline.  In order to avoid delay in the defense obligations under Rule 26.2, please provide me with any typed, handwritten or recorded statements made by any defense witnesses other than the defendant by the court-imposed May 27, 2019 deadline..

We have no desire to prosecute the wrong person, and would appreciate the opportunity to evaluate the necessity of proceeding in light of any information you have indicating that your client did not commit the offense or offenses charged.  Please communicate this request to your client so that, through you, we can receive and consider any such information.

Finally, the government will comply with, and expects reciprocal compliance with, Fed. R. Crim. P. 16(c), which states as follows:

"A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if:  (1) the evidence or material is subject to discovery or inspection under this rule; and (2) the other party previously requested, or the court ordered, its production."

Lacey, et. al. Discovery Letter 1
May 24, 2018
Page 5

Thank you for your cooperation.  Please call with any questions or concerns.

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States
Attorney
*s/Kevin M. Rapp*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

REGINALD E. JONES
Senior Trial Attorney, USDOJ

KMR/sh
Enclosures

EXHIBIT B

# EXHIBIT B



Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045

**James Grant**
206-757-8096 tel
206-757-7096 fax

jimgrant@dwt.com

**VIA EMAIL & HAND DELIVERY**

September 15, 2017

Dominic Lanza
Kevin M. Rapp
Office of the United States Attorney
District of Arizona
40 North Central Ave., Suite 1200
Phoenix, AZ 85004-4408
DLanza@usa.doj.gov
Kevin.Rapp@usdoj.gov

Reginald E. Jones
United States Department of Justice
1400 New York Ave., N.W.
Washington, DC 20530
Reginald.Jones4@usdoj.gov

Re:     Production in Response to Grand Jury Subpoena No. 16-04-108

Dear Counsel:

I write in response to your email of September 7 inquiring about production of materials in response to Grand Jury Subpoena No. 16-04-108 in light of the issuance of the Ninth Circuit's mandate. From DOJ's representations to the Ninth Circuit, we understand that you already have the materials covered by the subpoena, but we are producing them again with the hard copy version of this letter. We are also providing privilege logs. Please note that among the privileged documents that have been identified but not produced are ones that were inadvertently produced previously (and were identified) to the U.S. Senate Permanent Subcommittee on Investigations.

We are also providing a sheet providing instructions and passwords for accessing the documents on the hard drive.

Will you please send me a note acknowledging your receipt of the hard drive. Further, I suggest we provide a joint statement to the District Court that Backpage and Mr. Ferrer have complied with the Court's April 7 order. If you are agreeable, I will send a draft.

Messrs. Lanza, Rapp and Jones
September 15, 2017
Page 2

Sincerely,

DAVIS WRIGHT TREMAINE LLP

James C. Grant

Enclosure (w/ hardcopy version of letter)

cc:     Tom Henze
        Janey Henze Cook
        (w/o encl.)

EXHIBIT B

# EXHIBIT C

| From: | Jones, Reginald (CRM) |
|---|---|
| To: | Paul Cambria; Rapp, Kevin (USAAZ) |
| Cc: | Erin E. McCampbell |
| Subject: | RE: Discovery updates |
| Date: | Tuesday, August 14, 2018 12:38:00 PM |
| Attachments: | 17-0040_005368175.pdf |
| | 17-0040_000002818.pdf |
| | 17-0040_000337834.pdf |
| | 17-0040_005364265.pdf |
| | 17-0040_005369208.pdf |
| | 17-0040_005368419.pdf |
| | 17-0040_005366927.pdf |
| | 17-0040_000043883.pdf |
| | 17-0040_005366836.pdf |
| | 17-0040_001529836.pdf |
| | 17-0040_000002819.pdf |
| | image001.png |

Paul:

On July 19, the government disclosed more than 1,070 pages of documents it believes support the allegations contained in the indictment. *See* Bates Stamped Records DOJ-BP-0004601039-DOJ-BP-0004602110.   This production included, to our knowledge, all of the emails and other internal Backpage documents that are referenced in the indictment.  It's therefore surprising to hear you contend that "[a]lthough [it] included a few of the emails referenced in the indictment, it did not include many of the documents, including copies of the ads."  Other than victim ads (which are addressed in more detail below), we believe the July 19 disclosure was quite comprehensive. Furthermore, we intend to disclose the additional documents we believe support the new allegations contained in the superseding indictment within the next few weeks.

We also intend to provide victim-related materials (including the ads discussed in Counts 2-51). Although we hope to include this material in our next wave of disclosure, the privacy-redaction process is time-consuming.

With respect to the Backpage.com server data, we are still trying to address some technical issues and hope to make it available to the defense in the near future.  That said, it is massive in volume, so it may make sense for your technical folks to speak directly with our technical folks to ensure that everybody is on the same page.

Finally, with respect to CoStar materials, enclosed with this email are some individual documents that we believe are relevant and might be utilized at trial.  We will continue, in the coming months, to identify additional CoStar documents that are relevant, although we don't anticipate that the number of documents so identified will be voluminous.

**Reginald E. Jones**
**U.S. Department of Justice, Criminal Division**
T: 202.616.2807 | reginald.jones4@usdoj.gov

**From:** Kristina Drewery [mailto:kdrewery@lglaw.com] **On Behalf Of** Paul Cambria
**Sent:** Wednesday, August 8, 2018 9:22 AM

EXHIBIT B

**To:** Jones, Reginald (CRM) <Reginald.Jones@CRM.USDOJ.GOV>; Rapp, Kevin (USAAZ) <Kevin.Rapp@usdoj.gov>
**Cc:** Erin E. McCampbell <emccampbell@lglaw.com>
**Subject:** Discovery updates

Kevin and Reggie:

When we conferred on July 3 about the government's production of documents to the defendants, you said you would be producing to us, in short order, copies of all the documents referenced in the indictment, including copies of ads, emails, and the like.  Although your subsequent "hot docs" production included a few of the emails referenced in the indictment, it did not include many of the documents, including copies of the ads.  When can we expect to see the remainder of the documents referenced in the indictment (and now superseding indictment)?

Also, at the end of that same call we discussed the status of the Backpage.com website and related databases, and our need to access data from the website/databases.  You said you would inquire of your technical folks about the status of the Backpage.com website/databases.  We've not heard back from you on that point either.

Finally, you also said you would disclose individual documents from the "CoStar" production that you viewed as relevant to the indictment.  Your "hot docs" production included a few emails mentioning Avion.  Are those emails the universe of documents from the "CoStar" production that you view as relevant to the indictment?  Or do you expect to produce additional documents (and, if so, when)?

 **Lipsitz Green Scime Cambria** LLP

**Kristina Drewery**
Legal Assistant to Paul J. Cambria, Jr.

42 Delaware Ave | Suite 120 | Buffalo, NY 14202
**TEL** 716 849 1333 x346 | **FAX** 716 855 1580
**email** | **website** | **map**

**NOTICE:** This message contains privileged and confidential information intended only for the use of the persons named above. If you are not the intended recipient, you are hereby notified that any distribution or copying of this message is

EXHIBIT B

prohibited.

EXHIBIT B

# EXHIBIT D



**U.S. Department of Justice**

United States Attorney
District of Arizona

Two Renaissance Square          Main:    (602) 514-7500
40 N. Central Ave., Suite 1800  Main Fax: (602) 514-7693
Phoenix, AZ 85004-4408

July 19, 2018

Paul J. Cambria Jr.
Attorney at Law
Lipsitz Green Scime Cambria,
LLC
42 Delaware Ave, Suite 120
Buffalo, NY 14202
(attorney for Michael Lacey)

Jim Grant
Davis Wright Tremaine, LLP
1201 Third Avenue,
Suite 2200
Seattle, WA 98101
(attorney for Lacey and Larkin)

Robert Corn-Revere
Davis Wright Tremaine, LLP
1919 Pennsylvania Avenue N.W.,
Suite 800
Washington, DC 20006
(attorney for Lacey and Larkin)

Thomas H. Bienart, Jr., Esq.
Bienart, Miller & Katzman,
PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
(attorney for James Larkin)

Michael D. Kimerer, Esq.
1313 E. Osborn Road,
Suite 100
Phoenix, AZ 85014
(attorney for Jed Brunst)

Bruce Feder, Esq.
2930 East Camelback Road,
Suite 160
Phoenix, AZ 85016
(attorney for Scott Spear)

KC Maxwell, Esq.
Maxwell Law PC
899 Ellis Street
San Francisco, CA 94104
(attorney for Dan Hyer)

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel, PC
2 East Congress Street,
Suite 1000
Tucson, AZ 85701
(attorney for Andrew Padilla)

Steve Weiss
Attorney at Law
Karp & Weiss, PC
3060 North Swan Rd.
Tucson, AZ 85712
(attorney for Joye Vaught)

Re:   U.S. v. Michael Lacey, et.al.
      CR-18-00422-PHX-SPL (BSB)

Dear Counsel:

Pursuant to the government's agreement to disclose documents it believes support the allegations contained in the indictment, please find enclosed a DVD containing the following Bates Stamped records:

EXHIBIT B

Lacey, et. al.
July 19, 2018
Page 2

- "Hot Docs" – DOJ-BP-0004601039-DOJ-BP-0004602110[1]

This disclosure is without prejudice and will be supplemented throughout the case.

      Please let us know if you have any questions or concerns.

           Sincerely,

           ELIZABETH A. STRANGE
           First Assistant United States
           Attorney

           *s/Reginald E. Jones*
           REGINALD E. JONES
           Senior Trial Attorney, USDOJ

           KEVIN M. RAPP
           MARGARET PERLMETER
           PETER S. KOZINETS
           ANDREW STONE
           Assistant U.S. Attorneys

           JOHN J. KUCERA
           Special Assistant U.S. Attorney

Enclosures

---

[1] A DVD containing disclosure for defendants Michael Lacey and James Larkin are being provided to Paul J. Cambria Jr. and Thomas H. Bienart Jr., respectively.

# EXHIBIT E



**U.S. Department of Justice**

United States Attorney
District of Arizona

Two Renaissance Square                  Main:  (602) 514-7500
40 N. Central Ave., Suite 1800          Main Fax:  (602) 514-7693
Phoenix, AZ  85004-4408

September 24, 2018

Paul J. Cambria Jr.
Attorney at Law
Lipsitz Green Scime Cambria,
LLC
42 Delaware Ave, Suite 120
Buffalo, NY 14202
(attorney for Michael Lacey)

Jim Grant
Davis Wright Tremaine, LLP
1201 Third Avenue,
Suite 2200
Seattle, WA 98101
(attorney for Lacey and Larkin)

Robert Corn-Revere
Davis Wright Tremaine, LLP
1919 Pennsylvania Avenue N.W.,
Suite 800
Washington, DC 20006
(attorney for Lacey and Larkin)

Thomas H. Bienart, Jr., Esq.
Bienart, Miller & Katzman,
PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
(attorney for James Larkin)

Michael D. Kimerer, Esq.
1313 E. Osborn Road,
Suite 100
Phoenix, AZ 85014
(attorney for Jed Brunst)

Bruce Feder, Esq.
2930 East Camelback Road,
Suite 160
Phoenix, AZ 85016
(attorney for Scott Spear)

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel,
PC
2 East Congress Street,
Suite 1000
Tucson, AZ  85701
(attorney for Andrew Padilla)

Steve Weiss
Attorney at Law
Karp & Weiss, PC
3060 North Swan Rd.
Tucson, AZ 85712
(attorney for Joye Vaught)

Gary Lincenberg
Bird, Marella, Boxer, Wolpert,
Nessim, Drooks, Lincenberg &
Rhow, P.C.
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
(attorney for Jed Brunst)

Re:   U.S. v. Michael Lacey, et.al.
      CR-18-00422-PHX-SPL (BSB)

Dear Counsel:

Pursuant to your request for discovery and the government's obligations under Fed. R. Crim. P. 16 and the stipulated scheduling order in this case, please find enclosed a thumb drive

EXHIBIT B

Lacey, et. al. Discovery Letter 1
September 24, 2018
Page 2

containing the government's fourth disclosure.[1] The thumb drive contains the following Bates Stamped records:

- Backpage Agendas – DOJ-BP-0004602111-DOJ-BP-0004602507
- Backpage Superseding Indictment "Hot Docs" – DOJ-BP-0004602508-DOJ-BP-0004602851
- Co-Star "Hot Docs" – DOJ-BP-0004602852-DOJ-BP-0004602926
- Financial Records – DOJ-BP-0004602927-DOJ-BP-0004683544

Please call with any questions or concerns.

<div style="margin-left:40%">

Sincerely,


BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division
U.S. Department of Justice

REGINALD E. JONES
*/s Reginald Jones*
Senior Trial Attorney, CEOS
(202) 616-2807
reginald.jones4@usdoj.gov

ELIZABETH A. STRANGE
First Assistant U.S. Attorney

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW STONE
Assistant United States Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

</div>

Enclosures

---

[1] A thumb drive containing disclosure for defendants Michael Lacey, James Larkin, and Jed Brunst are being provided to Paul J. Cambria Jr., Thomas H. Bienart Jr., and Michael Kimerer respectively.

# EXHIBIT F

| From: | Lanza, Dominic (USAAZ) |
|---|---|
| To: | Michael Piccarreta |
| Cc: | Rapp, Kevin (USAAZ); Jones, Reginald (CRM); Perlmeter, Margaret (USAAZ) |
| Subject: | RE: Andrew Padilla |
| Date: | Thursday, December 21, 2017 4:59:41 PM |
| Attachments: | Padilla Docs.pdf |

Hi, Mike:

Nice speaking with you today.  Here are some of the case citations I mentioned, which involve prosecutions under 18 USC 1952 (Travel Act) and 18 USC 1956/1957 (money laundering) of folks who were helping facilitate escort businesses or strip clubs that were fronts for prostitution:

- *United States v. Nader*, 542 F.3d 713 (9th Cir. 2008) (affirming Travel Act convictions of the owner and operator of a massage studio that operated as a front for prostitution).

- *United States v. Vitich*, 357 F. Supp. 102 (W.D. Wisc. 1973) (sustaining Travel Act charges against the operators of a laundry service who supplied sheets, towels, and linens to prostitutes who were operating out of a casino hotel—the provision of laundry services was enough to "facilitate" a state-law prostitution offense).

- *United States v. Hurant*, 2017 WL 3475052 (E.D.N.Y. 2017) (founder of MyRentBoy.com pleaded guilty to 1952 charges)

- *United States v. Omuro* N.D. Cal. No. CR 14-CR-336-WHO (founder of MyRedbook.com pleaded guilty to 1952 charges).
- *United States v. Sigalow*, 812 F.2d 783 (2d Cir. 1987) (affirming Travel Act conviction of the manager of a massage parlor that acted as a front for prostitution and holding that the company's publication of advertisements in *The Village Voice* helped supply the requisite interstate link)

- *United States v. Fedele*, 2014 WL 3847402 (W.D. Ark. 2014) ("[T]he Government did not have to prove that the Defendant persuaded, induced, enticed, or coerced the escorts to have sexual relations with clients; rather, the Government only had to prove that Defendant knew the escorts were engaging in acts of prostitution and that Defendant used a facility of interstate commerce to facilitate the carrying on of this activity.").

- *United States v. Baker*, 227 F.3d 955 (7th Cir. 2000) (holding that all of the ATM transactions and bank transactions of a massage parlor that was a front for prostitution can be charged as promotional money laundering:  "It is not necessary, as Baker contends, for the government to separate out income from bona fide massages (whatever those were) from income from sexual services.").

Also, I've enclosed some of documents that we discussed during the meeting.  This email includes all of the .pdf files that we discussed, which I've combined into a single file.  In a few moments, I'll be sending a separate email containing all of the Word docs, Excel sheets, and Powerpoint presentations that we discussed.  (Space limitations prevent me from including everything in a single

EXHIBIT B

email.)

Please let me know if you need anything else.  Otherwise, happy holidays and hope to hear from you in January.

-Dom

**From:** Michael Piccarreta [mailto:mlp@pd-law.com]
**Sent:** Monday, December 18, 2017 3:33 PM
**To:** Lanza, Dominic (USAAZ) <DLanza@usa.doj.gov>; Rapp, Kevin (USAAZ) <KRapp@usa.doj.gov>
**Subject:** RE: Andrew Padilla

We are on for Thursday 9 am at your office. mlp

Michael L. Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC | 2 East Congress Street, Suite 1000, Tucson, AZ 85701
t 520.622.6900, ext. 133 | f 520-622-0521 | www.pd-law.com

**From:** Lanza, Dominic (USAAZ) [mailto:Dominic.Lanza@usdoj.gov]
**Sent:** Wednesday, December 13, 2017 10:43 AM
**To:** Michael Piccarreta; Rapp, Kevin (USAAZ)
**Subject:** RE: Andrew Padilla

Yes, that works.  Thanks.  602-514-7651.

**From:** Michael Piccarreta [mailto:mlp@pd-law.com]
**Sent:** Wednesday, December 13, 2017 10:18 AM
**To:** Lanza, Dominic (USAAZ) <DLanza@usa.doj.gov>; Rapp, Kevin (USAAZ) <KRapp@usa.doj.gov>
**Subject:** RE: Andrew Padilla

I will call you tomorrow after lunch 2pmish. Does that wok for you?  mlp

Michael L. Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC | 2 East Congress Street, Suite 1000, Tucson, AZ 85701
t 520.622.6900, ext. 133 | f 520-622-0521 | www.pd-law.com

**From:** Lanza, Dominic (USAAZ) [mailto:Dominic.Lanza@usdoj.gov]
**Sent:** Wednesday, December 13, 2017 9:35 AM
**To:** Rapp, Kevin (USAAZ); Michael Piccarreta
**Subject:** RE: Andrew Padilla

Hi, Mike:

Just wanted to follow up on this.  I'm pretty free this afternoon (other than 2:30 – 3:30) or tomorrow afternoon if you have a few minutes.

EXHIBIT B

**From:** Rapp, Kevin (USAAZ)
**Sent:** Wednesday, December 06, 2017 4:29 PM
**To:** Michael Piccarreta <mlp@pd-law.com>
**Cc:** Lanza, Dominic (USAAZ) <DLanza@usa.doj.gov>
**Subject:** Re: Andrew Padilla

Yes, no problem. We are around next week.

Sent from my iPhone

On Dec 6, 2017, at 4:07 PM, Michael Piccarreta <mlp@pd-law.com> wrote:

> Is next week ok? I am wrapping up a trial but should be back in the office next week.
> Mlp
>
> Sent from my iPad
>
> On Dec 4, 2017, at 10:42 AM, Rapp, Kevin (USAAZ) <Kevin.Rapp@usdoj.gov> wrote:
>
>> Mike:
>>
>> We received your letter last week. Let us know if you have a time for a call
>> this week. Thanks.
>>
>> Kevin M. Rapp| Assistant U.S. Attorney
>> Senior Litigation Counsel
>> Financial Crimes and Public Integrity Section
>> U.S. Department of Justice | Office of the United States Attorney
>> 40 N. Central Ave., Ste. 1200, Phoenix, AZ  85004
>> 602.514.7609, kevin.rapp@usdoj.gov
>>
>>
>>
>> Kevin M. Rapp| Assistant U.S. Attorney
>> Senior Litigation Counsel
>> Financial Crimes and Public Integrity Section
>> U.S. Department of Justice | Office of the United States Attorney
>> 40 N. Central Ave., Ste. 1200, Phoenix, AZ  85004
>> 602.514.7609, kevin.rapp@usdoj.gov

EXHIBIT B

# EXHIBIT G

EXHIBIT B

| From: | Bruce Feder |
|---|---|
| To: | Jones, Reginald (CRM) |
| Cc: | Rapp, Kevin (USAAZ); Feder Law |
| Subject: | Re: Indictment-related documents specific to Spear - email 1 |
| Date: | Monday, August 27, 2018 2:25:29 PM |

Reggie,

I received the emails. On 9/6, I'm available anytime in the afternoon.

Bruce Feder
2930 East Camelback Road, Suite 160
Phoenix, Arizona 85016
(602) 257-0135
bf@federlawpa.com

Confidentiality Notice
This email or fax, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. 1510 *et seq*. The information contained in this electronic mail or fax transmission, including any accompanying attachment, is intended solely for its authorized recipient, and may be confidential and/or legally privileged. If you are not an intended recipient, or responsible for delivering some or all of this transmission to an intended recipient, you have received this transmission in error and are hereby notified that you are strictly prohibited from reading, copying, printing, distributing, or disclosing any of the information contained in it. In that event, please contact me immediately by telephone at (602) 257-0135 or by electronic email at bf@federlawpa.com and delete the original and all copies of this transmission, including any attachments, without reading or saving them in any manner.

**From:** Jones, Reginald (CRM) <Reginald.Jones4@usdoj.gov>
**Sent:** Sunday, August 26, 2018 6:14 PM
**To:** Bruce Feder
**Cc:** Rapp, Kevin (USAAZ)
**Subject:** Indictment-related documents specific to Spear - email 1

Bruce,

As a follow up to your request for indictment specific documents related to Spear, please find attached more than 50 hot docs specifically relating to Spear. I'll send the attachments in several emails. Please confirm that you have received all emails and attachments.

Additionally, I know we had originally set Tuesday at 1:30pm PT/4:30 ET to discuss these documents and your client's exposure, but I recently learned that I'll be out of the office most of this week. Could we please move our call to **Thursday September 6th**? I'm available anytime that day so let me know what time works best for your schedule.

Thanks,
Reggie

EXHIBIT B

**Reginald E. Jones**
**U.S. Department of Justice, Criminal Division**
T: 202.616.2807 | reginald.jones4@usdoj.gov

EXHIBIT B

# EXHIBIT H

| | |
|---|---|
| **From:** | Jones, Reginald (CRM) |
| **To:** | Michael Kimerer |
| **Cc:** | Rapp, Kevin (USAAZ); glincenberg@birdmarella.com; Ariel A. Neuman (aneuman@birdmarella.com); gpanchapakesan@birdmarella.com |
| **Subject:** | RE: Jed Brunst-"hot documents" - EMAIL 1 |
| **Date:** | Wednesday, October 3, 2018 10:15:00 AM |
| **Attachments:** | Brunst - website technology.pdf |
| | Brunst - signature card.pdf |
| | Brunst - Cereus properties.pdf |
| | I, paragraph 141 part 2.pdf |
| | I, Paragraph 142.pdf |
| | I, paragraph 119 part 2.pdf |
| | SSI, Paragraph 57 attachment.xlsx |

A few additional "hot docs" pertaining to Brunst attached.

**From:** Michael Kimerer [mailto:mdk@kimerer.com]
**Sent:** Tuesday, October 2, 2018 3:25 PM
**To:** Jones, Reginald (CRM) <Reginald.Jones@CRM.USDOJ.GOV>
**Cc:** Rapp, Kevin (USAAZ) <Kevin.Rapp@usdoj.gov>; glincenberg@birdmarella.com; Ariel A. Neuman (aneuman@birdmarella.com) <aneuman@birdmarella.com>; gpanchapakesan@birdmarella.com
**Subject:** RE: Jed Brunst-"hot documents" - EMAIL 1

Reggie-

Thank you for responding so quickly to my request for the "Hot Docs" that relate to our client Jed Brunst. I have forwarded them to Gary Lincenberg's firm who are also counsel of record for Jed. It would be helpful if you could include those attorneys in any future communications. Their email addresses are above.

When we've had a chance to review the "hot docs" we may well have some questions for you. Thanks again.

Best-

Mike

## Michael D. Kimerer, Esq.

 **KIMERER & DERRICK, P.C.**
THE BEST IN CRIMINAL DEFENSE

**Telephone:** (602) 279.5900
**Email:** mdk@kimerer.com

1313 E. Osborn Road, Phoenix, AZ 85014
www.kimerer.com

EXHIBIT B

| | |
|---|---|
| **From:** | Jones, Reginald (CRM) |
| **To:** | Michael Kimerer |
| **Cc:** | Rapp, Kevin (USAAZ) |
| **Subject:** | RE: Jed Brunst-"hot documents" - EMAIL 1 |
| **Date:** | Tuesday, October 2, 2018 10:36:00 AM |
| **Attachments:** | I, Paragraph 26.pdf |
| | I, Paragraph 28-30.pdf |
| | I, Paragraph 97.pdf |
| | I, Paragraph 100.pdf |
| | I, Paragraph 117 part 1.pdf |
| | I, Paragraph 117 part 2.pdf |
| | I, Paragraph 119.pdf |
| | I, Paragraph 140.pdf |
| | I, Paragraph 141, part 1.pdf |
| | I, Paragraph 143.pdf |

Mike,

Per your request, we have segregated approximately 35 "hot docs" that pertain to the allegations against Brunst. I will send these documents to you in several emails.
Once you have reviewed these documents, let us know if you would like to schedule a call to discuss the significance of these documents and the allegations against Mr. Brunst in further detail.

Best,
Reggie

**Reginald E. Jones**
**U.S. Department of Justice, Criminal Division**
T: 202.616.2807 | reginald.jones4@usdoj.gov

**From:** Rapp, Kevin (USAAZ) [mailto:Kevin.Rapp@usdoj.gov]
**Sent:** Monday, October 1, 2018 5:32 PM
**To:** Michael Kimerer <mdk@kimerer.com>
**Cc:** Jones, Reginald (CRM) <Reginald.Jones@CRM.USDOJ.GOV>
**Subject:** RE: Jed Brunst-"hot documents"

Mike,

Reggie advises that we should have the hot docs to you by Wednesday. Thanks.

Kevin

**From:** Michael Kimerer <mdk@kimerer.com>
**Sent:** Monday, September 24, 2018 2:11 PM
**To:** Rapp, Kevin (USAAZ) <KRapp@usa.doj.gov>
**Cc:** Gary S. Lincenberg <glincenberg@birdmarella.com>; Ariel A. Neuman
(aneuman@birdmarella.com) <aneuman@birdmarella.com>; gpanchapakesan@birdmarella.com;

EXHIBIT B

Jones, Reginald (CRM) <Reginald.Jones4@usdoj.gov>; Kozinets, Peter (USAAZ)
<PKozinets@usa.doj.gov>; Stone, Andrew (USAAZ) <AStone1@usa.doj.gov>
**Subject:** RE: Jed Brunst-"hot documents"

Kevin-

It would be great and much appreciated if you could segregate the "hot documents" relating to Jed
and get them to us next week.

Mike

## Michael D. Kimerer, Esq.



## KIMERER & DERRICK, P.C.
### THE BEST IN CRIMINAL DEFENSE

**Telephone:** (602) 279.5900
**Email:** mdk@kimerer.com

1313 E. Osborn Road, Phoenix, AZ 85014
www.kimerer.com

**From:** Rapp, Kevin (USAAZ) [mailto:Kevin.Rapp@usdoj.gov]
**Sent:** Monday, September 24, 2018 2:02 PM
**To:** Michael Kimerer
**Cc:** Gary S. Lincenberg; Ariel A. Neuman (aneuman@birdmarella.com);
gpanchapakesan@birdmarella.com; Jones, Reginald (CRM); Kozinets, Peter (USAAZ); Stone, Andrew
(USAAZ)
**Subject:** RE: Jed Brunst-"hot documents"

Mike,

The "hot docs" are documents related specifically to the allegations contained in the superseding
indictment. These docs are going out day. They are not segregated by defendant but we could
segregate them for Brunst and send them next week if you would like. We are always willing to
discuss the significance of the documents. Just let us know.

Best,

**Kevin M. Rapp| Assistant U.S. Attorney**
**Senior Litigation Counsel**
**Financial Crimes and Public Integrity Section**

**U.S. Department of Justice | Office of the United States Attorney**
**40 N. Central Ave., Ste. 1800, Phoenix, AZ  85004**
**602.514.7609, kevin.rapp@usdoj.gov**

**From:** Michael Kimerer <mdk@kimerer.com>
**Sent:** Monday, September 24, 2018 1:41 PM
**To:** Rapp, Kevin (USAAZ) <KRapp@usa.doj.gov>
**Cc:** Gary S. Lincenberg <glincenberg@birdmarella.com>; Ariel A. Neuman
(aneuman@birdmarella.com) <aneuman@birdmarella.com>; gpanchapakesan@birdmarella.com
**Subject:** RE: Jed Brunst-"hot documents"

Kevin-

Thanks for getting back to me about the "hot documents" pertaining to Jed Brunst. Will the "hot
documents" that we will be receiving regarding Jed's allegations be segregated as to him or included
with a "generic" group of "hot documents" for all defendants? It would be helpful if you could
segregate them. Also we've all been talking about "hot documents",  but I'm not sure exactly what
that means. Other than testimony, are these the  documents that provide the most incriminating
evidence against each defendant?

After we have had a chance to review all the "hot documents" pertaining to Jed, we may want to
accept your invitation to sit down and discuss them.

Best regards-

Mike


# Michael D. Kimerer, Esq.



## KIMERER & DERRICK, P.C.
### THE BEST IN CRIMINAL DEFENSE

**Telephone:** (602) 279.5900
**Email:** mdk@kimerer.com

1313 E. Osborn Road, Phoenix, AZ 85014
www.kimerer.com


EXHIBIT B

**From:** Rapp, Kevin (USAAZ) [mailto:Kevin.Rapp@usdoj.gov]
**Sent:** Wednesday, September 19, 2018 3:54 PM
**To:** Michael Kimerer
**Subject:** RE: Jed Brunst-"hot documents"

Mike,

You should be receiving hot docs through discovery this week or next. After you have an opportunity to review let me know if you want to discuss.

Best,


**Kevin M. Rapp| Assistant U.S. Attorney**
**Senior Litigation Counsel**
**Financial Crimes and Public Integrity Section**
**U.S. Department of Justice | Office of the United States Attorney**
**40 N. Central Ave., Ste. 1800, Phoenix, AZ  85004**
**602.514.7609, kevin.rapp@usdoj.gov**




**From:** Michael Kimerer <mdk@kimerer.com>
**Sent:** Thursday, September 13, 2018 1:27 PM
**To:** Rapp, Kevin (USAAZ) <KRapp@usa.doj.gov>
**Subject:** Jed Brunst-"hot documents"


Kevin-

Several weeks ago, before the Superseding Indictment was filed, you shared with me some of the "hot documents" that pertained to the allegations against Jed Brunst. You indicated there may be others but gave me what was readily available. Would you check and see if there are any other "hot documents" pertaining to Jed and share copies with me so we have a complete set of what you think are the "hot documents" that support the Brunst allegations.

Hope all is well.

Mike

# Michael D. Kimerer, Esq.

EXHIBIT B

# EXHIBIT I

**Jones, Reginald (CRM)**

| | |
|---|---|
| **From:** | Jones, Reginald (CRM) |
| **Sent:** | Wednesday, January 9, 2019 3:17 PM |
| **To:** | 'sweiss@karpweiss.com'; 'cmcgarvey@karpweiss.com'; 'vvitolo@karpweiss.com' |
| **Cc:** | Rapp, Kevin (USAAZ) |
| **Subject:** | Joyce Vaught  - "hot docs" |
| **Attachments:** | SSI, paragraph 139.pdf; SSI, paragraph 145.pdf; SSI, paragraph 148.pdf; SSI, paragraph 149.pdf; SSI, paragraph 157, part 1.pdf; SSI, paragraph 157, part 2.pdf; SSI, paragraph 185.pdf; SSI, paragraph 129.pdf; SSI, paragraph 133.pdf; SSI, paragraph 137.pdf |

Good afternoon, Steve:

As you are aware, we have provided defense counsel with "hot docs" related to allegations contained in the indictment and superseding indictment in this case.  We also want to provide you with approximately 25 "hot docs" that pertain specifically to the allegations against Defendant Joye Vaught.  I will send these documents to you in several emails. When you have reviewed these documents, let us know if you would like to schedule a call to discuss their significance and the allegations against Vaught in detail.

Best,
Reggie

**Reginald E. Jones**
**U.S. Department of Justice, Criminal Division**
T: 202.616.2807 | reginald.jones4@usdoj.gov

1

EXHIBIT B

# EXHIBIT J



**U.S. Department of Justice**

United States Attorney
District of Arizona

The Two Renaissance Square                    Main:   (602) 514-7500
40 N. Central Ave., Suite 1800                Main Fax:   (602) 514-7693
Phoenix, AZ 85004-4408

December 10, 2018

Paul J. Cambria Jr.
Attorney at Law
Lipsitz Green Scime Cambria
42 Delaware Ave | Suite 120
Buffalo, NY 14202
(attorney for Michael Lacey)

Jim Grant
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200,
Seattle, WA 98101
(attorney for Lacey and Larkin)

Robert Corn-Revere
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW,
Suite 800
Washington, DC 20006
(attorney for Lacey and Larkin)

Thomas H. Bienart, Jr., Esq.
Beinart, Miller & Katzman,
PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
(attorney for James Larkin)

Michael D. Kimerer, Esq.
1313 E. Osborn Road
Phoenix, AZ 85014
(attorney for Jed Brunst)

Bruce Feder, Esq.
2930 East Camelback Road, Suite
160
Phoenix, Arizona 85016
(attorney for Scott Spear)

Gary Lincenberg,Esq.
Ariel A. Neuman, Esq.
Bird, Marella, Boxer, Wolpert,
Nessim, Drooks, Lincenberg &
Rhow, P.C.
1875 Century Park East, 23rd
Floor
Los Angeles, California
90067-2561
(attorney for Jed Brunst)

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ 85701
(attorney for Andrew Padilla)

Steve Weiss
Attorney at Law
Karp & Weiss, P.C.
3060 North Swan Rd.
Tucson, Arizona 85712
(attorney for Joye Vaught)

      Re:    <u>U.S. v. Michael Lacey, et al.</u>
             CR-18-00422-PHX-SPL (BSB)

Dear Counsel:

      This letter is meant to address the content on a number of servers that were seized and how
we intend to comply with our Rule 16 obligations. As background, the United States seized 32
servers and three hard drives located in Tucson at an Internet service provider known as Desert
Net. Desert Net was the primary domestic (Internet) host for Backpage. The servers have varying

December 10, 2018
Page 2

amounts of storage: some have 14.4 Terabyte (TB), another 7.2 TB, others 19.2 TB while others have 120 TB of storage. We have not gone through every server to determine the capacity. In the last subpoena we wrote, we estimated the capacity at approximately 500 TB or ½ petabyte (PB). Five additional servers were seized from Dallas, TX; one from Backpage Headquarters, and four additional servers from a datacenter in Dallas. Investigating agents also located 40 servers at a datacenter in Amsterdam, the Netherlands. Agents took possession of nine of the 40 servers in Amsterdam pursuant to an MLAT request and brought those servers to the Pocatello FBI office for examination. To date, two of the servers seized from the Tucson, AZ datacenter have been imaged, and the examination is ongoing. Also, four of the servers from the Amsterdam datacenter have been imaged.

All seized servers are being prioritized to be added to the queue to be imaged and prepared for review. One of the domestic servers contain literally millions of images that were uploaded for postings. The second server has over 100 separate databases which were used by Backpage to house, organize, and store data for the Backpage websites. The server's databases were named based on geographic regions. Some databases correlate with airport codes and others are a three-letter code that represent a yet undetermined geographic region. From this server we have access to the raw database files and are working to reconstruct the .ibd and .frm database files. These raw database files cannot be simply reviewed or loaded into a viewer to reconstruct the data. We are currently working on a solution to review these database files and correlate the images posed to the image server to the posts from the database files. Investigators were informed by the DesertNet administrators that the 31 servers remaining in Amsterdam did not contain pertinent data, but were utilized for frontend websites associated with Backpage. Once all servers are imaged, investigators will be able to provide hash verified image copies of all imaged drives. Due to the capacity of the Backpage servers this will be a time intensive undertaking and the imaged copies will be distributed over hundreds of hard disk drives.

In the final analysis, these servers contain millions of postings, both domestic and international, that are typical of the ads that are referenced in the PSI report, the Superseding Indictment, and provided discovery. As you know, the international postings contain considerably more explicit text and photos indicative of prostitution because they were not subject to moderation and in some of the countries, unlike the United States, prostitution is legal. A random sampling demonstrates that the domestic postings are typical of all too familiar ads that contain coded text and photos indicative of prostitution. It is unclear how a review of each posting would lend itself to the stated defense that they are protected by the First Amendment. In any event, we intend to provide defendants a single copy of the hard drives for review. If you disagree with this process please advise so that we may promptly raise this issue with the Court.

EXHIBIT B

December 10, 2018
Page 3

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division
U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney, CEOS
(202) 616-2807
reginald.jones4@usdoj.gov

ELIZABETH A. STRANGE
First Assistant U.S. Attorney


s/ Kevin M. Rapp
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW STONE
Assistant United States Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-18-422-PHX-SPL (BSB) |
|---|---|
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANTS' JOINT STATUS REPORT (CR 443)** |
| v. | |
| Michael Lacey, et al., | **[Status Conference set for January 25, 2019, 9:30 a.m.]** |
| Defendants. | |

## Preliminary Statement

Asserting without any support that "[v]irtually all of the Defendants are without funds to pay for their defense"—and without first conferring with the government about the case schedule—Defendants filed a "Joint Status Report" on January 18, 2019 that seeks a four-month delay of their Scheduling Order deadlines.  (CR 443 at 1.)  In reality, the "Joint Status Report" is a mislabeled motion for a continuance.  For several reasons, that motion should be denied.

EXHIBIT C

1      First, Defendants' motion contains no showing that Defendants lack sufficient

2  untainted funds to continue with their current counsel.  As explained below, if they believe

3  they are entitled to relief based on a claim of inability to pay counsel, Defendants' remedy

4  is to seek a hearing pursuant to *United States v. Monsanto*, 491 U.S. 600 (1989), provided

5  that they can first establish—with specific, particularized facts—they have no other funds

6  for attorneys' fees.  The government has even repeatedly offered to release funds for

7  attorneys' fees without the need for a hearing if Defendants provide sufficient supporting

8  evidence.  Not a single Defendant has availed themselves of that invitation or otherwise

9  sought a *Monsanto* hearing, and the requested delay should be denied for this threshold

10  reason.

11      Second, Defendants' motion should be denied because the timeline for resolving

12  their litigation in the Central District of California (CDCA) and the Ninth Circuit regarding

13  the government's pretrial seizures of assets linked to Backpage.com, LLC (Backpage) is

14  unknowable.  Without engaging in detailed rebuttal of Defendants' account of the CDCA

15  litigation, the government notes that a district court judge in the CDCA has stayed several

16  of Defendants' challenges to the government's seizures.  While Defendants have appealed

17  the stay order, the Ninth Circuit has questioned whether it has jurisdiction over that

18  appeal—and only recently permitted the appeal to proceed.  (*See In re: Any and All Funds

19  Held in Republic Bank of Arizona Accounts XXXX1889, XXXX2592, XXXX1938,

20  XXXX2912, AND XXXX2500*, 9th Cir. No. 18-56455, DktEntries 2, 27.)  Defendants have

21  other asset-seizure objections pending before a magistrate judge in the CDCA.  Simply put,

22  the timeframe for resolving all of Defendants' various challenges in the CDCA is unknown

23  (even after a Ninth Circuit appeal, there likely would be follow-on proceedings in the

24  CDCA)—and Defendants should not be permitted to use the CDCA litigation as a

25  mechanism for delaying their criminal trial in this District.

26      Third, the government vigorously disagrees with Defendants' "belie[f]" that they

27  will be successful in the CDCA and/or Ninth Circuit.  (CR 443 at 7.)  As explained below,

28  the cases Defendants cite are wholly inapposite.  Moreover, despite the government's

- 2 -

EXHIBIT C

invitation (*see* Ex. A), Defendants have failed to address numerous business practices (*e.g.*, moderation, the reciprocal-link program, aggregation/pre-boarding, financial relationships with "super pimps," concealment money laundering) engaged in by Backpage principals to increase Backpage's volume of prostitution ads and conceal its activities from law enforcement.  Backpage was a criminal enterprise engaged in an array of practices designed to increase revenue from prostitution—activities in no way protected by the First Amendment.

For these and other reasons, the requested continuance should be denied.

## Discussion

### I. Defendants Have Failed to Show They Cannot Pay Their Attorneys.

The requested continuance should be denied because the "Joint Status Report" is not supported by any definite, particularized showing that "[v]irtually all of the Defendants are without funds to pay for their defense."  (CR 443 at 1.)  Where a defendant produces sufficient evidence to show that seized assets are needed to pay for counsel of choice, the Fifth and Sixth Amendments require that the Court conduct a post-seizure, adversary "*Monsanto* hearing."  *United States v. Westelaar*, 2013 WL 8206582, *19-20 (D. Nev. 2013).  To obtain such a hearing, however, the defendant must make a preliminary showing that he is unable to retain his choice of counsel without the seized assets—in other words, that he has no other funds for attorney fees.  *Id*.

Under the so-called "*Jones–Farmer* Rule," a pretrial hearing on a defendant's motion to release assets is required only if the defendant: (1) demonstrates to the court's satisfaction that he has no assets, other than those restrained, with which to retain private counsel; and (2) makes a *prima facie* showing that the restrained assets are not forfeitable.  *United States v. All Funds on Deposit*, No. CV–05–3971(SJF), 2007 WL 3076952, at *7 (E.D.N.Y. Oct.17, 2007) (citing *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998)).  As the court held in *Farmer*, "[t]he defendant has the burden of showing that he lacks other funds with which to retain counsel; a bare-bones allegation that he has limited cash on hand and no income is not sufficient."  *United States v. Farmer*, 274 F.3d 800,

- 3 -

EXHIBIT C

804–05 (4th Cir. 2001); *see also United States v. Marshall*, 2015 WL 4139368, at *5 (N.D.W. VA. July 9, 2015) ("The defendant must disclose his assets, liabilities, and sources of income and say how much he has already paid counsel and how much more he needs. He must also show that he does not have access to funds from third parties, such as friends or family members."); *United States v. Varner*, 2005 WL 2206083, at *2 (W.D.Va. Sept. 9, 2005 ("Varner's affidavit does not detail his assets and liabilities or provide a meaningful basis for the court to independently judge his assertion that he lacks the ability to retain counsel. Therefore, the court denies Varner's request for a hearing.").

The Ninth Circuit has neither explicitly embraced the *Jones-Farmer* Rule nor clearly stated what type of proof is required for this preliminary showing, but one case is illuminating. In *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993), citing *Cohen v. United States*, 378 F.2d 751, 761 (9th Cir. 1967), the court found that to determine whether a hearing is required, "the court must decide whether the moving papers filed, including affidavits, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented. If the allegations are sufficient, and factual issues are raised, a hearing is required."

Here, Defendants have failed to support their request for a continuance with any such evidence. To the contrary, in response to a Defendant's claim of insufficient funds, the government offered to consider returning funds *without the need for a Monsanto hearing* to any Defendant who provided financial information that sufficiently established that he/she has no other assets with which to retain private counsel.[1] Defendant Larkin represented, through his counsel, that he would provide financial statements to establish his "need"; no such financial statements were ever provided to the government.

---

[1] *See, e.g.*, Ex. K, Nov. 7, 2018 email from the government to M. Piccarreta, counsel for Defendant Padilla (explaining that, "[s]hould [your client] wish to make a *Monsanto* claim, we offer every defendant the opportunity to show that they are financially unable to pay for their defense without the funds we are seizing.…[I]f you can make a showing that your client has no other funds with which to pay for his defense, we are happy to review those materials and consider releasing some amount back to pay legal fees.").

EXHIBIT C

Defendants Padilla and Vaught never responded to the government's offer.  None of the Defendants requested a *Monsanto* hearing from this Court prior to filing the Joint Status Report.  This is likely due to the fact that, as the government understands (upon information and belief), nearly all Defendants have more than sufficient untainted funds available for their defense.  The motion should be denied for these threshold reasons.[2]

## II.       The CDCA/Ninth Circuit Proceedings Do Not Warrant a Continuance.

As described above, the parties have no way of knowing when Defendants' various CDCA challenges to the government's pretrial seizure of assets will be fully resolved. Particularly absent any showing by Defendants to support the assertion they are unable to pay their attorneys, Defendants cannot use the CDCA/Ninth Circuit litigation as a reason to delay this case until all such litigation concludes.

Moreover, the cases Defendants cite in their Joint Status Report are inapposite. Pointing to *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989), and *Adult Video Ass'n v. Barr*, 960 F.2d 781 (9th Cir. 1992) (readopted in *Adult Video Ass'n v. Reno*, 41 F.3d 503 (9th Cir. 1994)), Defendants assert the government's pretrial seizures of assets linked to Backpage violated the First Amendment.  (CR 443 at 7-8.)  Defendants nevertheless concede, as they must, that *Fort Wayne Books* and *Barr* dealt only with the pretrial seizure and removal from circulation of *expressive materials* (CR 443 at 8).  Indeed, those cases only directly addressed the pretrial seizure of books, films and videos the government alleged were "obscene" under *Miller v. California*, 413 U.S. 15 (1973).  They did not invalidate the pretrial seizure of *non-expressive assets* (*e.g.*, bank accounts, real estate, etc.).

In *Fort Wayne Books*, for example, the Supreme Court held that the pretrial seizure

---

[2] Defendants also assert "the government assured counsel for two defendants that the government was not seeking attorney trust funds."  (CR 443 at 4.)  Defendants never identify who made that representation, when and to whom it was made, and under what circumstances.  Without more, it is difficult to respond.  In any event, the government would have never agreed (and does not agree) to an attorney's use of tainted funds for legal fees, unless a defendant could demonstrate that he or she has no other source of legitimate funds.

EXHIBIT C

of thousands of allegedly obscene books and films, based merely on a probable cause finding, constituted a prior restraint on speech prohibited by the First Amendment. Because the seizure "interrupt[ed] the flow of expressive materials" by removing them from sale or circulation, it triggered unique First Amendment concerns that otherwise do not generally apply to pretrial seizures. 489 U.S. at 63-57. The parties did not litigate, and the Court expressly did "not hold" "that the pretrial seizure of petitioner's *nonexpressive* property was invalid." *Id*. at 67 n.12.

Three years after *Fort Wayne Books*, in *Barr*, the Ninth Circuit invalidated a portion of the federal RICO statute (18 U.S.C. § 1963(d)) that permitted pretrial seizures of allegedly obscene films or videotapes without a hearing. The Ninth Circuit held that *Fort Wayne Books* required invalidation of pretrial seizures of obscene materials based merely on probable cause. *Barr*, 960 F.2d at 788. **However, the court "uph[e]ld § 1963(d)'s provision for the pre-trial preservation of assets."** *Id*. at 792. *See also id*. at 792 ("Only that part of section 1963(d) that authorizes pre-trial seizures of obscene materials on the basis of probable cause is unconstitutional."). Like *Fort Wayne Books*, *Barr* is inapposite.

Nor does *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Bd*., 502 U.S. 105 (1991), apply here. (*See* CR 443 at 8-10.) *Simon & Schuster* is not a pretrial seizure case; rather, it concerned New York's "Son of Sam" statute, which effectively authorized a tax on income from works that a "criminal" authored "on *any* subject, provided that they express the author's thoughts or recollections about his crime, however tangentially or incidentally." 502 U.S. at 121. The statute's definition of a "criminal" included "any person who has voluntarily and intelligently admitted the commission of a crime for which such person is not prosecuted." *Id*. at 110. As the Court observed, a person never accused of a crime, "but who admits in a book or other work to having committed a crime, is within the statute's coverage." *Id*. Had the statute been in effect at an earlier time and place, it would have applied to *The Autobiography of Malcom X*, Thoreau's *Civil Disobedience*, and the publications of Martin Luther King, Jr. *Id*. at 122. The Court invalidated the Son of Sam statute as impermissibly overbroad, and expressly confined its holding to that

EXHIBIT C

1   statute.  *Id*. at 122-23.  The Ninth Circuit did not cite *Simon & Schuster* in its subsequent

2   *Barr* decision, and it has no application here.

3         Defendants' remaining authorities (CR 443 at 9-10) are inapposite.  The portion of

4   *Citizens United v. FEC*, 558 U.S. 310, 336-337 (2010), cited by Defendants refers back to

5   *Simon & Schuster.  United States v. Natl. Treas. Employees Union*, 513 U.S. 454, 468-69

6   (1995), invalidated a 1989 law that prohibited federal employees from accepting

7   compensation for speeches or articles regardless of any connection between such works

8   and the employee's official duties.  The statute erected a "wholesale deterrent to a broad

9   category of expression by a massive number of potential speakers," 513 U.S. at 467; it had

10   nothing to do with the seizure or forfeiture of assets involving criminal conduct.  *United*

11   *States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 812 (2000), concerned the

12   Telecommunications Act's "signal bleed" provision that required cable operators to

13   scramble sexually explicit channels in full or limit such programming to certain hours.  It,

14   too, had nothing to do with speech integral to illegal conduct, let alone civil seizure or

15   criminal forfeiture issues.  *Am. Lib. Ass'n v. Thornburgh*, 713 F. Supp. 469, 484 n.19

16   (D.D.C. 1989), *vacated sub nom. Am. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992),

17   invalidated the pretrial seizure of non-expressive assets—but only on the rationale that the

18   seizure of those assets threatened the viability of an *ongoing* publishing business:

19         Because the Court in the instant case concludes that the seizure of non-

20         expressive assets—such as printing presses, bank accounts, etc.—of a
      business engaged in distributing expressive material **may determine**

21         **whether the business is able to continue functioning or not,** the Court
      concludes that pre-trial seizure of non-expressive material *ex parte* from a

22         business engaged in distributing expressive material…is unconstitutional.

23   713 F. Supp. at 484 n.19 (emphasis added).  Defendants have not identified any ongoing

24   publishing business that may be jeopardized if the accounts at issue (including IOLTA

25   accounts) are subject to seizure.[3]

26   _____

27   [3] In early April 2018, Backpage and its CEO pleaded guilty and admitted that Backpage
      was involved in knowingly facilitating prostitution.  Backpage ceased its operations and

28   agreed to forfeit the assets at issue.  (*See, e.g., United States v. Backpage.com*, LLC, D.

EXHIBIT C

As the Supreme Court has long recognized, speech facilitating criminal conduct—including adult and underage prostitution—is categorically excluded from First Amendment protection. *See, e.g., Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad…soliciting prostitutes."); *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) ("From 1791 to the present…the First Amendment has permitted restrictions upon the content of speech in a few limited areas" including "speech integral to criminal conduct…."); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980) (the First Amendment is inapplicable to speech proposing an illegal transaction).

Nevertheless, citing three cases that involved Backpage, Defendants assert that "numerous courts have recognized that the publication of classified advertisements, even advertisements for adult services, are protected expression." (CR 443 at 10.)   Yet Defendants' cited cases were all decided *before* Backpage and its CEO pleaded guilty and admitted that, during its 14 years of existence, Backpage "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services," and "the great majority of these advertisements are, in fact, advertisements for prostitution services…."  (*United States v. Ferrer*, D. Ariz. CR-18-464-PHX-SPL, Doc. 7-2 (Ferrer Plea Agreement at 12-13); *United States v. Backpage.com, LLC*, D. Ariz. CR-18-465-PHX-SPL, Doc. 8-2 (Backpage Plea Agreement at 11).)[4]

One of Defendants' cited cases, *Backpage v. Dart*, was dismissed as moot as a result of these guilty pleas; the only remaining issue in that case is whether Backpage's former lawyers (Davis Wright Tremaine) should be sanctioned for perpetuating a fraud on the court.  (*See* Ex. B (Backpage.com, LLC v. Dart, Civil No. 1:15-cv-06340 (N.D. Ill.), CR

Ariz. CR-18-465-PHX-SPL, Dkt. 8-2 at 11-12; *United States v. Ferrer*, D. Ariz. CR-18-464-PHX-SPL, Dkt. 7-2 at 12-14).)

[4] On August 17, 2018, Backpage Sales and Marketing Director Dan Hyer pleaded guilty to an information charging him with a violation conspiracy, under 18 U.S.C. § 371, to commit one or more crimes in violation of § 1952 (Travel Act) and § 1956 (money laundering). (*United States v. Hyer*, D. Ariz. CR-18-422-5-SPL, Doc. 271 ("Hyer Plea Agreement").)

EXHIBIT C

244 (Order Dismissing Case); Ex. C (CR 226, Sheriff Dart's Motion for Sanctions).) Moreover, Defendants' cases were decided long before the emergence of voluminous evidence, outlined in the Superseding Indictment and partially summarized below, demonstrating that Backpage was a criminal enterprise that knowingly hosted advertisements for adult and underage prostitution.

**III.    Defendants Engaged in an Array of Business Practices Calculated to Increase Revenue by Increasing the Volume of Prostitution (Including Child Sex Trafficking) Ads on Backpage.**

In an exchange with Senior Judge David Campbell during the grand jury subpoena litigation that preceded this prosecution, then-counsel for Backpage and Ferrer (and current counsel for Defendants Lacey and Larkin) acknowledged that Defendants can be criminally liable for hosting third-party content they knew was illegal:

> THE COURT:  If a website operator republishes an advertisement knowing, completely knowing and understanding that the advertisement is for underage prostitution, meeting the scienter requirement that was addressed in the briefing, is it Backpage's position that that -- either that is not a crime or, if it could be characterized as a crime, it can't be prosecuted because it's committed in a First Amendment context?
>
> MR. GRANT:  To take the Court's question, I'm assuming they have knowledge not simply because somebody submitted an ad, but they know something?
>
> THE COURT:  Yeah, they know something more –
>
> MR. GRANT:  Actual mens rea, actual knowledge?
>
> THE COURT:  Right.  That's my hypothetical.
>
> MR. GRANT:  So the situation of the hypothetical is if there is actual knowledge, say through participation in a venture, you're conspiring with somebody, you know they posted an ad, you know the person involved is underaged, that's a prosecutable crime, Your Honor.

(Ex. D.)  Against this backdrop, and the following are business practices committed with full knowledge by Defendants that Backpage was facilitating prostitution, including child sex trafficking:

    i.   <u>Moderation</u>

Defendants' cases discussing Backpage (CR 443 at 10) were all decided prior to the release of the U.S. Senate's Permanent Subcommittee on Investigations (PSI) Report in

- 9 -

EXHIBIT C

2017.  That 50-page report, entitled Backpage.com's Knowing Facilitation of Online Sex Trafficking, addressed a trove of internal Backpage documents not previously available.[5] The report was accompanied by an 840-page appendix largely consisting of incriminating Backpage documents.[6]  As set forth in the report, and further outlined in the Indictment and Superseding Indictment in this case, Backpage engaged in a practice of content "moderation" that involved removing terms and pictures that were particularly indicative of prostitution, including child sex trafficking, and then publishing a revised version of the ad.  (*See, e.g.*, CR 230, ¶¶ 11, 34, 68-152.)

Backpage CEO Carl Ferrer described the moderation process as follows in the factual basis of his guilty plea:

> I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., D.H., A.P, and J.V.) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers.  For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad.  Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage.  These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.

(*United States v. Ferrer*, CR 18-464-PHX-SPL, CR 7-2, Ferrer Plea Agreement at 13.)

Backpage Sales and Marketing Director Daniel Hyer corroborated Ferrer's account and described the moderation process in the factual basis of his guilty plea as follows:

> Over time, I also became involved (along with Ferrer, Andrew Padilla, and Joye Vaught) in Backpage's efforts to "moderate" the content of the website's escort and adult ads.  Once again, I knew that the great majority of the ads being "moderated" were actually offering illegal prostitution services—our removal of explicit words and pictures did nothing to change

---

[5] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf

[6] https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf

EXHIBIT C

the underlying nature of the services being offered.  In fact, Padilla insisted that I and other Backpage employees use the term "models" in intra-company emails when referring to persons in Backpage ads who appeared to be underage.  This was a code word intended to avoid looking bad in a lawsuit.

(CR 271, Hyer Plea Agreement at 10.)  In short, "moderation" involved the deliberate and knowing publication of prostitution ads.

ii.     Reciprocal Link: The Erotic Review

In addition to facilitating prostitution through the moderation process, in 2007 Backpage established a business relationship with a known prostitution website, The Erotic Review.  The Erotic Review allowed "johns" to post reviews of prostitutes, including child sex trafficking victims, on their website.  (*See* Ex. E; an example of a Backpage posting with a link to The Erotic Review.)  Around 2007, Backpage recognized inserting links to The Erotic Review in Backpage postings would increase ad revenue.  Backpage paid David Elms, The Erotic Review's owner, as much as $10,000 per month for this reciprocal link relationship.  (*See, e.g.,* Ex. F; invoice to Elms). Backpage insisted that Elms disguise the name of The Erotic Review as Elms Website Technologies in an effort to conceal the nature of The Erotic Review and Backpage's financial relationship with The Erotic Review.

Hyer described Backpage's relationship with The Erotic Review in the factual basis of his guilty plea as follows:

Among other things, the true nature of the ads was obvious and we sometimes used ads appearing on *The Erotic Review* (a website where customers would post "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts) as the source of the content for the new Backpage ads we were creating.

(CR 271, Hyer Plea Agreement at 9.)

As early as 2007, the subject of The Erotic Review was raised at management meetings attended by Defendants Larkin and Spear.  Two years after the establishment of the business relationship between TER and Backpage, Elms was arrested in 2009.  The arrest was reported on by the alternative weekly newspaper *The New Times* (then owned by Defendants Lacey and Larkin) which characterized The Erotic Review as "the Amazon.com of prostitution."  (Ex. G)  Following Elms' arrest, Larkin notified Spear and Ferrer by email about the arrest with a subject line of "johns accused of favorably rating

- 11 -

EXHIBIT C

escorts on Erotic Review in exchange for discounts." (Ex. H.)  Backpage's relationship with The Erotic Review continued after Elms' arrest until approximately February 2011. (*See* Ex. I; email from Andrew Padilla.)  By inserting The Erotic Review links in Backpage postings, Backpage was knowingly facilitating prostitution.

On March 1, 2011, Larkin, Lacey, Ferrer, Spear and attorney Hemu Nigam met with representatives of the National Center for Missing and Exploited Children ("NCMEC") in Alexandria, Virginia.  During that meeting, NCMEC staff provided a PowerPoint that detailed how The Erotic Review links were inserted into Backpage ads that featured child sex trafficking victims.  (*See* Ex. E.)  The Backpage participants remained silent about their experience with The Erotic Review; at most, Larkin told NCMEC CEO Ernie Allen that [Backpage] "has nothing to do with Erotic Review." (Ex. J; Mar. 1, 2011 email from Ernie Allen.)   Nevertheless, Backpage's approximately four-year reciprocal link business relationship with The Erotic Review further demonstrates that Backpage knowingly facilitated prostitution.  (*See also* CR 230, ¶¶ 45-58.)

iii.   Aggregation/Pre-boarding

Backpage also promoted illegal prostitution by engaging in a practice known within Backpage corporate offices as "aggregation" or "pre-boarding."  This was accomplished by identifying prostitutes advertising on other websites.  Backpage would then post a free ad and contact the pimp or prostitute and solicit them to Backpage with the incentive of a free ad for six weeks (or a similar financial incentive).  (*See* CR 230, ¶¶ 35-44.)

Hyer explained the process in the factual basis of his guilty plea as follows:

> In general, this process consisted of identifying so-called "escort" and "adult" ads on other websites and creating ads on Backpage for the women depicted in those ads in the hope of securing their future business.  These aggregation efforts, which I discussed on multiple occasions with my bosses Carl Ferrer and Scott Spear, resulted in large revenue and traffic growth for Backpage.  As a result, Ferrer and Spear authorized the expansion of the aggregation team I was supervising and authorized me to repeat the aggregation process (which was initially concentrated in Dallas) in other major U.S. markets.

(CR 271, Hyer Plea Agreement at 9.)

In short, by copying (or aggregating) the ad from a competing prostitution website

- 12 -

EXHIBIT C

1    and imposing the Backpage banner on the ad, and in some cases, inserting The Erotic

2    Review link, Backpage was knowingly facilitating prostitution.

3              iv.    Affiliate Program

4         Backpage also engaged in another business practice by entering into a financial

5    arrangement with "affiliates" or "super affiliates" like "Dollar Bill," an individual who

6    earned fees for knowingly arranging for prostitutes and pimps to post ads on Backpage.

7    (*See* CR 230, ¶¶ 59-67.)

8         In sum, the business practices detailed above (moderation, reciprocal link,

9    aggregation, and affiliate programs) clearly were ventures to facilitate prostitution.

10             v.    Concealment Money Laundering

11        By 2015, the major credit card companies stopped processing payments for

12   Backpage and some banks closed Backpage's accounts out of concern they were being

13   used for illegal purposes.  (CR 230, ¶¶ 182-183.)  In response, Defendants pursued an array

14   of money laundering strategies.  These included: (a) instructing customers to send checks

15   and money orders to a particular Post Office box, depositing those payments in bank

16   accounts held in the name of entities with no apparent connection to Backpage, and then

17   giving customers a corresponding "credit" on Backpage to purchase new ads; (b) wiring

18   the proceeds of Backpage's business to bank accounts held in foreign countries and then

19   redistributing the funds to certain Defendants (as compensation) or redepositing the funds

20   in bank accounts held in the United States (to conceal the nature of those funds and promote

21   Backpage's ongoing operations); and (c) converting customer payments, and the proceeds

22   of Backpage's business, into cryptocurrencies.  (CR 230, ¶¶ 184-194.)

23        Ferrer described the actions Defendants took to conceal from conventional banks

24   the fact that transactions were being processed for payment to Backpage as follows:

25        In addition to conspiring to knowingly facilitate the state-law prostitution
         offenses being committed by Backpage's customers, I also conspired with
26        other Backpage principals (including but not limited to M.L., J.L., S.S., J.B.,
         and D.H.) to engage in various money laundering offenses.  Since 2004,
27        Backpage has earned hundreds of millions of dollars in revenue from
         publishing "escort" and "adult" ads.  Over time, many banks, credit card
28        companies, and other financial institutions refused to do business with

                                    - 13 -

EXHIBIT C

1
2
3
4
5

> Backpage due to the illegal nature of its business.  In response, I worked with my co-conspirators to find ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

6

(*United States v. Ferrer*, CR 18-464-PHX-SPL, CR 7-2, Ferrer Plea Agreement at 13-14.)

7
8
9
10
11

The foregoing is not meant to provide a complete account of the evidence and legal theories that the government intends to present to the Court in any future proceedings, or at trial, in this case.  Rather, the government offers the above summary to illustrate many of the reasons why Defendants' case citations in the "Joint Status Report" are inapposite, and why Defendants' request for a continuance lacks merit.

12

**IV.    The Public and the Victims Have a Statutory Right to "Proceedings Free From Unreasonable Delay."**

13
14
15
16
17
18
19
20
21
22
23

Defendants' requested continuance should be denied for a further reason: The public and the victims have a right conferred by statute to "proceedings free from unreasonable delay."  18 U.S.C. § 3771(a)(7) (the "Crime Victims' Rights Act" or "CVRA"); *see also* 18 U.S.C. § 3161(h)(7)(A).  The Superseding Indictment contains 17 select victim summaries.  (CR 230, ¶¶ 160-176.)  Of these victims, at least five were juveniles when they were trafficked on Backpage.  (CR 230, ¶¶ 163, 164, 167, 169, 172.)  Four of the victims were murdered or killed as a result of being trafficked on Backpage, and their surviving family members or lawful representatives stand in their shoes for purposes of the CVRA. 18 U.S.C. § 3771(e)(2)(B).  (CR 230, ¶¶ 165, 173, 174, 175.)  The victims' statutory rights—and their need for an expeditious resolution of this prosecution—strongly militates against further delay.

24

### Conclusion

25
26
27
28

The government incorporates by reference its January 18, 2019 Status Report (CR 444), which summarizes early and extensive efforts to provide Defendants with discovery, including the production of more than seven million documents and detailed indices by May 2018, subsets of "hot documents" tailored to each Defendant, meetings with

- 14 -

EXHIBIT C

1   prosecutors to review the government's evidence, and access to DOJ e-discovery personnel

2   to assist with technical questions regarding the government's productions.

3          For all of the foregoing reasons, Defendants' request for a four-month continuance

4   should be denied.

5

6          Respectfully submitted this 23rd day of January, 2019.

7                                              ELIZABETH A. STRANGE
                                               First Assistant United States Attorney
8                                              District of Arizona

9
                                               *s/ Kevin M. Rapp*
10                                             KEVIN M. RAPP
                                               MARGARET PERLMETER
11                                             PETER S. KOZINETS
                                               ANDREW C. STONE
12                                             JOHN J. KUCERA
                                               Assistant U.S. Attorneys
13
                                               BRIAN BENCZKOWSKI
14                                             Assistant Attorney General
                                               Criminal Division, U.S. Department of Justice
15
                                               REGINALD E. JONES
16                                             Senior Trial Attorney
                                               U.S. Department of Justice, Criminal Division
17                                             Child Exploitation and Obscenity Section

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT C

1

## **Certificate of Service**

2

I hereby certify that on this date, January 23, 2019, I transmitted the foregoing under-seal document for filing to the Clerk of the United States District Court and sent a copy via electronic mail to: Paul J. Cambria Jr. Esq. and Erin e. McCambpell, Esq., Lipsitz Green Scime Cambria, LLC, 42 Deleware Ave, Suite 120, Buffalo, NY 14202, **pcambria@lglaw.com** and **emccampbell@lglaw.com**, Thomas H. Bienert, Jr., Esq., Anthony R. Bisconti, Esq., Kenneth M. Miller, Esq., and Whitney Bernstein, Esq., Bienart, Miller & Katzman, PLC, 903 Calle Amanecer, Suite 350, San Clemente, CA 92673, **tbienert@bmkattorneys.com,                        tbisconti@bmkattorneys.com, kmiller@bmkattorneys.com, wbernstein@bmkattorneys.com**; Mike Piccarreta, Esq., Piccarreta Davis Keenan Fidel, PC, 2 East Congress Street, Suite 1000, Tucson, AZ 85701, **mlp@pdlaw.com**; Jim Grant Esq., Davis Wright Termaine, LLP, 1201 Third Avenue, Suite 2200, Seattle, WA 98101, **jimgrant@dwt.com**; Michael D. Kimerer, Esq. and Rhonda Elaine Neff, Esq., 1313 E. Osborn Road, Suite 100, Phoenix, AZ 85014, **MDK@kimerer.com** and **rneff@kimerer.com**; Steve Weiss Esq., Karp & Weiss, PC, 3060 North Swan Rd., Tucson, AZ 85712, **sweiss@karpweiss.com;** Robert Corn-Revere Esq., Davis Wright Termaine, LLP, 1919 Pennsylvania Avenue N.W., Suite 800, Washington, D.C., 20006, **bobcornrevere@dwt.com**; Bruce Feder, Esq., 2930 East Camelback Road, Suite 160, Phoenix, AZ 85016, **bf@federlawpa.com**; Gary Linenberg, Esq., Ariel Neuman, Esq., Gopi K. Panchapakesan, Esq., Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C., 1875 Century Park East, 23rd Floor, Los Angeles, CA 90067, **glincenberg@birdmarella.com, aan@birdmarella.com, gkp@birdmarella.com.**

3

4

5

6

7

8

9

10

11

12

13

14

*s/ Angela Schuetta*

15

Angela Schuetta
U.S. Attorney's Office

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT C

INDEX OF EXHIBITS

Exhibit A            November 16, 2018 Letter to Mike Piccarreta from U.S.
                     Attorney

Exhibit B            Order Dismissing *Backpage v. Dart* Litigation as Moot

Exhibit C            Sheriff's Motion for Sanctions Against Backpage and Its
                     Attorneys in *Backpage v. Dart*

Exhibit D            February 22, 2017 Transcript Excerpts re Grand Jury 16-4
                     Motion to Compel and Cross-Motion to Quash Grand Jury
                     Subpoena

Exhibit E            National Center of Missing and Exploited Children PowerPoint
                     entitled "Backpage Advertisements and The Erotic Review"

Exhibit F            January 1, 2008 Invoice from Elms Web Services, Inc.

Exhibit G            February 17, 2009 Phoenix New Times Article
                     *"TheEroticReview.com" Founder David Elms Arrested in*
                     *Phoenix, Suspected of Trying to Hire Killer*

Exhibit H            May 11, 2009 Email to Scott Spear from Jim Larkin

Exhibit I            February 18, 2011 Email from Andrew Padilla

Exhibit J            March 1, 2011 Email from Ernie Allen to Brad Myles

EXHIBIT C

Exhibit K            November 7, 2018 Email from Amanda Wick to Mike Piccareta

EXHIBIT C

# Exhibit A

EXHIBIT C



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:   (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:   (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:   (602) 514-7450 |

<u>VIA EMAIL</u>                                             November 16, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

   Re: *Your Letter of October 26, 2018*

Dear Mike:

   We wish to respond to your October 26, 2018 letter.  The letter requests disclosure of *Brady* material and appears to be a standard letter that you send prosecutors in other cases with a few categories specific to this case.  A *Brady* determination in this case, however, is particularly difficult based on the defense theories that the joint defense has advanced in pleadings (in this case and others), correspondence, and meetings with the prosecution team.

   As you well know, you and other defense counsel have repeatedly asserted that the activities on the Backpage.com website, including the conduct detailed in the Superseding Indictment, was somehow immunized by the First Amendment and/or Section 230 of the Communications Decency Act ("CDA").  We disagree.  First, Section 230 of the CDA does not apply, on its face, to a federal prosecution.  47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of … [any] Federal criminal statute.").  The defense has not provided any counter-arguments to this position.  Second, the evidence demonstrates considerable content creation on the part of the principals and employees of Backpage.  The following three activities constitute, at a minimum, content creation by Backpage:

   **Moderation**: Backpage engaged in the practice of sanitizing ads by editing them—specifically, removing terms and pictures that are indicative of prostitution and then publishing a revised version of the ad.  Unfortunately, this also included child sex trafficking victims.

   **Aggregation**: This was accomplished by identifying prostitutes advertising on other similar prostitution websites.  Backpage would then post a free ad and contact the pimp or prostitute and solicit them to Backpage with the incentive of a free ad for six weeks or with similar financial incentives.

EXHIBIT C

November 16, 2018
Page 2 of 5

**Reciprocal Link and Affiliate Program**: This refers to Backpage's business arrangement with a website known as The Erotic Review (TER). Backpage and TER posted reciprocal ads on each other's websites. As you know, TER is a website that allows clients of prostitutes to provide written reviews of the prostitutes' various attributes. By inserting TER link in particular ads, Backpage was manipulating or creating content. In addition, Backpage entered into a financial arrangement with a person known as "Dollar Bill" who earned fees in return for arranging for numerous prostitutes and pimps to post ads on Backpage.

In light of the above, we do not share your view that there "is abundant information in the government's possession and/or generated by the government that is favorable and exculpatory to the defendants." Quite the opposite. It is noteworthy that neither you nor any of the other defense attorneys, in any of the pleadings and correspondence filed to date, have made any effort to address the above areas of content creation – all of which are described in detail in the Superseding Indictment. Nevertheless, we will attempt to address your *Brady* requests.

*First*, as set forth in the October 29, 2018 response to your letter ("USA response") requesting the inadvertently disclosed material, again we do not agree with your general assessment that there is an abundance of *Brady* material. As a reminder, we met in December 2017 and explained our legal theory, provided incriminating emails exchanged by your client, and identified witnesses that will be testifying against your client in a pending prosecution. ■ Instead, you took the position that your client maintains he had a First Amendment right to his activities at Backpage and alternatively, did not have the *mens rea* to commit the specific offenses contained in the indictment. Again, you have neither provided us any authority in support of that legal theory nor any counter evidence. And, that exchange occurred before both Backpage CEO Carl Ferrer and Backpage Sales and Marketing Director Dan Hyer agreed to cooperate and testify against your client and the remaining defendants.

*Second*, your request involving 2010 statements from Francey Hakes regarding whether Craigslist could be held criminally liable for content in their adult section eight years ago is not relevant to the Superseding Indictment in this case for several reasons. First, it is important to appreciate the distinctions between Craigslist and Backpage and what has occurred since 2010. Craigslist voluntarily shut down its adult section, presumably recognizing that it faced exposure to both criminal and civil liability for facilitating prostitution. Second, and more importantly, we are unaware of Craigslist engaging in the same business practices that Backpage employed to increase revenue from prostitution ads. For example, Craigslist did not have similar moderation practices employed by Backpage (*e.g.*, stripping out words or terms indicative of prostitution and then posting the ads (including ads indicative of child sex trafficking), etc.). We also have no evidence that Craigslist engaged in the solicitation and "aggregation" of prostitution ads from a competing prostitution websites. Furthermore, we

EXHIBIT C

November 16, 2018
Page 3 of 5

know of no financial relationship between Craigslist and "Dollar Bill" or someone similarly situated. As you know, in an email exchange between your client and another Backpage employee, "Dollar Bill" was characterized as a "super affiliate" who received considerable fees for arranging for prostitutes and pimps to post ads on Backpage. (*See* Superseding Indictment, ¶¶ 60-62.) In a related email, your client directed that 4200 [prostitution] ads posted by Dollar Bill be reinstated. (*Id.*) Finally, Craigslist did not have a financial relationship with the website TER or a similar site.

*Third,* we are also unaware of Craigslist engaging in activities designed to circumvent conventional banking and credit card processing to disguise the true nature of their adult services category. In contrast, Backpage was conspiring with others (e.g., "Dollar Bill", TER, and numerous other obvious pimps to facilitate prostitution. In short, whatever position a DOJ representative might have taken 10 years ago regarding the *mens rea* required by a website operator has little relevance to this prosecution. Lastly, the statement that you attribute to Ms. Hakes also predated the successful prosecutions of myRedBook.com, Rentboy.com, escorts.com and Ross William Ulbricht (the "Silk Road" prosecution). It is noteworthy that the defense, here, has made no meaningful attempt to distinguish the successful prosecutions of these websites from the activities engaged in by Backpage.

Next, you cite to a statement in the Congressional record that is relevant to concerns about legislation proposed to combat sex trafficking on prostitution websites similar to Backpage *by State and local prosecutors.* This is in the context of the application of the CDA. Yet this federal prosecution is exempted from the restrictions of the CDA. That was the point of the legislation referenced in the Congressional record—to allow states to prosecute websites like Backpage in the same manner a federal prosecution can be achieved. But again, the Backpage employees that are cooperating acknowledge that the Backpage defendants knew for years that they were facilitating prostitution, and the internal emails and public statements of Lacey and Larkin bear this out. Even James C. Grant, representing Backpage in the Arizona federal grand jury litigation, conceded that if the website knew "through participation in a venture, you're conspiring with somebody, you know they posted an ad, you know the person involved is underage [of course, the illegality of prostitution is not limited to underage sex trafficking victims] that's a prosecutable crime…" (GJ RT 2/22/17, p. 38 ) Here, because of the aggregation, affiliation and reciprocal link ventures and other conduct summarized above, Backpage knew that *every* ad had the potential for facilitating prostitution services, including child sex trafficking.[1]

*Fourth*, you cite a nearly forty-year old, out-of-circuit civil case, that stands for the proposition that a federal court can enjoin a *state court prosecution* if it was brought for

---

[1] As with our prior correspondence, the discussion in this letter is not meant to be an exhaustive statement of the reasons why the apparent defenses referenced by the joint defense defense team to date lack merit, particularly in view of the limited amount of information known so far about Defendants' theories and defenses.

EXHIBIT C

November 16, 2018
Page 4 of 5

improper purposes. *Fitzgerald v. Peek,* 636 F.2d 943, 945 (5th Cir.1981) ("conduct allegedly retaliated against or sought to be deterred is constitutionally protected and that the state's bringing of the criminal prosecution is motivated at least in part by a purpose to retaliate against or deter that conduct, and the state fails to show that it would have decided to prosecute even had the impermissible purpose not been considered."). This case has no relevance to the facts here and it does not even stand for the proposition that you are apparently citing it for, namely a discovery requirement. Although your request is based on mere speculation you are—in a manner of speaking—barking up the wrong tree. Categorically no such evidence exists. We are aware that Larkin and Lacey have publicly decried the late Senator John McCain and his wife Cindy as the architects of the federal Backpage prosecution, arguing that this case is politically motivated. The decision to investigate Backpage that resulted in the Superseding Indictment was made by the United States Attorney's Office in the District of Arizona, the DOJ Criminal Division, and no one else. The same analysis applies to your overly-broad request contained in paragraph 5.

*Fifth,* you are requesting all documents and commendations from law enforcement to Backpage relating to Backpage's cooperation in any criminal investigation. (Your October 26 letter, ¶¶ 6,7,11.) This request is unclear for several reasons. If you are asking for all subpoenas issued to Backpage in the course of state and federal investigations where Backpage complied with subpoenas, we do not share the view (nor is there any legal support) that this would be *Brady* material. Backpage was merely complying with a court order. Moreover, any documents or testimony at a trial or a hearing provided by Backpage in response to a subpoena would be in furtherance of court-ordered compliance. This isn't exculpatory—it's just avoiding contempt.

You also seek commendations Backpage received from law enforcement. These aren't *Brady* material either. Backpage was engaged in a veneer of cooperation with law enforcement. They hid their true business model that included moderation, aggregation, and affiliated programs. Moreover, after banks no longer would do business with Backpage they concealed payments from pimps posting prostitution ads and concealed Backpage as the payee, etc. We expect that at trial former Backpage employees (including but not limited to Ferrer and Hyer) will testify that Backpage's business model was concealed from law enforcement in variety of ways. We also expect at trial that law enforcement, including those that provided commendations to Backpage, will testify that had they known of Backpage's actual business practices (*e.g.,* stripping out words and posting the ads, inserting the link to TER, etc.) and financial relationships (*e.g.,* affiliated relationships with "Dollar Bill" and others, etc.) they would not have provided the commendations. In sum, we do not view commendations from law enforcement as *Brady* material.

*Sixth,* without providing any authority, you demand various communications between the prosecution team and attorneys representing cooperators, various law enforcement agencies, civil attorneys representing victims, NCMEC etc. (Your October 26 letter, ¶¶ 6-11) Without more, it is difficult to respond to such a request. Although you have provided some

EXHIBIT C

November 16, 2018
Page 5 of 5

authority for other requests (which we do not concede are necessarily on point), you provide no authority for this overbroad request. In short, this appears to be a wish list, based on speculation, in an effort to engage in a fishing expedition.

*Seventh*, you request all documents to and from Backpage and NCMEC relating to possible unlawful activity involving underage individuals. (Your October 26 letter, ¶ 10.) )It is unclear what you mean by "documents" nor do you articulate why you believe these are exculpatory. In any event, if you are asking for emails between Backpage and NCMEC, those are readily available based on emails we received via search warrants and subpoenas. They are also contained in the PSI Appendix, which is available on the U.S. Senate website. Any other documents we received from NCMEC has been provided or will be provided based on the scheduling order.

*Eight*, paragraph 12 of your October 26 letter requests internal Justice Department memoranda "relating the understanding of the applicable law government Backpage." Again, you provide no authority for this request. And, case law makes clear that material encompassing only an attorney's mental impressions or legal theories does not constitute *Brady*. *See, e.g., Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006). "Extending the *Brady* rule to opinion work product would greatly impair the government's ability to prepare for trials." *Id.* Indeed, "if opinion work product were accessible by opposing counsel 'much of what is now put down in writing would remain unwritten.'" *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

*Ninth and last*, paragraphs 4-31 make various general *Brady* requests, non-specific to this case, citing some authority (mainly from the 1980s). We will examine your specific requests and, to the extent we have information covered by the requests and supported by the cases you cite, we will make it available. Finally, in the event you are unsatisfied with our responses to your October 23 and 26 letters and file a discovery motion, please include our responses to both letters as attachments so the court has an understanding of our efforts to be responsive to your various requests.

Sincerely,

ELIZABETH A. STRANGE
First Assistant U.S. Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

EXHIBIT C

# Exhibit B

EXHIBIT C

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BACKPAGE.COM, LLC, | |
| Plaintiff, | Civil No. 1:15-cv-06340 |
| v. | Judge John J. Tharp, Jr. |
| THOMAS J. DART, Sheriff of Cook County, Illinois, | |
| Defendant. | |

## ORDER

The defendant's motions to dismiss the case [222] and to dissolve the preliminary injunction entered on December 23, 2015 [223] are granted. Accordingly, the case will be terminated on the docket. The defendant's motion for sanctions [226] remains pending, however, with briefing to be completed on the schedule previously entered by the Court.

## STATEMENT

In the wake of guilty pleas entered by the plaintiff in this case, Backpage.com LLC, and its CEO, Carl Ferrer, to federal charges of money laundering conspiracy and conspiracy, respectively, Sheriff Dart has moved to dismiss this case as moot and to dissolve the preliminary injunction entered by this Court on December 23, 2015. At a hearing conducted on April 26, 2018, a briefing schedule was set; Backpage's response to the Sheriff's motions was due on May 17, 2018, with the Sheriff's reply due on May 31, 2018. Backpage filed neither a response nor a motion to extend the time to respond and has therefore forfeited its claim. *Boogaard v. National Hockey League*, --- F.3d ---, 2018 WL 2377803 (7th Cir. May 25, 2018).

In any event, the Court agrees with the Sheriff that this case is moot in light of the guilty pleas entered by Backpage and Ferrer, and the plea agreements they entered into with the United States.[1] In its guilty plea, Backpage admitted, among other things, that Backpage executives conspired to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers and to launder the hundreds of millions Backpage earned by facilitating the unlawful publishing of ads for prostitution offenses. Backpage Plea Agreement at ¶ 10.a., ECF No. 8-1, Case. No. 18-cr-465 (D. Ariz.). Ferrer, in his plea agreement, acknowledged that he had participated in the Backpage conspiracy. Ferrer Plea Agreement at

---

[1] "Courts may take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned." *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017).

EXHIBIT C

¶ 10.a, ECF No. 7-1, Case. No. 18-cr-465 (D. Ariz.). Ferrer agreed, among other things, "to immediately shut down the website www.backpage.com ('Backpage') in the United States and all other countries in which the website operates" and to the "surrendering to the United States the registration account, including login and password information, for the www.backpage.com domain name necessary to operate the various Backpage websites and providing technical assistance to the United States to effectuate the shutdown." *Id.* at ¶ 3.a. Backpage, for its part, agreed that it would "cease to exist or operate." Backpage Plea Agreement at ¶ 3.d. Ferrer and Backpage each agreed to forfeit any interest in the website (or any of dozens of related websites) as well as various bank accounts and other assets of the company. In short, the plea agreements effectively ended the operational existence of Backpage.[2]

Backpage's shutdown renders this case moot. Backpage's claim in this case is that Sheriff Dart violated Backpage's First Amendment speech rights by attempting to coerce third parties— specifically, credit card companies—not to process payments for advertising on the web site. Backpage characterized the Sheriff's actions as a prior restraint on speech, but with its shutdown there is nothing left to restrain. Backpage's shutdown would not necessarily moot its claim if it were seeking damages, of course, but in an effort to narrow discovery in the case, Backpage previously disavowed any claim for damages and filed an amended complaint seeking only injunctive relief. *See* Backpage Motion for Leave to Amend, ECF No. 167, at ¶ 4; Tr. 8/9/16, ECF No. 174, at 4:4-13; Amended Compl., ECF No. 173, at 20-21 ("Prayer for Relief," seeking no damages).[3] But the injunction that Backpage seeks can no longer do it any good. Now that it is operationally defunct, no one—not credit card companies or anyone else—can do business with Backpage and Backpage is of course out of the business of providing advertising for prostitution services. An injunction would therefore change nothing. Injunction or no, there will be no more advertising—licit or illicit—on Backpage.com.

As the Sheriff correctly notes, because an injunction can no longer provide any benefit to Backpage, its claim for injunctive relief is moot. "A court's power to grant injunctive relief only survives if such relief is actually needed." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009). "In an action seeking only injunctive relief, this requirement ordinarily means that, once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot." *Brown v. Bartholomew Consol. Sch. Corp*., 442 F.3d 588, 596 (7th Cir. 2006). Where a company seeking injunctive relief has ceased to operate, its claims are ordinarily deemed to be moot. *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 (2001) ("a live controversy is not maintained by speculation that City News might be temporarily disabled from reentering a business that City News has left and currently asserts no plan to reenter"); *Bd. of License Comm'rs of Town of Tiverton v. Pastore*, 469 U.S. 238, 239-40 (1985). And while the criminal prosecutions of Backpage and its executives, and the forfeiture of Backpage's assets, are not final, there is no realistic possibility that Backpage will ever resume operations; it follows as well that there is no realistic possibility that the Sheriff will resume his exhortations to (or, in

---

[2] And, indeed, visitors to backpage.com are greeted with a notice advising that backpage.com and affiliated websites have been seized by the government.

[3] Backpage also sought attorney's fees, but "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim"). *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990).

EXHIBIT C

Backpage's view, his coercion of) third parties not to facilitate Backpage's crimes. There is, in short, "no reasonable expectation that the [alleged] wrong will be repeated." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000). Accordingly, Backpage's claim is moot.

Because Backpage's claim is moot, there is no case or controversy and this Court therefore lacks subject matter jurisdiction. *Home Care Providers, Inc. v. Hemmelgarn*, 861 F.3d 615, 620 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1000, 200 L. Ed. 2d 252 (2018) ("cases that do not involve 'actual, ongoing controversies' are moot and must be dismissed for lack of jurisdiction"). And because the case is being dismissed for lack of jurisdiction, the Court has no basis to continue in force the preliminary injunction previously entered. Nor could the preliminary injunction survive the dismissal of the case in any event. Accordingly, the preliminary injunction is dissolved.

Date: May 31, 2018

John J. Tharp, Jr.
United States District Judge

3

EXHIBIT C

# Exhibit C

EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BACKPAGE.COM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-06340 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| THOMAS J. DART, Sheriff of Cook | ) | Magistrate Judge Young B. Kim |
| County, Illinois, | ) | |
| | ) | |
| Defendant. | ) | |

**SHERIFF'S MOTION FOR SANCTIONS**
**AGAINST BACKPAGE AND ITS ATTORNEYS**

Thomas J. Dart, Sheriff of Cook County, Illinois, by his undersigned Special

Assistant State's Attorneys, requests that this Court enter an order based on its inherent authority

and pursuant to Federal Rule of Civil Procedure 26(g)(3) and 28 U.S.C. § 1927 requiring

Backpage and its attorneys, jointly and severally, to pay Cook County, Illinois all of its

attorneys' fees and costs incurred in this litigation, including on appeal and in petitioning for

*certiorari*, on the grounds that Backpage admitted on April 5, 2018 that its entire first

amendment civil rights case was based on untrue facts from the beginning, and thus a hoax, a

fraud on this Court, a fraud on the Seventh Circuit Court of Appeals and a fraud on the United

States Supreme Court.  Backpage and its attorneys also have squandered resources of the Cook

County State's Attorney Office, the Office of the Sheriff of Cook County and the taxpayers of

Cook County under the guise of a civil rights plaintiff in its phony lawsuit, simultaneously

fighting off the advances of law enforcement so that it could continue to make hundreds of

millions of dollars from its enterprise that admittedly facilitated and promoted prostitution and

child trafficking.  In support of his motion, the Sheriff states:

EXHIBIT C

I.      **THE SIGNED PLEA AGREEMENT OF CARL FERRER,**
        **CEO AND OWNER OF BACKPAGE, PROVES FALSITY**

On April 5, 2018 Carl Ferrer, CEO and owner of Backpage, entered into a plea agreement with the United States on behalf of himself and Backpage.  *See* Exhibits A and B.  In those plea agreements, Ferrer attested to facts demonstrating that the entirety of Backpage's complaint against the Sheriff was a fraud from the beginning—something the Sheriff has been arguing since the inception of this case.

In the signed plea agreements, Ferrer admits the following facts regarding Backpage being a content provider for illegal prostitution advertisements on its website:

> I have long been aware that the great majority of these advertisements [on Backpage] are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and much of Nevada).  (Ex. B, ¶ 10(a).)
>
> Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L., J.L., S.S., D.H., A.P., and J.V.) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers.  *Id.*
>
> For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and publish a revised version of the ad.  *Id.*
>
> These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads."  *Id.*

In addition to acknowledging that Backpage was a content provider for illegal advertisements for prostitution, Ferrer admitted that the reason credit cards companies stopped doing business with Backpage was due to the illegal nature of Backpage's business, and not the Sheriff's letters to the credit card companies:

2

EXHIBIT C

> Since 2004, Backpage has earned hundreds of millions of dollars
> in revenue from publishing "escort" and "adult" ads.  Over time,
> many banks, credit card companies, and other financial institutions
> refused to do business with Backpage due to the illegal nature of
> its business.  *Id.*

And on top of Backpage wrongfully accusing the Sheriff of first amendment violations,

Backpage and its attorneys lied to this Court when stating that due to the Sheriff's actions,

Backpage had not been able to accept credit card payments for advertisements and was being

crippled by the loss of income.  (ECF No. 5 at p. 17.)   On the contrary, Ferrer now admits:

> In response [to the credit card companies refusing to do business with
> Backpage], I worked with my co-conspirators to find ways to fool credit
> card companies into believing that Backpage-associated charges were
> being incurred on different websites, to route Backpage-related payments
> and proceeds through bank accounts held in the name of seemingly
> unconnected entities (including, but not limited to Posting Solutions,
> Website Technologies, Website Technologies, and Cereus Properties) . . .
> (Ex. B, ¶ 10(a).)

## II.   THE ENDLESS LIES OF BACKPAGE AND ITS ATTORNEYS ARE WIDESPREAD, BEGINNING WITH THE COMPLAINT AND TAINTING THE ENTIRETY OF ITS CONDUCT THROUGHOUT THIS LITIGATION

### A.   Backpage's complaint was a fraud when filed

On August 21, 2015, two weeks after the United States Senate Permanent

Subcommittee on Investigations had issued a subpoena to Backpage requesting information

regarding its business practices, Backpage filed suit against the Sheriff.  From day one,

Backpage's complaint against the Sheriff was a fraud, neither grounded in fact nor law.  From

the opening salvo through the prayer for relief, Backpage painted a false picture of a first

amendment-crusading Backpage versus a Sheriff that was trying take away the constitutional

rights of an information platform and its posters:

> Sheriff Dart's actions to cripple Backpage.com and all speech through the
> site are an especially pernicious form of prior restraint.  He has achieved
> his purpose through false accusations, innuendo, and coercion . . .

3

EXHIBIT C

Moreover, Sheriff Dart's actions have not only infringed Backpage.com's right to publish and distribute speech, but the rights of millions of the website's users to post and receive protected speech.  (ECF No. 1, ¶ 6.)

As shown in the Ferrer and Backpage plea agreements, the above factual assertions have always been lies; the speech at issue was never protected by the first amendment, and Backpage was a content provider and distributor of illegal, non-protected speech.

The lies in Backpage's complaint range from Backpage stating it prohibited and prevented illegal content on its platform:

Backpage.com prohibits illegal content and activity on its website and takes extensive steps to prevent such misuse, especially to guard against any form of human trafficking or child exploitation (ECF No. 1, ¶ 23)

to Backpage stating it was only a third-party content provider, not an author of the illegal advertisements for prostitution:

Sheriff Dart's actions also violate Section 230 of the CDA, 47 U.S.C. § 230, as he has no right or authority to preclude or seek to prosecute Backpage.com under state law for publishing third-party content (ECF No. 1, ¶ 56)

to Backpage stating that it was the Sheriff's actions that caused the credit card companies to stop doing business with Backpage:

Thus, because of Sheriff Dart's actions, Backpage.com is barred from credit card services of any of the three largest card companies [American Express, Visa, Master Card] or any acquiring banks or credit processing companies. (ECF No. 1, ¶ 43.)

**B.      Backpage follows up its fraudulent complaint with a request for a TRO and a Preliminary Injunction**

Not satisfied with its fraudulent request for money damages and declaratory relief in its Complaint, Backpage also filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction.   (ECF No. 5.)  In support of the same, Backpage attached the sworn declaration of Carl Ferrer (ECF No. 6), which was replete with lies:

4

EXHIBIT C

- Backpage.com does not dictate or require users to post any content. Instead, users provide all the content for ads they post using an automated interface.  Ferrer Declaration, ¶ 4.

- Backpage.com also employs extensive, voluntary monitoring measures to prevent and remove improper user postings.  Ferrer Declaration, ¶ 14.

- The practical effect of Sheriff Dart's and the credit card companies' actions has been to cut off nearly all revenue to Backpage.com. This affects not only adult ads but also other ads for dating, housing, services, trades, and sales of goods, among others. Although Backpage.com allows payment by bitcoin, this has accounted for a very small percentage of purchase on Backpage.com.  Ferrer Declaration, ¶ 27.

- Sheriff Dart's actions and the termination of credit card services have also harmed Backpage.com's efforts to police and preclude improper ads. Ferrer Declaration, ¶ 29.

And those lies created the basis for this Court to enter a Temporary Restraining Order against the Sheriff on July 24, 2015.  (ECF No. 29.)

　　　After the TRO was entered by this Court, based on the misrepresentations of Backpage, the parties began to engage in limited discovery to determine whether a preliminary injunction was appropriate.  In this limited discovery period, during which Backpage was withholding valuable information from the Sheriff, Backpage was completely stonewalling the United States Senate.  On August 6, 2015 Backpage informed the Senate that it was refusing to provide any information regarding its business practices.  *See Backpage Answer to Subpoena,* August 6, 2015; ECF No. 197-1 at 14.  And Backpage's attorneys in this case were aware of Backpage's obstructionist conduct before the Senate as they served as Backpage's attorneys in the Senate proceedings.  U.S. District Court for the District of Colombia, Case No. 16-mc-00621 at ECF No. 6 (Appearance of Robert Corn-Revere).

　　　 During this limited discovery period, Backpage's lies continued.  In answers to interrogatories, Backpage referenced the above-cited affidavit from Carl Ferrer, thereby perpetuating those falsehoods.  Additionally, in its written response to the Sheriff's interrogatory

5

EXHIBIT C

number four, Backpage stated that after July 6, 2015 Backpage.com could no longer charge for ads because of the Sheriff's actions to pressure Visa and MasterCard.  We now know for certain that this is false as Backpage and Ferrer have admitted to setting up straw companies to circumvent the credit card companies' ban.  (Ex. A, ¶ 10(a) and Ex. B, ¶ 10(a).)

       In preparation for the subsequent preliminary injunction hearing, Backpage's lies continued.  In the deposition of Carl Ferrer, he perpetuated the lie that Backpage did not know that many ads on its site were for child prostitution, for example:

> Q.   You are aware that each month hundreds of postings in Backpage's adult services site likely involve minors?
>
> A.   No.

August 18, 2015 deposition of Carl Ferrer.  But despite the lies and deceit of Backpage, this Court correctly denied its request for a preliminary injunction.  Backpage moved to stay the case pending an appeal of the denial of its request for a preliminary injunction, and therein lied again.  Backpage told the Court that VISA and Mastercard had "cut off nearly all revenue to Backpage.com."  As set forth above, we now know this to not be true, and to this day, neither Backpage nor its attorneys have corrected the record.

**C.**   **Backpage continued its lies on appeal**

       In its opening and reply briefs on appeal, the parade of lies continued.  Here are two of the most egregious:

- Backpage.com had a multi-tiered system to screen, block and remove posts that may be improper.  (October 2, 2015 Opening Brief at 5, n.1.)

- [Sheriff] Dart cannot pursue legal claims against Backpage.com under state criminal or nuisance laws for allegedly aiding and abetting individuals who misuse the site, because the website does not cause this in any sense. (November 5, 2015 Reply Brief at 5.)

EXHIBIT C

The assertion Backpage made to the Seventh Circuit that it was doing everything it could to block prostitution ads when in fact it was helping to write them is as material of a lie as Backpage could have made. And that its lawyers then used this lie to make an argument that Backpage could never be liable under state criminal laws for aiding and abetting prostitution—an argument that was clearly wrong—is exactly the type of argument that Backpage's lawyers should have refused to make. Their participation makes them complicit in their client's lies.

### D.   <u>Backpage's lies continued throughout the litigation</u>

At points that Backpage and its attorneys could and should have come clean about Backpage's lies to this Court, they instead prolonged them. In its Motion for Partial Summary Judgment, Backpage made the following false statements:

- Backpage.com also employs extensive voluntary monitoring measures to prevent and remove improper user postings. (ECF No. 124-1, ¶ 14.)

- Through its review process, Backpage.com . . . immediately reports any that may concern child exploitation to NCMEC (approximately 300 per month.) (ECF No. 124-1, ¶ 15.)

Backpage went to great lengths to fight the Sheriff's Motion for Leave to Amend Affirmative Defenses and spent a great deal of effort trying to undercut the importance of the Red Beauty ad placed by a member of Sheriff's Office. As this Court recalls, the Sheriff sought to plead the affirmative defense of illegality, and in support provided evidence regarding Backpage sanitizing the Red Beauty ad of references indicating the subject was a child. Backpage filed briefs and affidavits trying to show that the Sheriff's claims about the Red Beauty ad were false. *See, e.g.,* Backpage's May 17, 2016 Opposition to Dart's Motion for Leave to Amend Affirmative Defenses. (ECF No. 160.) In fact, the "evidence" provided by Backpage in support of that argument was false, but focusing on that misrepresentation misses the larger point. The larger point is that Backpage knew that it routinely did exactly what the Red Beauty evidence showed:

<center>7</center>

EXHIBIT C

sanitize ads of references to the subject of the ads being children, and its tremendous efforts to attack the Red Beauty evidence was designed to divert the Court's attention. What Backpage and its lawyers should have done, in fact were required to do, was come clean to the Court and admit that it engaged in sanitization of ads, for example, by amending their false complaint.

## III.   SANCTIONS AGAINST BACKPAGE AND ITS COUNSEL SHOULD BE AWARDED PURSUANT TO THIS COURT'S INHERENT AUTHORITY

As this Court is aware, it has power to sanction parties and their attorneys under several rules and statutes. *See, e.g.,* Federal Rule of Civil Procedure 11, 26, 37 & 56 and 28 U.S.C. § 1927. In addition to these specific rule and statutory bases, the Court has inherent authority to enter sanctions. "[I]f a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). "A court has inherent power, which is to say a common law power, to punish by an award of reasonable attorneys' fees or other monetary sanction . . . misconduct by lawyers appearing before it." *Carr v. Tillery,* 591 F.3d 909, 919 (7th Cir. 2010) (*citing Chambers,* 501 U.S. at 43-46). The Supreme Court has made clear that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers,* 501 U.S. at 49. This Court should use its inherent power to sanction both Backpage and its counsel for the lies which Backpage told and which its counsel must have known were lies when stated.

In *Chambers*, the Court explained that "the District Court could have employed Rule 11 to sanction [the plaintiff] for filing 'false and frivolous pleadings,' and that some of the other conduct might have been reached through other Rules. Much of the bad-faith conduct by [plaintiff], however, was beyond the reach of the Rules; his entire course of conduct throughout

EXHIBIT C

the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address.  In circumstances such as these in which all of a litigant's conduct is deemed sanctionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves."  *Id.* at 50–51 (citations omitted).

In *Reichmann v. Neumann*, 553 F. Supp. 2d 307, 327–28 (S.D.N.Y. 2008), the court entered a sanction pursuant to the court's inherent authority requiring plaintiff and his attorneys to pay the defendant's costs and attorneys' fees where plaintiff's attorneys "did not reasonably question [plaintiff] or investigate the support for his claims, even as the facts he alleged grew more and more implausible."

In *In re Narragansett Clothing Co*., 143 B.R. 582 (Bankr. D.R.I. 1992), the court granted a motion for sanctions against the bankruptcy trustee and his attorney.  The court reasoned that "at no time during the pleading and pre-trial stage, nor at the hearing on the merits, has there been any discernable or justifiable reason for the Trustee to litigate this matter.  While [the court did] not, with the benefit of hindsight, like to second guess the litigants in such matters, here, with or without hindsight, there was never any reasonable basis upon which the Trustee should have incurred legal expense to the estate in litigating this matter.  Because of the total absence of any merit in the Trustee's position, [the] motion for sanctions is granted, and the full amount of its necessary and reasonable attorneys' fees herein are awarded against the Trustee and his attorneys, and payment of said sanctions, of course, should not come from estate funds." *Id.* at 583–84.

EXHIBIT C

In *In re Evergreen Sec., Ltd*., 384 B.R. 882, 937 (Bankr. M.D. Fla.), *aff'd*, 391 B.R. 184 (M.D. Fla. 2008), *aff'd*, 570 F.3d 1257 (11th Cir. 2009), the court awarded as sanctions "the amount of $371,517.69, representing approximately fifty-five percent of Evergreen's fees and costs incurred in the recusal litigation" to be paid by the party who filed the motion to recuse and his law firm, jointly and severally.   The court explained that in filing motion for recusal of judge, disqualification of Chapter 11 debtor's counsel and his law firm, and revocation of all orders entered in main case and proceedings involving their clients, attorneys and law firms engaged in "bad faith," as warranted imposition of sanctions pursuant to court's inherent powers, section of Bankruptcy Code authorizing court to issue any order necessary or appropriate to carry out provisions of title 11, and Bankruptcy Rule 9011.  *Id.*  Attorneys and firm "conducted no reasonably thorough and objective investigation of the actual facts" instead constructing their motion from "gossip, hearsay, untruths, and assumptions," so that every allegation in the motion was objectively frivolous, they relied on inapposite and inflammatory case law to support the motion, namely, case law involving criminal investigations of judges, and they filed the motion for improper purposes of delaying matters in debtor's case, harassing the court, debtor and debtor's attorneys and punishing the court for unfavorable rulings. *Id.* at 932.

As seen in the above-cited cases, when a party and its counsel perpetuate a meritless case based upon bald-faced lies, the Court should impose sanctions against the party and its lawyers for engaging in such egregious conduct.  As seen in the fact section above and in the sections immediately below, Backpage lied to this Court and its attorneys perpetuated those lies when they should have instead brought those lies to the Court's attention so that it could properly and timely address them.

EXHIBIT C

### A.     <u>The Court should use its inherent authority to sanction Backpage</u>

Here, Backpage repeatedly lied to this Court about numerous issues, the  most mendacious of which are Backpage's statements that:  (1) it did not "sanitize" or "moderate" the ads on its website that were, prior to sanitization or moderation, clearly for adult prostitution or child prostitution; (2) that VISA and Mastercard ceased doing business with it because of the letters sent by the Sheriff; and (3) that it was unable to process credit card transaction or otherwise be paid for ads placed on its website.  These lies caused the Seventh Circuit to order that this Court enter a preliminary injunction, the Supreme Court to deny a *certiorari* petition, and caused this Court to rule against the Sheriff on several motions and allow this case to go on for more than another year.  This Court should find that Backpage perpetrated a fraud on the Court, and that under its inherent authority, sanctions should be awarded to the Sheriff in the amount of the reasonable attorneys' fees for his entire representation in this matter.  *See Reichman*, 553 F. Supp. 2d at 319 (plaintiff in breach of contract case sanctioned where he brought claim knowing that the dispute had been settled and only dismissed case when documents showed up that completely foreclosed his claim).

### B.     <u>The Court should sanction Backpage's counsel</u>

Backpage's counsel may well have known all along about their client's lies, but even if not, they were presented with an abundance of opportunities from very early on in this case to know that their client was lying to the Court about the critical issues.  They then either learned of these lies but did nothing or stuck their heads in the sand.  "Sticking one's head in the sand is more than undignified.  It is sanctionable.  In this case appellees' attorneys' fees are an appropriate sanction; these are costs that would not have been incurred but for a doomed appeal, and the expense should be borne by the side that created them."  *Khalil v.*

11

EXHIBIT C

*Town of Cicero*, 916 F.2d 715 (7th Cir. 1990) (imposing sanctions under Rule 37). *See also City of Livonia Employees' Retirement System v. Boeing Co*., 306 F.R.D. 175, 181 (N.D. Ill. 2014) (Rule 11); *Paniagua v. Max 18, Inc.*, No. 11 C 03320, 2013 WL 5907893, *8 (N.D. Ill. Nov. 4, 2013) (Rule 11).  The following chronology paints the picture of why and when Backpage's counsel knew or should have known that their client was lying to the Court:

In April 2015, the United States Senate, through the Permanent Subcommittee on Investigations (the "Subcommittee"), requested an interview to discuss Backpage's business practices.  ECF No. 197-1 at 14.  On June 19, 2015, after two months of negotiations with Backpage's counsel over specific topics the Subcommittee wished to discuss, the Subcommittee interviewed Elizabeth McDougall, Backpage's general counsel.  *Id.*  During that interview, McDougall would not answer critical questions regarding Backpage's procedures for screening for illegal content.  *Id.*  This was the first red flag that gave an indication that Backpage's procedures may be less than legal.

On July 7, 2015, two weeks before Backpage filed its complaint against the Sheriff, the Subcommittee issued a subpoena to Backpage, seeking, among other things, documentation regarding its screening process and data retention policies.  *Id.*  On August 6, 2015, a few weeks prior to the preliminary injunction hearing in this case, Backpage sent the Subcommittee a letter stating it was refusing to answer its subpoena.  *Id.*  Red Flag Number Two.

On August 13, 2015 the Subcommittee subpoenaed two Backpage employees, Andrew Padilla—the head of Backpage's moderation department—and Joye Vaught—the supervisor in charge of training Backpage's moderators (not coincidentally, on information and belief, two of the people that Carl Ferrer alleges he conspired with, *see* Plea Agreement at Ex. B at ₱ 10(a))—to discuss their job duties.  ECF No. 192-1 at 14—15.  Instead of answering the

EXHIBIT C

Subcommittee's questions, both individuals hired an attorney and refused to answer, invoking

their fifth amendment privilege, stating their answers might tend to incriminate them.  *Id.* at 15.

Red Flag Number Three.

On October 1, 2015 the Subcommittee issued a new, more targeted subpoena,

focusing on Backpage's moderation efforts, including information related to editing or

modifying of ads prior to publication—the very information that would have destroyed

Backpage's argument of immunity under the Communications Decency Act.  *Id.*  Backpage

answered by providing twenty-one pages of publicly available documents and writing a letter

stating it refused to provide any relevant documents, citing first amendment objections.  *Id.*  Red

Flag Number Four.

The Subcommittee informed Backpage that its objection was without merit and

ordered Backpage to comply by November 12, 2015.  *Id.* at 16.  Additionally, the Subcommittee

subpoenaed Carl Ferrer to testify before the Subcommittee on November 19, 2015.  *Id.*  Not

surprisingly, Backpage refused to answer the subpoena and Carl Ferrer did not show up at the

Subcommittee's hearing as he had fled the country.  *Id.*; ECF No. 126.  Red Flag Number Five.

On November 30, 2015 the Seventh Circuit reversed this Court's decision

regarding the preliminary injunction, finding that "it is *unclear* that Backpage is engaged in

illegal activity."  *Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (emphasis

added).  Given that Backpage was refusing to answer subpoenas regarding its moderation

processes, and its employees were invoking their fifth amendment privileges against self-

incrimination with regard to those processes, it was becoming clear that "illegal activity" may be

at the heart of Backpage's functions.

EXHIBIT C

On March 11, 2016 Backpage filed a Motion for Partial Summary Judgment, stating that there was no need for the parties to engage in further discovery.  ECF No. 124.  Again, Backpage was pushing to cover up its "illegal activity," as it did not want the Court to allow the Sheriff to see discovery which would demonstrate that the entire case against the Sheriff was a farce.

On March 29, 2016 the Subcommittee filed its Application to Enforce Subpoena Duces Tecum with the U.S. District Court for the District of Columbia, and Backpage through its counsel (*the same counsel that is representing Backpage in this case*) filed its opposition to the same.  ECF No. 197-1 at 16—17; U.S. District Court for the District of Colombia, Case No. 16-mc-00621 at ECF No. 6 (Appearance of Robert Corn-Revere).  Red Flag Number Six.

On March 30, 2016, the Court denied Backpage's Motion for Summary Judgment without prejudice and ordered the parties to brief any disputed discovery issues.  ECF No. 137.   On April 6, 2016 the Sheriff filed a Bench Memorandum, arguing he was entitled to discovery on, among other things:  (1) Backpage's purported damages, specifically requesting information on lost profits and any illegal contracts for prostitution, as Backpage should not be compensated for the same; and (2) Backpage's moderation practices to show the illegality of Backpage's business.  ECF No. 143.

On April 20, 2016 Backpage filed a response to the Sheriff's Bench Memorandum, arguing Backpage should not have to turn over moderation discovery as the Communication Decency Act provides immunity for Backpage as a platform provider.  ECF No. 153.  This argument by Backpage's attorneys was disingenuous at best, as by now they had to know that Backpage was a part author in a great majority of the prostitution ads on the website, thereby losing any possible immunity under the CDA.  As of this date, at the very latest,

EXHIBIT C

Backpage's attorneys were at best practicing willful indifference to Backpage's actions, because if its attorneys did not know that Backpage was authoring ads for prostitution, that is due to their intentionally turning a blind eye to all of the evidence in front of them.

On April 21, 2016, as part of the Sheriff's Motion for Leave to Amend Affirmative Defenses, the Sheriff informed the Court about the Red Beauty Investigation, during which the Sheriff gained first-hand knowledge of Backpage's sanitization process, proving that Backpage was not just an information platform provider but an author of ads purporting to prostitute children. ECF No. 155. Rather than acknowledging Backpage's conduct, Backpage's attorneys accused the Sheriff of creating fake ads that failed to demonstrate any sanitization. ECF No. 160. This was obviously false and provides further evidence that Backpage's attorneys were either covering up their clients' illegal actions or purposefully sticking their heads in the sand.

On May 17, 2016 Backpage's attorneys filed an opposition brief with the Court, arguing that the Sheriff should not be allowed to amend his affirmative defenses as the Sherriff's defense on illegality was "futile" because the Sheriff's "proposed illegal conduct defense directly violates [the CDA]." *Id.* Again, by now, Backpage's attorneys should have known that this was untrue.

On August 2, 2016 Backpage sought leave to file a first amended complaint, abandoning its request for monetary damages. ECF No. 167. Backpage and its attorneys knew that it needed to drop the claim for money damages, otherwise the Court would allow discovery into Backpage's purported lost profits, and its moderation practices for purposes of determining which "contracts" were illegal (*i.e.*, payments for ads for prostitution). ECF No. 141 (Transcript from March 30, 2016). Backpage knew that if it allowed the Sheriff to dig into its lost profits

EXHIBIT C

claim, the Sheriff would learn (1) that Backpage never stopped making money through Visa and
MasterCard, and therefore the entire basis for its requested injunctive relief—that Backpage was
stopped from doing business with Visa and Master Card—was a sham; (2) that Backpage was a
content provider and could never have any protections under the CDA; and (3) that Backpage
was laundering money through straw entities.

On August 5, 2016 the district court in the Senate Action granted enforcement of
the Subcommittee's subpoena, rejecting Backpage's first amendment argument.  *Senate
Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016*), vacated as moot sub nom.
Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080 (D.C. Cir. 2017).  Over
the course of the next three months, Backpage engaged in legal theatrics, requesting appeals and
stays from the district court's enforcement order.  ECF No. 197-1 at 17—18.  Finally, after all
appeals and stays were exhausted, Backpage started turning over documents.  *Id.* at 18.  By the
end of 2016, Backpage had turned over more than five hundred thousand pages of documents in
response to the Subcommittee's subpoena.  *Id.* at 20.

On August 9, 2016 Backpage again requested that this Court proceed with
summary judgment proceedings, stating the "Court should reject the Sheriff's arguments
[regarding needing additional discovery] again and move this case forward to consideration and
briefing of summary judgment on liability and declaratory relief."

On September 26, 2016 and December 23, 2016, Carl Ferrer was indicted in the
State of California for taking part in a pimping conspiracy and money-laundering conspiracy.
Ex. C.  The December indictment detailed efforts that Backpage had undertaken to set up sham
companies to bypass detection by American Express.  *Id.*  According to the indictment, in May
of 2015, in only the State of California, Backpage was able to conduct $48,288.25 worth of

EXHIBIT C

transactions, even though American Express had ceased processing Backpage transactions on

May 1, 2015.  *Id.*  Attorneys for Backpage in this case also represented Carl Ferrer in the

indictment proceedings.  Ex. D.

      At this point there is direct evidence, known to Backpage's attorneys, that

Backpage and its CEO, Carl Ferrer, had lied to this Court.  Specifically, in paragraph 4 of both

the complaint and the amended complaint, which was filed just prior to the indictments,

Backpage stated that due to the Sheriff's letters, American Express, Visa and Master Card all

blocked use of their cards for any and all purchases on the website.  ECF No. 1; ECF No. 173.  If

Backpage was circumventing the blocks being administered by the credit card companies, and

still using American Express, Visa and Master Card to accept payment, this directly affects

Backpage's theory of causation and its requests for relief.  Specifically, if Backpage was still

running transactions through the credit card companies, albeit illegally, Backpage was never

suffering the harm it alleged in its complaint.

      Instead of bringing the above to this Court's attention, as they were obligated to

do, Backpage's attorneys chose to do nothing, except press forward with Backpage's request for

summary judgment.  In fact, since learning that Backpage had lied in the amended complaint

pending before this Court, Backpage sought summary judgment or a summary judgment hearing

on four separate occasions.  *See* Opposition to Defendant's Motion for Leave to File Sur-

Response Opposing Backpage's Motion to Renew Summary Judgment Proceedings (November

23, 2016) (ECF No. 191) (stating "the Court should set a hearing on the Plaintiff's motion for

summary judgment at the earliest possible date"); Opposition to Suggestion of Mootness

(February 21, 2017) (ECF No. 196) (stating the Court should "hold this case is moot and

expeditiously proceed to Plaintiff's motion for summary judgment"); Plaintiff's Motion for

EXHIBIT C

Sanctions Based on Sheriff Dart's Fraud on the Court (December 15, 2017) (ECF No. 205) (stating that Backpage seeks an order requiring that "[a] schedule be set for briefing and argument on Plaintiff's motion for summary judgment," even though it was completely unrelated to the motion it filed); Plaintiff's Reply to Sheriff Dart's Opposition to Motion for Sanctions Based on Sheriff Dart's Fraud on the Court (February 2, 2018) (ECF No. 214) ("Backpage filed its Motion for Sanctions and asked this Court to order … a briefing schedule for resolution of the case on summary judgment").  Once Backpage's attorneys learned that the factual basis for the entire amended complaint was false, namely that Backpage was still actively using credit cards to pay for services on its website, they had a duty and an obligation to inform the Court and the Sheriff's attorneys of the same, at a minimum, by amending their errant pleading.  Instead, they ran from that obligation, and pushed this Court for an entry of summary judgment in their client's favor, even though such a judgment would have been based on a fraud.

On January 19, 2017 after reviewing documentation provided and testimony regarding Backpage's business practices, the Subcommittee issued a report from its investigation titled Backpage.com's Knowing Facilitation of Online Sex Trafficking.  ECF No.  197-1.  In the report the Subcommittee found that Backpage had knowingly concealed evidence of criminality by systematically editing its adult ads, and that it knowingly facilitated prostitution and child trafficking.  *Id.*

On September 15, 2017, the Sheriff sought leave to issue subpoenas to discover evidence proving that Backpage has been and is engaged in criminal activities, including the solicitation of prostitutes and creation of advertisements for prostitution.  ECF No. 201.  The evidence was discovered in the Philippines in a non-related case.  *Id.*  The Sheriff explained in his motion that based on the date range of a few of the incriminating documents that were

EXHIBIT C

available from the docket in Backpage's case against Missouri Attorney General Hawley, it

appeared that Backpage was sanitizing ads of their criminal content in 2015 and 2016, the same

time it was telling this Court that it was not.  *Id.*

       In response to the Sheriff's request, Backpage's attorneys did not tell this Court

about any of the evidence that they had discovered over the course of the last eighteen months,

but rather, pushed forward and continued to argue that the Court should reject the issue raised in

the Sheriff's motion as those issues already had been considered by the Court.  ECF No.  204.

       Counsel for Backpage, throughout the course of this litigation, their representation

of Backpage in the Subcommittee proceedings, and their representation of Carl Ferrer in his

California criminal proceedings, learned of information disproving the facts alleged by Backpage

in its amended complaint.  At the very least, counsel for Backpage, in this case, learned that (1)

Backpage, even after the attempted ban by the credit card companies, was still able to use credit

cards to process payments for services provided through Backpage.com; and (2) Backpage was

sanitizing its ads such that it was an information content provider, and not afforded protections

by the Communications Decency Act.   Even with such knowledge, they performed no

investigation into the same, and failed to inform the Court of evidence discovered.   Such

"ostrichism" is shocking and sanctionable.

IV.     **BACKPAGE'S COUNSEL SHOULD BE**
       **<u>SANCTIONED UNDER 28 U.S.C. § 1927</u>**

       Sanctions under § 1927 should be awarded when counsel acts in an objectively

unreasonable and vexatious manner.  *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 452 B.R.

676, 685 (N.D. Ill. 2011), *aff'd*, 719 F.3d 785 (7th Cir. 2013).  "Objective bad faith does not

require a finding of malice or ill will; reckless indifference to the law will qualify. If a lawyer

pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to

<div align="center">19</div>

EXHIBIT C

be unsound, the conduct is objectively unreasonable and vexatious." *Id.* When determining whether an attorney's actions were objectively reasonable, the court "may infer intent from a total lack of factual or legal basis for a suit." *Id. See also Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184–85 (7th Cir.1992) (counsel sanctioned under § 1927 when "counsel acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of these claims, or counsel otherwise showed indifference to statutes, rules, or court orders").

Now that the criminal indictment and guilty pleas from Backpage and Carl Ferrer have come to light, it is clear that almost every paper filed and proceeding conducted was tainted by false representations, omissions and outright lies. It is obvious that counsel knew or should have known that Backpage was engaged in a criminal conspiracy, and yet its attorneys continued to make false assertions and fight all attempts by the Sheriff to uncover the truth. By repeatedly filing false declarations and motions intended to thwart attempts to reveal the illegitimacy of their client's business, Backpage's counsel have shown utter disrespect for the judicial process and the rule of law. Similar actions have resulted in the imposition of harsh sanctions against the attorneys. *See Kapco Mfg. Co., Inc. v. C & O Enterprises, Inc.*, 886 F.2d 1485, 1490 (7th Cir. 1989) (imposing sanctions against attorney for the cost incurred by the defendants in defending the litigation where the actions of the plaintiff's attorney "evidenced a disregard for an orderly and truthful resolution of the dispute"). Here, the Court needs to simply look at the indictment and plea filed in the criminal case and the misrepresentations and deceit on the Court that Backpage's attorneys have engaged in throughout the proceedings becomes clear.

Considering Backpage's admission in the plea agreement that it fraudulently implemented methods of continuing to receive payment after credit card companies ceased doing business with them, it appears the damages initially claimed in this case were non-existent. "An

EXHIBIT C

award of sanctions is proper if the attorney 'has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice or where a claim is without a plausible legal or factual basis and lacking in justification." *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir.2014) (*quoting Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988)).  Similarly, Backpage's claim that it did not sanitize or moderate ads to remove the appearance of adult and child prostitution is equally sanctionable as there has been ample evidence in other courts to prove otherwise, and Backpage's attorneys were part of these proceedings too.

Even if counsel for Backpage try to claim ignorance as to the false nature of the claims when they were initially filed, the Seventh Circuit has interpreted 28 U.S.C. § 1927 as the appropriate source of authority "to impose a continuing duty upon attorneys to dismiss claims that are no longer viable." *Intellect Wireless, Inc. v. Sharp Corp.*, 87 F. Supp. 3d 817, 848–49 (N.D. Ill. 2015).  Its attorneys also cannot claim that they could not act because of their duty to Backpage to keep confidential Backpage's illegal conduct.  *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063 (7th Cir. 2000) (concluding that the district court did not abuse its discretion in sanctioning an attorney for providing false information and failing to disclose relevant information when awarding attorneys' fees and costs incurred as a result of bad conduct, in which the Court cited to a comment to Rule of Professional Conduct 3.3 which states the "duty to protect client confidentiality does not come before the duty to be honest with the court").

There is too much evidence of illegality for counsel not to have been cognizant of the false pleadings and deceit.  The Sheriff requests, if not already sufficient by this written motion and attached evidence, limited discovery to prove that Backpage's counsel knew the

EXHIBIT C

pleadings, discovery responses, filings and statements in open Court were false when made, followed by an evidentiary hearing, supplemental briefing and an award to promote justice.

WHEREFORE, for the foregoing reasons, the Sheriff requests that this Court enter an order:

1.  permitting limited discovery;

2.  holding an evidentiary hearing on sanctions;

3.  permitting supplemental briefing on the appropriateness and amount of sanctions; and

4.  for any other relief the Court deems appropriate.

Respectfully submitted,

THOMAS J. DART,
SHERIFF OF COOK COUNTY, ILLINOIS

By: Paul J. Kozacky
      One of his attorneys

Paul J. Kozacky
Alastar S. McGrath
Jerome R. Weitzel
KOZACKY WEITZEL MCGRATH, P.C.
55 West Monroe Street, 24th Floor
Chicago, Illinois 60603
(312) 696-0900

EXHIBIT C

# **Exhibit D**

EXHIBIT C

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                    _____

4

5      In Re Grand Jury 16-4,              )  Phoenix, Arizona
                                           )
6      _____)  February 22, 2017
                                           )
7

8

9

10

11         BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

12             REPORTER'S TRANSCRIPT OF PROCEEDINGS

13    Motion to Compel and Cross-Motion to Quash Grand Jury Subpoena

14

15                          <u>SEALED</u>

16

17

18

19

20

21    Official Court Reporter:
      Patricia Lyons, RMR, CRR
22    Sandra Day O'Connor U.S. Courthouse, Ste. 312
      401 West Washington Street, SPC 41
23    Phoenix, Arizona  85003-2150
      (602) 322-7257
24
      Proceedings Reported by Stenographic Court Reporter
25    Transcript Prepared with Computer-Aided Transcription

EXHIBIT C

14:56:11  1    Western District of Washington is instructive and I recommend;

       2    the Court's attention to that --

       3            THE COURT:  I've read both of Judge Jones' orders.

       4            MR. GRANT:  Thank you.

14:56:21  5            But -- and I say that because what he did was he

       6    looked very closely at the actual request the government was

       7    making.  He said I'm not going to redraft your subpoenas for

       8    you, but you can't do this; this is too broad.  There may be

       9    some permissible request, there may not be, but come back to

14:56:43 10    me with something else.  That was the first of the subpoenas

      11    he eliminated.

      12            Then afterward, when the government did come back

      13    with further subpoenas and had no better connection for their

      14    cause of their investigation, he said, in effect, enough's

14:57:00 15    enough.

      16            So I think his sort of measured approach as to how to

      17    address the subpoenas and to recognize the real flaw was this

      18    vast overbreadth of the subpoena in the first place, that it

      19    recommends itself and Rule 17 suggests that is exactly the way

14:57:19 20    the analysis should go.

      21            Are there other questions?

      22            THE COURT:  Yeah.  Hold on just a minute.

      23            MR. GRANT:  Sure.

      24            THE COURT:  If a website operator republishes an

14:58:05 25    advertisement knowing, completely knowing and understanding

EXHIBIT C

14:58:09  1    that the advertisement is for underage prostitution, meeting

2    the scienter requirement that was addressed in the briefing,

3    is it Backpage's position that that -- either that that is not

4    a crime or, if it could be characterized as a crime, it can't

14:58:34  5    be prosecuted because it's committed in a First Amendment

6    context?

7         MR. GRANT:  To take the Court's question, I'm

8    assuming they have knowledge not simply because somebody

9    submitted an ad, but they know something?

14:58:47  10        THE COURT:  Yeah, they know something more --

11        MR. GRANT:  Actual mens rea, actual knowledge?

12        THE COURT:  Right.  That's my hypothetical.

13        MR. GRANT:  So the situation of the hypothetical is

14    if there is actual knowledge, say through participation in a

14:58:58  15    venture, you're conspiring with somebody, you know they posted

16    an ad, you know the person involved is underaged, that's a

17    prosecutable crime, Your Honor.

18        THE COURT:  Let's assume, then, hypothetically, that

19    the government has reason to believe that a website operator

14:59:16  20    is doing that.  Is knowingly engaging in illegal activity by

21    publishing these advertisements, and let's say that the

22    government serves a grand jury subpoena on the website

23    operator to obtain information from the operator as to how the

24    ads are received and processed and revised and what

14:59:45  25    communications occur with the advertisers to try to figure out

EXHIBIT C

# Exhibit E

EXHIBIT C

# Backpage Advertisements and the Erotic Review



EXHIBIT C

# EXAMPLE #1 – HOW IT WORKS

**backpage.com**

backpage.com > las vegas adult entertainment > las vegas escorts

Post an Ad

las vegas, nv free classifieds

## One Of A Kind*34C~23-38 Caramel Vixen ~ 25

posted July 29 2010 08:47 PM

inappropriate content   wrong category   over posted

**Reply:** click here

I'm like that exquisite, luxurious getaway, with never forgetting memories well after the retreat.
Make it a priority to call on ME!
Veronica (503) 891.1565

**Poster's age: 25**

↑

- **Location:** Outcalls Preferred
- **Post ID:** 3117490

Email this ad to a friend


Enlarge Picture


Enlarge Picture



EXHIBIT C



New Reviews | Search Reviews | Home | Reviews | Mail | Discussion Boards | Search ▼ | Top 100 ▼ | Site Reviews | Chat | TER Plug-In | Submit a Review

◐ ONLINE NOW

**Veronica White's Profile**
TER ID: 144149

Send Private Mail To Provider | Chat with a Provider | Add To Favorites | Report A Problem | Link To This Review

# Erotic Review for Backpage Ad

**Same name**

**Same Number**

## general information

| | |
|---|---|
| ad website | http://la.backpage.com/... |
| personal website | http://mswhite.cuties-lasvegas.com |
| agency name | Unknown |
| agency | Independent |
| city | Orange County |
| phone 1 | (503) 691-1565 |
| phone 2 | None |
| incall/outcall | incall/outcall |
| services delivered as promised | Yes |
| on time | Yes |
| porn star | No |

| | |
|---|---|
| service | Escort/Massage |
| other city serviced | Los Angeles |
| phone type | She picks up |
| phone type | None |
| email | veronica.white-9@gmail.com |
| smokes | No |
| availability | daytime/nighttime |

## appearance

| | |
|---|---|
| real photo | Yes |
| build | Thin |
| ethnicity | African american |
| age | 21 - 25 |
| hair color | Black |
| hair type | Straight |
| hair length | Shoulder length |
| piercings | None |
| pussy | Shaved |

| | |
|---|---|
| photo accurate | Yes |
| height | 5'6" - 5'8" |
| Transsexual | No |
| breast size | 34-35 |
| breast cup | B |
| breast implants | No |
| breast appearance | Perky |
| tattoos | A few |

## services offered

| | |
|---|---|
| massage | VIP only |
| sex | VIP only |
| blow job | VIP only |
| touch pussy | VIP only |
| kiss | VIP only |
| two girl action | VIP only |
| more than one guy at a time | VIP only |
| multiple pops allowed | VIP only |

| | |
|---|---|
| massage quality | VIP only |
| s&m | VIP only |
| cum in mouth | VIP only |
| lick pussy | VIP only |
| anal | VIP only |
| will bring second provider | VIP only |
| full, no-rush session | VIP only |
| rimming | VIP only |

EXHIBIT C

## cost of service

Check out our VIP Section section for info on becoming a supporter of The Erotic Review. Being a supporter of this site gains you access to the Explicit part of search form, plus alot of other nice stuff. If you would like to sign-up, click here. If you are already a VIP member please click here.

| SERVICE | LENGTH | PRICE |
|---|---|---|
| VIP only | VIP only | VIP only |

## Reviews (25)

| DATE | | REVIEWER | ONLINE STATUS | APPEARANCE / PERFORMANCE |
|---|---|---|---|---|
| view | Nov-2010 | | thekingpin | |
| view | Oct-2010 | | cynic.com | |
| view | Sep-2010 | | sd | **Review: VERONICA WHITE** |
| view | Aug-2010 | | nc | |
| view | Aug-2010 | | ge | **THEKINGPIN'S REVIEW OF VERONICA WHITE** |
| view | Aug-2010 | | VIP only | appearance |
| view | Aug-2010 | | nc | performance |
| view | Jun-2010 | | ta | VIP only |
| view | Jun-2010 | | | general details |
| view | Jun-2010 | | ts | I haven't written a review in a while, mainly because the providers I've seen have requested me not to. However, Veronica asked me to post a review after our session. Let me tell you, the session was great and Veronica is a sweetheart, so I would do anything she asked. I contacted her initially through email. After a few exchanges and her checking my references, we set up a time for |
| view | Jun-2010 | | kz | her to come to my hotel near LAX. At the appointed time, I received a knock at my door. When I went to open the door, she was nowhere to be found. Then, she appeared from the side of the hall. Apparently, she tries to be low-key in public, so she didn't |
| view | Jun-2010 | | wc | have her heels on when she came to the hotel. She quickly made the switch after she knocked on my door. I can appreciate that. Let me say that her pictures don't do her justice because she was drop-dead gorgeous in person. I invited her in and then the fun began. Non-vips, you gotta see her. |

| APPEARANCE / PERFORMANCE |
|---|
| VIP only |
| Report A Problem   See Provider's Profile   Send Mail |
| attitude |
| VIP only |
| atmosphere |
| VIP only |

**The Juicy Details   *In-depth reviews for VIP Erotic Review Members**

This feature is for VIP Members Only.

EXHIBIT C

# Example #2 – Missing Child

Child went missing from Phoenix, AZ in 2007 and was recovered after nine months in 2008. This was her posting while she was missing – at age 15

This child is 18 years old today, but has reviews on the Erotic Review dating back to 2006 when she was just 14 years old.

The child continues to be advertised on-line as of Dec 2010.

backpage.com

salt lake city, ut free classifieds

Melanie Is Ready To Please you › salt lake city escorts › backpage.com    http://saltlakecity.backpage.com/FemaleEscorts/melanie_is_ready_t...

salt lake city adult entertainment › salt lake city escorts

report: inappropriate content | spam/scam | wrong category | over posted | miscategorized

## Melanie Is Ready To Please you - 20
posted: March 29, 2008, 03:47 PM

Reply: click here

I CAN GIVE YOU A GREAT EROTIC MASSAGE & TERRIFIC GFE
TER REVIEWED AND I DEFINITELY AIM TO PLEASE!

INCALL-200 PER HOUR
150

NO RESTRICTED CALLS
NO TEXTING
PLEASE BE DISCREET
602-434-3016
MELANIE

Location: MID-VALLEY
Poster's age: 20

Email this ad to a friend

No other company or person should contact this advertiser for solicitation for any product or service.


Enlarge Picture


Enlarge Picture

Account Login | Help  Popular Adult Searches | Terms of Use | Privacy Policy © Copyright 2008
saltlakecity.backpage.com is an interactive computer service that enables access by multiple users and should not be treated as the publisher or speaker of any information content provider.

Melanie Is Ready To Please you › salt lake city escorts › backpage.com

EXHIBIT C



EXHIBIT C



The E Review

Home | Reviews | Mail | Discussion Boards | Search ▼ | Top 100 ▼ | TER Plug-In | Chat

New Reviews | Search Reviews | Chat with a Provider

Report A Problem | See Provider's Profile | Send Mail

## Review: MELAINE

### JOHNDOE007'S REVIEW OF MELAINE

**appearance**
VIP only

**performance**
VIP only

**attitude**
VIP only

**atmosphere**
VIP only

### general details

Many people on CL have been expressing a desire to see Melanie, but have been reluctant since no hobbiest has posted a review yet in any forum. I took the plunge and gave Melanie a call since I was craving some attention from a cute young thing. Melanie was easy to reach on the phone and was quite pleasant. I asked if she was a GFE provider and she stated she was. Set an apointment with her and used the standard two call system. Called again when I was approaching the incall location and she provided specific directions and room number at the motel.

She was waiting at the door of her room when I pulled up in my car. She looked even a bit better than her pictures. Took care of business, and I was told to get comfortable. Melanie jumped out of her clothes and asked me what I like. Things steadily went downhill from there....

### The Juicy Details

This feature is for VIP Members Only

## A "hobbyist's" review of the child in 2006 - at age 14

EXHIBIT C

# Example #3- confirmed victim of child trafficking

**Child has advertisements going back to at least age 17**

backpage.com

Post an Ad

northbay  free classifieds by

backpage.com > north bay  adult entertainment > north bay  escorts

**//SE Capreece Starling|real 34 Ds! NorthBay Outcalls! - 19**

Posted  October 2  2016  09:57 A.M.

inappropriate content | wrong category | over posted

Reply click here

~Incalls & Outcalls.. I~* Hey guys,

This is Capreece.

Hopefully can become Much More than your average encounter. Being that I'm only 19, I have A LOT of curious energy. So combining my curiosity with my New found Maturity. I would say you should expect to enjoy yourself and Take a step OFF. But notice my Always speak louder than words. So I would probably work better if I could show you, rather than tell you. So give me a call and we'll have a good time....I promise. See ya!.

.Please No Blocked Calls and No txt Messages.

P.S. If you want to know a little more about me see my awesome reviews on TER (search user ID 139538)...! ⟵

~Capreece~* (707) 536-7441

Donation exchanged for legal adult personal services such as modeling, escorting or massages are simply for time, companionship, and related services. Anything else that may or may not occur is a matter of personal choice and personal preferences between two or more consenting adults of legal age and is not contracted for, nor is it requested to be contracted for in any manner. This is NOT an offer of or for prostitution. Fees charged are for the time spent only. I do reserve the right to decline appointments and individuals as I deem necessary. By contacting me either through phone or email you agree to this contract and these terms and hereby acknowledge that you are not part of any law/enforcement agency using this advertisement for entrapment or for arrest.

Poster's age: 19

· Location: Northbay outcalls

· Post ID: 6284409 northbay

· Other ads by this user:

Want to play?! I'm only a call away! Capreece Starling, OUTCALLS. - 19 🔞 (OUTCALLS!) adult entertainment escorts

Want to play?! I'm only a call away! Capreece Starling. - 19 🔞 (East Bay, incall) adult entertainment escorts

Want to play?! I'm only a call away! Outcalls!!!. - 19 🔞 (Outcalls!) adult entertainment escorts

Want to play?! I'm only a call away! Outcalls!!!.. - 19 🔞 (San Jose/Santa Clara/Sunnyvale ) adult entertainment escorts

Come and Play on My Last Day! - 19 🔞 (San Jose/Santa Clara/Sunnyvale ) adult entertainment escorts

Come and play on my last day! I'm only a call away! MAJOR SPECIALS!! - 19 🔞 (lo-ato) adult entertainment escorts

Email this ad to a friend

Enlarge Picture

Enlarge Picture





EXHIBIT C



Home   Reviews   Mail   Discussion Boards   Site Reviews   Chat

New Reviews   Search Reviews   Chat with a Provider   Search ▾   Top 100 ▾   TER Plug-in   Submit a Review

Report a Problem   See Review 3 Prob   Send mail

## Review: CAPREECE

### STROKER312'S REVIEW OF CAPREECE

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| VIP only | VIP only | VIP only | VIP only |

**general details**

I came across Capreece's ad last night. I was in the mood for something young and tight. She seemed to fit the bill and I saw that she would be in my area the following day. I called and she was nice and easy to talk to on the phone. Decided to have her give me a call when she got to her incall the following day and go from there. She called the following day, early afternoon and we set up an appointment for later in the day. I got to her incall and called. She is known from her room and met me in the parking lot. Asked me to kiss her on the lips, I assume this was to prove I was not LE. Nice tits too, she has some very sweet lips. Checked out her body while I followed her into her place and back to her room. She is thick but athletic with beautiful big breasts. Got to room and set out donation. We get comfortable on the bed and...

**The Juicy Details**

This feature is for VIP Members Only.

The johns know that the activity is illegal and occasionally reference law enforcement in their reviews.

This child was identified through the Innocence Lost National Initiative.

EXHIBIT C

# Example #4 – CyberTipline Report

**backpage.com**

backpage.com > washington, DC adult entertainment > washington, DC escorts

washington dc free classifieds

report    inappropriate content |    wrong category |    crer posted

♥__S_w_E_e_T__B_u_s_t_Y__♥__
P_L_A_t_i_N_u_M__B_l_O_n_D_e__♥ - 20

posted September 1, 2010 01:33 PM

Reply: click here

♥Friendly & Fun To Be Around♥____

(310)
3
0
0
◄
8
8
8
3

*Alica*

*I'm sweet, open minded and all my pictures are real!
He is lonesome. When I was the last time you were able to
just let loose, be sort of care free, and indulge a bit?
Well, right now is your chance!
I am absolutely what you have been looking for. Safe,
relaxing, and sexy! My sweetness and fun-loving attitude will
leave you satisfied!*

*I'm absolutely what you have been looking for. Safe,
experience, LOOK NO FURTHER, I'm here!*
*So call me cause I always pick up my phone!*
*::A::V::A::I::L::A::B::L::E.....24/7::*
*$140/$240 INCALLS....*

*Poster's age: 20*

• Location: Hwy 495+ Alexandria [Incalls][Ourcalls]

• Post ID: 3657140 washingtondc

Email this ad to a friend



Enlarge Picture

Enlarge Picture

Enlarge Picture

Traffickers try to
hide phone numbers
from law
enforcement
searches by using
different ways to
spell out or display
the phone number.

However, the PRICE
of services is not
hidden and is clear
to readers.

EXHIBIT C

# The Johns recognize that they are engaging in sex with a "*young*" girl

## Alica's Profile
TER ID: 155328

Add To Favorites    Report A Problem    Link To This Review

### general information

| | | |
|---|---|---|
| **ad website** | https://washingtondc.backpage.com/FemaleEscorts/a_v_e_a_r_-_b_u... | |
| **personal website** | n/a | |
| **agency name** | Unknown | |
| **agency** | Independent | |
| **city** | Washington D.C. | **other city serviced** None |
| **phone 1** | (310) 303-9836 | |
| **phone 2** | None | |
| **incall/outcall** | incall/outcall | **service** Escort/Massage/S&M |
| **services delivered as promised** | Yes | |
| **on time** | Yes | |
| **porn star** | No | |

New Reviews    Search Reviews    Chat with a Provider    Search    Top 100    TER Plug-In    Submit a Review

## Review: ALICA

Report A Problem    See Provider's Profile    Send Mail

### appearance

| | |
|---|---|
| **real photo** | Yes |
| **build** | Average |
| **ethnicity** | White |
| **age** | 18 - 20 |
| **hair color** | Blonde |
| **hair type** | Straight |
| **hair length** | Below sh |
| **piercings** | None |
| **pussy** | Shaved |

### GUITARMAN69'S REVIEW OF ALICA

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| VIP only | VIP only | VIP only | VIP only |

### general details

I was browsing and saw Alica and decided to give it a shot. Contacted call system applied. She was available at a nice hotel. She met me at a side entrance and led me up to the room. She is young and sexy as I expected. I left the donation on the table and we got comfortable.

### The Juicy Details
This feature is for VIP Members Only

### services offered

| | |
|---|---|
| **massage** | VIP only |
| **sex** | VIP only |
| **blow job** | VIP only |
| **touch pussy** | VIP only |
| **kiss** | VIP only |
| **two girl action** | VIP only |
| **will bring second provider** | VIP only |
| **more than one guy at a time** | VIP only |
| **full, no-rush session** | VIP only |
| **multiple pops allowed** | VIP only |
| **rimming** | VIP only |

EXHIBIT C

# Example #5 – CyberTipline Report

**backpage.com**

backpage.com > fargo adult entertainment > fargo escorts

report:  inappropriate content   wrong category   over posted

fargo, nd free classifieds

Children are routinely moved by their traffickers from city to city to keep them away from familiar surroundings and to avoid detection by law enforcement.

--> Layla Marx <-- Sexy Petite Asian Playmate

Posted: November 18, 2010, 02:47 PM

**NEXT FEW DAYS ONLY!** - 20

Reply: click here

heyy fellas!
my name is layla marx nd i am here for yur enjoyment!
beautiful, charming, nd so much fun!
i am here for tha week so come have some fun with me!
it's getting cold out... maybe i can warm yu up?
looking good nd smelling pretty, just for yu!
5'1
108lbs
34b
714-788-1860

yu can also check out my reviews on TER, nd other review sites!
hope to hear from yu soon!

serious callers only!
no blocked calls, txts, or emails!
by calling yu are agreeing that yu are not affiliated with any form of law enforcement!
all donations are for time nd companionship only!

wanna double tha fun?!
ask about my two girl!

• Location: incall 24/7

• Poster's age: 20



Enlarge Picture





Enlarge Picture

EXHIBIT C

## Reviews (4)

**Layla Marx's Profile**
TER ID: 15486

New Reviews | Search Reviews | Cha | Home | Reviews

### general information

**ad website** http://altus.backpage.com/FemaleEscorts/exotic-tiny-lil-asian-...
**personal website** n/a
**agency name** Unknown
**agency** Independent
**city** St. Louis
**phone 1** (612) 390-2597

**service** Escort/Massage
**other city serviced** Minnesota
**phone type** She picks up

| DATE | REVIEWER | ONLINE STATUS | APPEARANCE / PERFORMANCE |
|------|----------|---------------|--------------------------|
| Oct-2010 | MusicCityScene | OFFLINE | VIP only |
| Sep-2010 | CrazLuvin | OFFLINE | VIP only |
| Aug-2010 | atomos319 | OFFLINE | VIP only |
| Jul-2010 | lgpaladin | OFF-LINE | VIP only |

| view | | | |
| view | | | |
| view | | | |
| view | | | |

Report A Problem | See Provider's Profile | Send Mail

### Review: LAYLA MARX

**CRAZLUVIN'S REVIEW OF LAYLA MARX**

#### services delivered

**appearance**
VIP only

#### general details

**appearance**
VIP only

**performance**
VIP only

**attitude**
VIP only

**atmosphere**
VIP only

#### services offered

#### The Juicy Details

I had been watching this girl for awhile and finally decided to give her a go. Called from my hotel, she picked up right away and was able to see me just about an hour later. She came alone to the room, but her girlfriend drove her to the hotel and apparently stayed in the car. She made one phone call after getting to the room, I guess to say things were cool. She did not kiss but was willing to hug. She was super cute and tiny. The original agreement was for less than I paid her because I decided if she was going to be a bit detached, then I wanted a little something extra. Non-VIP you should know this girl is something special and worth every penny - VIP read on to see just how far this girl will go....

more tha
m

EXHIBIT C

# Example # 6

## Another CyberTipline Report to NCMEC

## The ads leave little to the imagination...



**backpage.com** > phoenix adult entertainment > phoenix escorts

phoenix, az free classifieds

report: inappropriate content | wrong category | cross posted

## TaStEy CARAMEL honey... uMmm m F33L Me :::

### SqIURt ::: - 20

posted: March 9, 2010, 06:57 PM

Reply: click here

::: & TASTE MY SWEET HONEY UMMMM...:::

EBONY CARAMEL HONEY AVAILABLE FOR YOUR PLEASURE.

HEY MY NAME IS CANDY & IM FEELING REALLY NAUGHTY! I HAVE A COUPLE OF TOY'S BY MY BED & IM READY TO PLAY...HOW DO YOU WANT TO GIVE IT TO ME???

FAST!...SLOW!...CAN I RIDE YOU??...OR DO YOU WANT IT FROM THE BACK??...HOWEVER YOU LIKE IT...M & LET ME SHOW YOU MY SPECIAL TECHNIQUES.

MY HONEY DRIPS...MY BOOTY CLAPS UMM & LET ME SHOW YOU MY NAUGHTY SIDE!

BOOTY CLAPING!!!

SPECIALS!!!

UMMM I CANT WAIT TO HEAR FROM YOU!

TASTE MY CANDY...48(0)31(8)11(0)7

TER: http://www.theeroticreview.com/reviews/show.asp?id=148604

Poster's age: 20

• Location: Anywhere you need me.




EXHIBIT C

# ...and the reviews corroborate the illegal activity

## Review: CANDY

Report A Problem   See Provider's Profile   Send Mail

### BIGGEEP'S REVIEW OF CANDY

| appearance | performance | attitude | atmosphere |
| --- | --- | --- | --- |
| VIP only | VIP only | VIP only | VIP only |

**general details**

Saw her pics and I always wanted a squirter. Typical two call system, you guided me to her rental apartment. She is nice looking, not beautiful but will do. I got the 15 min session, she only squirts for 1/2 hr or hour. Would see again.

**The Juicy Details**

This feature is for VIP Members Only

## Review: CANDY

Report A Problem   See Provider's Profile   Send Mail

### FROM 85003'S REVIEW OF CANDY

| appearance | performance | attitude | atmosphere |
| --- | --- | --- | --- |
| VIP only | VIP only | VIP only | VIP only |

**general details**

I had seen Candy's ads on BP for while and send her an PM. She replied and sounded like fun. I was getting ready to leave the office on Fridy when I saw her ad on BP that she was having a special so I called her and she was available not to far from me. So I booked a date and stopped by her incall in 30 mins. Non VIPs she's okay for the price but not FS.

**The Juicy Details**

This feature is for VIP Members Only

EXHIBIT C

# Example #7

## Can certain keywords suggest a child victim?

"fresh"
"young"
"new in town"



**phoenix, az** free classifieds

report: inappropriate content | wrong category | over posted

backpage.com > phoenix adult entertainment > phoenix escorts

## *-*-* YOUNG SOUTHERN THING !!! ::: New To Phoenix : : : Sweet & Sexy : : Call Me Anytime !!! *-*-* - 20

posted: August 11, 2010_06:42 PM

Hi:

I'm PARIS !!! I am fresh from Alabama and here to please you with my Southern Charm. I am very sweet, sexy, and seductive!!!

I have long blonde hair, deep green eyes, and a very petite and toned body!!

So, call me now or anytime you are ready – Paris:
☎ 928-310-7213

I am your fantasy dream girl, your perfect playmate! Experience the ultimate pleasure with me!

I only cater to upscale men who know what they want, are very generous, well mannered, and possess impeccable hygiene.

I will make all of your fantasies come true! Think of me as a memorable break in the middle of a tiring day or a sweet retreat any time of day.

I am very open minded and have an uninhibited wild side!

I am a 100% natural. I have WILD gorgeous hair, soft tanned skin, seductive green bedroom eyes, and a petite tight toned body. I am very bright, funny, sensual, honest, discreet, and just love the company of men.



Enlarge Picture



Enlarge Picture

EXHIBIT C

New Reviews    Search Reviews    Chat with a Provider    Search    Top 100    TER PlugIn    TER PlugIn    Submit a Review

**Jaymie / Paris's Profile**
TER ID: 158771

Add To Favorites    Report A Problem    Link To This Review

# This review lends credibility to the fact that the girl is young and

" *...a new provider who still needs to learn a few things about the business...* "

**general information**

| | |
|---|---|
| ad website | http://eroticservices.cityvibe.com/escorts.php?d=review&p=194823... |
| personal website | http://proenix.backpage.com/FemaleEscorts/10964293 |
| | n/a |

**agency name** - unknown

| | |
|---|---|
| agency | Independent |
| city | Atlanta |
| phone 1 | (678) 565-5346 |
| phone 2 | (929) 310-7213 |

incall/outcall

**services delivered as promised :** JAYMIE

on time
pom sta

**service** Escort
**other city serviced** None
**phone type** She picks up
**phone type** Voice mail

**appearance**

re

MASONDIXON JAYMIE

Paris and I had a hard time hooking up due to some phone problems she was having. I had initially scheduled an appointment with her, but when I showed up to the motel, she didn't answer. We finally reconnected a bit later, and she explained the phone problems, so we rescheduled for later that day. When I arrived, she gave me her room number, and I went up. I was very pleased when she opened the door, as she was definitely the girl in the photos, cute, petite, and with a great... incredible tight little ... She gave me a nice hug, and I left the donation on the table, which she promptly scooped up, counted, and put aw...

Paris is a fairly new provider, who still needs to learn a few things about the business, but, on the whole, a very sweet girl with ...l body, and I would see her again.

**services offered**

| | |
|---|---|
| sex | VIP only |
| blow job | VIP only |
| touch pussy | VIP only |
| kiss | VIP only |
| two girl action | VIP only |
| more than one guy at a time | VIP only |
| multiple pops allowed | VIP only |

| | |
|---|---|
| skin | VIP only |
| cum in mouth | VIP only |
| lick pussy | VIP only |
| anal | VIP only |
| will bring second provider | VIP only |
| full, no-rush session | VIP only |
| rimming | VIP only |

EXHIBIT C

# How Do we know that children are being advertised on Backpage?

- Since 2006 NCMEC has identified 17 missing children in advertisements on Backpage

- 10 of those children were identified in 2010 alone .

- The children range in age from 13-17 years old

EXHIBIT C

# Example #8 - Confirmed Missing Child Victim

Child reported missing multiple times, starting at age 12. She was last recovered during Operation Cross Country in Nov 2010.

In this ad she is 16 years old. Traffickers will often place the child in sexual poses while hiding the face child to conceal identity and youth

**ONGOING INVESTIGATION

**backpage.com**

baton rouge, la free classifieds

backpage.com > baton rouge adult entertainment > baton rouge escorts

ExTrEmLY hOT & WILD... EXoTiC BARbiE ! - 18

posted October 7, 2010, 12:30 PM

report: [illegible]



**Reply: click here**

I can assure you that our time spent together will never be rushed, of the highest quality, and a time you will always remember.
After BEING with me all of your EXPIRENCES will have been satisfied. Let me fulfill your ULTIMATE FANTASY.

207 458 4130

50 Roses 15 Minute Incall
100 Roses 30 Minute incall
150 Roses 60 Minute incall
I WILL NOT TALK ABOUT DONATIONS OVER THE PHONE !?

Poster's age: 18

• Location: Airline ( I12 )

• Post ID: 4045874

Email this ad to a friend

EXHIBIT C

# Example #9 – Confirmed Missing Child Victim

This Child is a repeat runaway and has been reported missing to NCMEC multiple times. Traffickers pray on vulnerable children in state care.

The child was 15 years old at the time of this advertisement.

**backpage.com**

backpage.com > chicago adult entertainment > chicago escorts

chicago, il  free classifieds

**NEW!!!!°o \*Exotic- #1 Choice-\*\*\*\*\*\* ♡°₰ε ☆ A WILD 1 ☆ ♡°₰ε ♡°₰ε\*\*\*\*\*\*• - 21**

report:   inappropriate content          wrong category          now posted

posted June 16. 2010. 04:00 PM

Reply  click here

Beautiful toned figure and an amazing personality that will keep you entertained and feeling warm and relaxed for hours...

G...F...E



Enlarge Picture

100 HH
160 HR
PARIS
203 302 8122

Do not post obscene images, e.g. explicit genitalia, sex acts, erect penises, etc.

Do not post content which advertises an illegal service.

Postings not complying with the terms of use are subject to removal.

EXHIBIT C

# Example #10

north carolina free classi

**backpage.com**

backpage.com > north carolina adult entertainment > north carolina escorts

report:   inappropriate content   |   wrong category   |   over posted

## 100 QUICKiE *~* ☆ ★ B*E*A*U* T*I*F*U*L

posted: June 21, 2010, 09:46 AM

Looking for a satisfying time gentlemen?
Meet the beautiful BROOKLYN........ I am an open-minded,
easygoing, sexy, and seductive Goddess ready for
companionship!
Take the perfect break out of a long and busy week you won't
regret! `-_-Don't you think its time to treat yourself?
*_-`*100% Real Photos*`-_`*
LET ME FULLFILL YOUR FANTASY!!!!!!! Dont miss out on my
HOUR special. TONIGHT!!(:):):)
CALL NOW!!!! ****310-595-4061****

• Location: Raleigh / Durham

• Post ID: 3983657

Email this ad to a friend



EXHIBIT C

# Review: BROOKLYN

Report A Problem    See Provider's Profile    Send Mail

## FOURLITTLE'S REVIEW OF BROOKLYN

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| VIP only | VIP only | VIP only | VIP only |

### general details

It was tough to get her on the phone initially, but finally around 4:00 she picked-up. She initially seemed like I woke her up, but when I said I wanted to see her that night, she said absolutely. She said she would call me 30 minutes before to make sure I was still coming since she was sharing a room with someone and needed to know in case I didn't show up so something else could be scheduled. At 30 minutes before, she did not call, so I waited until about 15 minutes before and called her. Again, she seemed out of it. Like I woke her up again. I asked if she wanted to do another time and she said absolutely not. She said to give her 20 minutes and call back to get the room number. Finally, I called back, got the room number and was on my way.

### The Juicy Details

This feature is for VIP Member's Only

This reviewers comments suggest the girl was "out of it". Pimps often use drugs to control the girls or to keep them working. Drug abuse and/or exhaustion are common for victims of trafficking.

EXHIBIT C

# Exhibit F

EXHIBIT C



# Elms Web Services, Inc.

# Invoice

**David Elms**

**Bill To:**
Backpage.com, LLC
1201 E Jefferson
Phoenix, AZ 85034

**Invoice No:** 1313

**Date:** Jan 1, 2008

**Referrals that convert!**
My team and I specialize in placing banner ads and one way in bound links with high conversions and SEO.

| Description | Estimated new referrals per mo | Cost per visit | Amount |
|---|---|---|---|
| Feb Banner ad placement | 450,000 | .00888 | $4,000 |

| | |
|---|---|
| Subtotal | $4,000 |
| Sales Tax | na |
| Total | $4,000 |

**Remit Payment to:**
Elms Web Services, Inc.

5228 W 124th St
Hawthorne, CA 90250
T 310.491.1451 F 310.491.1452
Email: david@elmsweb.com

EXHIBIT C

# Exhibit G

EXHIBIT C

# "TheEroticReview.com" Founder David Elms Arrested in Phoenix, Suspected of Trying to Hire Killer

Ray Stern | February 17, 2009 | 9:49am

- 
- 
- 
- 
- 

AA

The founder of theeroticreview.com, a Web site the *New York Times* calls the Amazon.com of prostitution, has been arrested in Phoenix on suspicion of trying to kill one person and seriously injure another, selling drugs and misconduct with weapons.

David Elms, 38, was booked into the Maricopa County jail early this morning after he arrived in Phoenix from California, following information about him that police gleaned from the "Desert Divas" escort service investigation. Here's the straight poop from Sergeant Andy Hill's news release:

*Suspect: Elms, David; A/M; DOB 4/09/71; booked into Maricopa County Jail for one count of conspiracy to commit murder; one count of conspiracy to commit aggravated assault; one count of conspiracy to possess narcotic drugs for sale; one count of conspiracy to commit misconduct involving weapons; one count of possession of drug paraphernalia*

Continue Reading

*Victim 1: 32 year old female*

*Victim 2: 62 year old male*

EXHIBIT C

*Phoenix Police Department investigators recently received information that Mr. Elms wanted to hire someone to kill the listed female victim. Investigators met with Mr. Elms after he arrived in Phoenix from California just after midnight on February 15, 2009.*

*Mr. Elms was arrested about 30 minutes later after probable cause was developed to arrest him for the listed charges. Investigators state that Mr. Elms contracted to have the woman killed and the listed adult male victim seriously injured. Mr. Elms was arrested without incident by officers from the Phoenix Police Department's Special Assignments Unit.*

*Some of you have asked if the information received is related to the recent "Desert Divas" case. Investigators said it is related because information in this conspiracy to commit murder case came from a suspect in the "Desert Divas" case. Investigators are looking into whether there is any other connection.*

*This investigation is continuing.*

The above-referenced *New York Times* story says Elm's popular Web site rates high-end escort services and makes it easier for customers to hook up with prostitutes in the same area. Elm has supposedly made a comfortable living from the site -- and there are plenty of perqs.

From the article:

*"He is the most influential man in the prostitution business in America," said Jason Itzler, the former head of NY Confidential, an escort ring. Mr. Itzler was released from prison last year after serving 30 months for the attempted promotion of prostitution.*

*...*

EXHIBIT C

*Mr. Elms usually does not say much publicly about his Web site, asserting that reporters twist his words. But in an interview with MSNBC.com in 2006, Mr. Elms said that he started The Erotic Review in 1999 because he wanted to empower the customers of prostitutes.*

*"I was getting ripped off," he said. "There was no way to hold people accountable for their actions."*

**If you like this story, consider signing up for our email newsletters.**
**SHOW ME HOW**
X

**Newsletters**



- ☑ Film
- ☑ Promotions
- ☑ Events
- ☐ Daily ☑ Weekly

All-access pass to the top stories, events and offers around town.

- No Thanks
- Sign Up

And here's a sample from his site:

Clicking on one of the "providers" gets you contact and personal info. As in, *really* personal:

Elms is in the middle of a federal copyright infringement lawsuit and was fighting drug and weapons charges back in June (we're not sure how that turned out). The

EXHIBIT C

latest charges are his most serious yet -- and he'll be stuck with the "plead to the lead" policy of Maricopa County Attorney Andrew Thomas.

Will Elms' next Internet venture have something to do with prison sex?

**Ray Stern** has worked as a newspaper reporter in Arizona for more than two decades. He's won many awards for his reporting, including the Arizona Press Club's Don Bolles Award for Investigative Journalism.

EXHIBIT C

# Exhibit H

EXHIBIT C

**To:** Scott Spear[scott.spear@villagevoicemedia.com]; Carl Ferrer[carl.ferrer@backpage.com]
**From:** Jim Larkin
**Sent:** Mon 5/11/2009 7:27:57 PM
**Subject:** johns accused of favorably rating escorts on Erotic Review in exchange for discounts

Authorities: 43 more indicted in Desert Divas prostitution bust

Arizona Republic, May 9, 2009


Authorities on Friday announced that 43 more people have been indicted on charges of having roles in a prostitution syndicate that earned an estimated $18 million over six years.

Those arrested as part of the latest phase of the Desert Divas prostitution scandal included four "VIP customers" accused of favorably rating escorts online in exchange for reduced rates for sex.

Others answered phones or photographed the women for advertisements, according to investigators.

Most of those included in the April 23 indictment are accused of being prostitutes, including Jillian Lybarger, a Maricopa County sheriff's detention officer.

Friday's announcement came less than one month after Desert Divas founder Paul Nichta and others pleaded guilty to a variety of felony charges.

Maricopa County Attorney Andrew Thomas and Phoenix detectives said the latest waves of arrests stretched from Phoenix to Colorado, Florida and Washington.

More than 20 people have yet to be arrested as part of the latest indictment, officials said.

Phoenix police Lt. John Collins said the VIP customers indicted this spring rated Desert Divas escorts on the California-based Erotic Review prostitution Web site - an action that authorities said they would prosecute as a felony for supporting a criminal enterprise.


Reach the reporter at michael.ferraresi@arizonarepublic.com.


Content-Type: text/plain; charset=US-ASCII
Content-Transfer-Encoding: 7bit
Content-Disposition: inline

Authorities: 43 more indicted in Desert Divas prostitution bust

Arizona Republic, May 9, 2009

EXHIBIT C

Authorities on Friday announced that 43 more people have been indicted on charges of having roles in a prostitution syndicate that earned an estimated $18 million over six years.

Those arrested as part of the latest phase of the Desert Divas prostitution scandal included four "VIP customers" accused of favorably rating escorts online in exchange for reduced rates for sex.

Others answered phones or photographed the women for advertisements, according to investigators.

Most of those included in the April 23 indictment are accused of being prostitutes, including Jillian Lybarger, a Maricopa County sheriff's detention officer.

Friday's announcement came less than one month after Desert Divas founder Paul Nichta and others pleaded guilty to a variety of felony charges.

Maricopa County Attorney Andrew Thomas and Phoenix detectives said the latest waves of arrests stretched from Phoenix to Colorado, Florida and Washington.

More than 20 people have yet to be arrested as part of the latest indictment, officials said.

Phoenix police Lt. John Collins said the VIP customers indicted this spring rated Desert Divas escorts on the California-based Erotic Review prostitution Web site - an action that authorities said they would prosecute as a felony for supporting a criminal enterprise.


Reach the reporter at michael.ferraresi@arizonarepublic.com.

EXHIBIT C

# Exhibit I

EXHIBIT C

**From:** Andrew Padilla ███████████████ on behalf of Andrew Padilla
**Sent:** Friday, February 18, 2011 10:16 PM
**To:** Adam███ Allen███ Amanda███ Andrew███ Angel███ Angela███ Beverlie███ Billie███ Brian███ Bryan███ Cathleen███ Cody███ Dawn███ Devyn███ Donavon███ Ian███ James███ Jana███ Jason███ Jeff███ Jennifer███ Jessica███ John███ Justin███ Kolter███ LaTamara███ Levi███ Maria███ Martina███ Matt███ Michael███ Michael███ Misty███ Monica███ Nathan███ Nick███ Ray███ Roger███ Sara███ Sean███ Stefano███ Tara███ Tranica███ Zeke███
**Cc:** Joye███
**Subject:** another term bites the dust
**Attachments:** good.jpg; bad.jpg; bad (1).jpg; bad (2).jpg; bad (3).jpg

All:

We've been filtering out the terms "TER" and "The Erotic Review" along with links to theeroticreview.com since January of this year but our internet safety experts have suggested we take a more aggressive approach.

Effective immediately, any variation of, or reference to, TER is banned. If you find it in an ad, remove the phrase and update the ad but do not lock the ad from editing for this violation alone. If the review ID number is attached to the reference (TER #8675309), remove the ID number along with the TER reference.

If you find a string of numbers without a direct reference to TER, it's allowed.
Examples:

"#123456"

"Well Reviewed #666666"

"Google my reviews #12011201"

An easy way to weed out a good chunk of these references is to do a search for "TER" on the city page. You'll get some false positives but it should point you in the right direction. Non-adult spammers will sometimes use hidden keywords like "block bus ter video" and the search will see the tail-end of "bus ter". To avoid this, you can start your search after you've navigated to the Adult section of the city.

I'm attaching 4 example screenshots of what is not allowed (circled in red) and 1 example screenshot of what is okay (circled in green).

If you have any questions, please ask me or Joye. Thanks.

Andrew Padilla
Operations Manager
Backpage.com | Village Voice Media
████████████

1

App.000260                                        EXHIBIT C

# **Exhibit J**

EXHIBIT C

| | |
|---|---|
| **From:** | Ernie Allen |
| **To:** | Brad Myles |
| **Subject:** | FW: |
| **Date:** | Tuesday, March 01, 2011 4:51:00 PM |

This is the first e-mail.

-----Original Message-----
From: Ernie Allen
Sent: Tuesday, March 01, 2011 12:07 PM
To: Anderson, Harold
Cc: Anderson, Kayrita
Subject: RE:

Harold, Kayrita:

I promised a report after my meeting this morning with Backpage executives. Kayrita, I am including you in this update because you were brought up during the meeting, and not in a positive way. I am going to give you a full unvarnished report, so we need to treat it as confidential. Most of these things, I cannot say to others. They were honest and candid, and so was I. I can tame it down a little, but felt that you should hear it all.

To say that the meeting did not go well is an understatement. I had a very important 10 am phone call and had told them that I only had one hour to give them. However, at 10 am we were screaming at each other and I simply could not leave. So, we did battle for another half hour.

The attendees were Jim Larkin, Chairman and CEO of Village Voice Media; Scott Spear, Executive Vice President; Mike Lacey, co-owner (with Larkin) and Editor-in-Chief (I googled him and in several reports, he refers to himself as "asshole in charge"), which speaks volumes about him; Carl Ferrer, Vice President of Sales & Marketing and pointman for Backpage; plus Hemu and his staffperson, Simrin Hooper.

Carl did a presentation on all they have done, and the steps they are taking. Larkin said that they were changing all of their ads to conform with a "print standard." Ferrer said that they have implemented two levels of moderation and now have 90 people reviewing and moderating ads. Larkin said that their primary source of guidance is "user moderation," and that they are getting lots of reports from their users.

They have banned hundreds of terms and are continually monitoring to keep illegal content from appearing. They talked about the problems they are having with "phishing," people hacking into their site and stealing their customers identity, financial information, etc.

I responded with several basic points:

(1) That we appreciated the steps they were taking, but they aren't working. I mentioned Erotic Review, and said that all you have to do is to look at the Erotic Review site to determine that the ads they are running are clearly prostitution ads involving both kids and adults. (Larkin said, "we have nothing to do with Erotic Review.") I asked, "have you registered with Erotic Review so you can read the ads about the woman and children being advertised for sex on your site?" They haven't.

(2) I pointed out that while they had made 158 reports to NCMEC, virtually all of them came as a result of user-generated complaints. I said that if 90% of the reports came from your users, that means that Backpage's 90 "screeners" and "moderators" and their two-tiered review system effectively had only found 9 or 10 ads that they deemed worthy of reporting. While they quibbled a little about the numbers, Larkin said that "user-generated" reports are the best way to identify inappropriate content and activity. Ferrer committed that he would enhance their review system and generate more proactive reports.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

# Exhibit K

EXHIBIT C

**From:** Wick, Amanda (CRM) <Amanda.Wick@CRM.USDOJ.GOV>
**Sent:** Wednesday, November 7, 2018 6:17 PM
**To:** mlp@pd-law.com
**Cc:** Reid, Patrick (CRM) <Patrick.Reid@CRM.USDOJ.GOV>
**Subject:** RE: Andrew Padilla: seizure warrants issued for IOLTA funds to defend Mr. Padilla / request for seizure affidavit

Mike,

Kevin forwarded me your email so that I could address your concerns. First, it might help for me to clarify a few things as some of the information in your email isn't quite accurate. We actually obtained two seizure warrants for funds contained within two different IOLTA accounts, both held in the name of Piccarreta Davis Keenan Fidel PC. One (attached hereto as "36A 37 38 40 JPMC") is for $10,000 from a JP Morgan Chase bank account ending in -9285. The second (attached hereto as "36B Grand Point") is for $740,000 from a Grand Point bank account ending in -3985.

I'm not sure who the "they" is that you reference in your email below, but my supervisor at DOJ has told any counsel that inquired that this case is being prosecuted out of the District of Arizona and MLARS is assisting on asset recovery issues only. As a result, we would have to consult with the prosecutors in Arizona to confirm what the status of the criminal case was, whether discovery had been provided, whether the warrant was under seal and, if not, whether we could provide it upon request. Given that the warrant affidavit would likely be produced at some point during discovery, we didn't think the prosecutors in Arizona would object, but we needed to check with them before sending out the warrant affidavit. I anticipate having an answer on that tomorrow.

Finally, the warrant needs to be executed within 14 days, the deadline for which is Wednesday, November 14th. We give law firms the opportunity to wire funds to the United States, in lieu of serving the warrants on the banks, because we are trying to minimize any disruption the warrant could have on your IOLTA accounts. I'm sure Patrick told you that, often when we serve a seizure warrant on a bank to seize funds from an IOLTA account, the bank freezes the accounts entirely and sometimes more accounts than the ones listed in the warrant. Because of the adverse effects that can cause, we work very hard to coordinate with law firms to effectuate the turnover of the funds with as little impact on the firms as possible. However, some firms do decline to wire funds in lieu, and in that situation, we serve the warrants on the bank, as authorized by the court, prior to the 14th day.

To the extent a law firm has earned fees that have not been moved from the IOLTA to an operating account, we request that substantiating bills (redacted for attorney-client privilege) be submitted to us for due diligence review, and once reviewed, we subtract that amount from the seizure amount, as we are not seeking to seize earned fees.

Should you wish to make a <u>Monsanto</u> claim, we offer every defendant the opportunity to show that they are financially unable to pay for their defense without the funds we are seizing. Because of the timeliness of the warrant, we will be seizing the funds before the 14th, but if you can make a showing that your client has no other funds with which to pay for his defense, we are happy to review those materials and consider releasing some amount back to pay legal fees.

I hope that answers your questions, but if not, please do not hesitate to call me at my direct line below. Thank you for your time and assistance with this matter.

EXHIBIT C

Sincerely,

**Amanda Schlager Wick**
**Trial Attorney, Asset Forfeiture & Money Laundering Unit**
**Money Laundering & Asset Recovery Section (MLARS)**
**1400 New York Ave. NW, 10th Floor**
**U.S. Dept. of Justice, Washington, D.C. 20004**
**(202) 514-2842**
**(202) 597-0435 (cell)**
**(202) 514-5522 (fax)**

*CONFIDENTIALITY NOTICE*:  This communication with its contents and attachments, if any, may contain confidential, law enforcement sensitive, privileged attorney/client communications or work products, and is not subject to disclosure.  It is solely for the use of the intended recipient(s).  Unauthorized interception, review, use, or disclosure is prohibited.  If you believe that you have received this communication in error, please notify the sender immediately and permanently delete the email, any attachments, and all copies from your computer.

EXHIBIT C

**DISTRICT JUDGE'S MINUTES**
# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA – PHOENIX

| | |
|---|---|
| **U.S. District Judge:** Steven P. Logan | **Date:** January 25, 2019 |
| **USA v. Lacey, et al** | **Case Number:** CR-18-00422-PHX-SPL |

**Assistant U.S. Attorneys:** Kevin Rapp, Andrew Stone, Reginald Jones, John Kucera and Margaret Perlmeter

**Defendant-1: Michael Lacey**

**Attorneys for Defendant:** Paul Cambria and Robert Corn-Revere, retained
**Defendant:** ☒ Present ☐ Not Present ☒ Released ☐ Custody ☐ Summons ☐ Writ

**Defendant-2: James Larkin**

**Attorneys for Defendant:** Thomas Bienert, Jr. and Robert Corn-Revere, retained
**Defendant:** ☒ Present ☐ Not Present ☒ Released ☐ Custody ☐ Summons ☐ Writ

**Defendant-3: Scott Spear**

**Attorney for Defendant:** Bruce Feder, retained
**Defendant:** ☒ Present ☐ Not Present ☒ Released ☐ Custody ☐ Summons ☐ Writ

**Defendant-4: John Brunst**

**Attorneys for Defendant:** Michael Kimerer and Gopi Panchapakesan, retained
**Defendant:** ☒ Present ☐ Not Present ☒ Released ☐ Custody ☐ Summons ☐ Writ

**Defendant-6: Andrew Padilla**

**Attorney for Defendant:** Michael Piccarreta, retained
**Defendant:** ☐ Present ☒ Not Present ☒ Released ☐ Custody ☐ Summons ☐ Writ

EXHIBIT D

USA v. Lacey et al                                            **Date:** January 25, 2019

**Case Number: CR-18-00422-PHX-SPL**                         Page 2 of 2

**Defendant-7:  Joye Vaught**

**Attorney for Defendant:** Stephen Weiss, retained

**Defendant:**  ☐ Present  ☒ Not Present  ☒ Released  ☐ Custody ☐ Summons ☐ Writ

**STATUS HEARING:**

Argument is presented regarding the Defendants' Joint Status Report, (Doc. 443), the United States' Memorandum (Doc. 444) and the United States' Response to Defendants' Joint Status Report (Doc. 446).

Recess taken.

Further argument is presented.  The Court treats the Defendants' Joint Status Report (Doc. 443) as a motion/request to stay the defendants' obligations.  For the reasons stated on the record, the defendants' motion is denied.  Counsel for the government and for the defense are directed to continue to meet the deadlines set forth in the Court's Scheduling Order (Doc. 131).

Court Reporter Elva Cruz-Lauer                    Start:  9:35 AM
Deputy Clerk Lisa Richter                         Stop:  11:29 AM

                                                  Total court time: 1 hour, 34 minutes

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JAN 23 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re:  ANY AND ALL FUNDS HELD IN REPUBLIC BANK OF ARIZONA ACCOUNTS XXXX1889, XXXX2592, XXXX1938, XXXX2912, AND XXXX2500, _____ UNITED STATES OF AMERICA,           Plaintiff-Appellee,  v. JAMES LARKIN, Real Party in Interest Defendant; et al.,           Movants-Appellants. | No.    18-56455  D.C. No. 2:18-cv-06742-RGK-PJW Central District of California, Los Angeles  ORDER |

Before:  THOMAS, Circuit Judge, GOULD and PAEZ, Circuit Judges.

The motion for leave to file a reply (Docket Entry No. 11) is granted.  The reply at Docket Entry No. 11 has been filed.

The court has received and reviewed the parties' responses to this court's October 31, 2018 order to show cause.  The order to show cause is discharged.

In addition to all other issues the parties wish to raise in their briefs, the parties shall address the basis of this court's jurisdiction.  The parties may not incorporate by reference their arguments regarding jurisdiction set forth in their prior filings to this court.

EXHIBIT E

Accordingly, the Clerk shall strike the opening brief submitted on December 28, 2018 (Docket Entry No. 20), in which appellants seek to incorporate by reference appellants' arguments regarding the basis for this court's jurisdiction set forth in Docket Entry No. 9.  Appellants need not re-submit the excerpts of record submitted on December 28, 2018.

Appellants' request to expedite, set forth in Docket Entry No. 26, is granted in part.

Appellants' opening brief is due February 6, 2019; the answering brief is due March 8, 2019; and the optional reply brief is due within 21 days after service of the answering brief.  The Clerk shall calendar this case for the first available calendar upon completion of briefing.

Appellants' motion for judicial notice (Docket Entry No. 23) and motions to seal (Docket Entry Nos. 22 and 24) will be addressed in a separate order.

18-56455
EXHIBIT E

**PROOF OF SERVICE BY E-MAILING**

I am over the age of 18 and not a party to the within action.  I am employed by the Office of the United States Attorney, Central District of California.  My business address is 312 North Spring Street, 14th Floor, Los Angeles, CA 90012.

On **January 31, 2019**, I served a copy of: **NOTICE OF MATERIAL DEVELOPMENT** upon each person or entity named below by attaching a copy to an e-mail provided by the receiving person or entity per request of the receiving person or entity.

**TO:**   tbienert@bmkattorneys.com; pcambria@lglaw.com; emccampbell@lglaw.com; glincenberg@birdmarella.com; aneuman@birdmarella.com; jimgrant@dwt.com; mlp@pd-law.com; sweiss@karpweiss.com; gpanchapakesan@birdmarella.com; fl@federlawpa.com; wbernstein@bmkattorneys.com; tbienert@bmkattorneys.com; tthomas@bmkattorneys.com; quigley@djqplc.com; and EPeters@keker.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on: **January 31, 2019** at Los Angeles, California.

_____/s/ **K. Sor**_____
KRYSTIE SOR